Frank J. Coughlin, SBN 164851
Steven E. Bolanos, SBN 303047
**RUZICKA, WALLACE & COUGHLIN, LLP**
4097 Trail Creek Rd., Suite 103
Riverside, CA 92505
(951) 324-1119
frank.coughlin@rwclegal.com
steve.bolanos@rwclegal.com

Attorneys for Defendants
Altaf Hudani and Jasmine Hudani

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTHFIELD INSURANCE COMPANY, an Iowa Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ALTAF HUDANI; JASMINE HUDANI; and DOES 1 through 10, Inclusive,<br><br>Defendants. | CASE NO.: 2:20-CV-01695<br><br>Assigned for all purposes to:<br>Hon. John A. Kronstadt, Judge<br>Dept.: 10B<br><br>CLASS ACTION<br><br>**FIRST AMENDED COUNTERCLAIM TO PLAINTIFFS' COMPLAINT FOR DECLATORY JUDGMENT [8 U.S.C. 2201(a)] BY DEFENDANT ALTAF HUDANI** |
| ALTAF HUDANI,<br><br>Counterclaimants,<br><br>v.<br><br>NORTHFIELD INSURANCE COMPANY, an Iowa Corporation, and DOES 1 through 10, Inclusive,<br><br>Counter-Defendants. | Complaint Filed: 08/28/2019<br><br>Trial Date: None Set |

- 1 -

Defendant Altaf Hudani ("Counterclaimant" or "Hudani") brings this amended Counterclaim (hereinafter, "Counterclaim") against Plaintiff and Counter-Defendant Northfield Insurance Company ("Counter-Defendant" or "Northfield"). The Counterclaim is brought by Counterclaimant on behalf of himself and for those similarly situated (sometimes referred to herein as "those similarly situated" or "the Class"), as alleged more fully herein.

## JURISDICTION

1. This Court has subject matter jurisdiction based upon 28 U.S.C. § 1332 because there is complete diversity of citizenship between Counterclaimant and Counter-Defendants, and because the amount in controversy exceeds the sum of $75,000. This Court also has subject matter jurisdiction over Counterclaimant's claims for violations of common law, including breach of contract and insurance bad faith, because those claims are so related to Counter-Defendant's claims that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3. Defendant-Counterclaimant Altaf Hudani is an individual who, at all times relevant to this Complaint, resided in Los Angeles County, and is an owner of the property that is the subject of the underlying action, located at 228 Atlantic Avenue, Long Beach, CA 90802 ("Subject Property"). Altaf Hudani was insured under a liability insurance policy issued by Northfield and was named as a defendant in the underlying action that is subject of the instant declaratory judgment action.

4. Northfield Insurance Company, at all material times herein alleged, is an insurance company organized under the laws of the State of

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

Iowa, having its principal place of business in the state of Connecticut, and conducts business in the State of California.

5.      The names and capacities, whether individual, corporate or otherwise of Counter-Defendants Does 1 through 10, inclusive, are unknown to Counterclaimant, which thereupon sues such "DOE" Counter-Defendants by fictitious names. Counterclaimant will seek leave of Court to amend this Counterclaim to show the true names and capacities of such Counter-Defendants when the same have been ascertained.

6.      Counterclaimant is informed and believes and thereon alleges that at all material times herein, Counter-Defendants, and each of them, were the agents, servants, and employees, and affiliates of the other, and each of them.

## **GENERAL ALLEGATIONS**

7.      On or around September 1, 2018, Counterclaimant purchased a policy of general liability insurance (No. WS355533) from Northfield. ("Northfield-Hudani Policy"). The Northfield-Hudani Policy had effective dates of coverage of September 1, 2018 to September 1, 2019, and covered property located at 226 Atlantic Avenue, Long Beach, CA 90802 ("Subject Property"). A true and correct copy of the Northfield-Hudani Policy is attached as Exhibit "A" to this Counterclaim and incorporated herein by reference as though fully set forth at length.

8.      Counterclaimant is informed and believes and thereon alleges that the Northfield-Hudani Policy was delivered to Plaintiff in the State of California and that all premiums for the policy were paid in California.

9.      Counterclaimant Altaf Hudani is the named insured under the Northfield-Hudani Policy for liabilities covered by the policy, including bodily injury and property damage liability, personal and advertising injury liability, among others.

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

10.     The Northfield-Hudani Policy provides, *inter alia*, the following:

a) Coverage of personal and advertising injury:

    a. "We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies."

    b. The definition of personal and advertising injury includes:

        i. "The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;"

11.     On or about June 6, 2019, Ryan Nash and Patrick Nash, sent Counterclaimant a settlement communication that made several allegations related to the underlying plaintiffs' former tenancy at the Subject Property. The settlement communication included a draft complaint, which alleged, *inter alia*, that Counterclaimant attempted to "unlawfully recover possession of the property" and served "bogus Three-Day Notices" upon underlying plaintiffs, among other allegations (the "Nash Action").

12.     After receiving said settlement communication, Counterclaimant tendered a demand to the Northfield.  Northfield subsequently acknowledged the receipt of the tender of the defense.

13.     On August 28, 2019, the underlying Plaintiffs in the Nash Action filed a Complaint against Counterclaimant Hudani and his daughter in the Superior Court of California, County of Los Angeles, alleging *inter alia,* that Hudani attempted to "unlawfully recover possession of the property; served "bogus Three-Day Notices;" and "entered [tenants'] home without permission." The original Complaint in the Nash Action is attached as "Exhibit B" and incorporated herein by reference.  Claimants' settlement

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

communication on June 6, 2019 is attached as "Exhibit C." The underlying plaintiffs subsequently filed an amended complaint on or around November 20, 2019. The Nashes' First Amended Complaint is attached as "Exhibit D."

14. On July 19, 2019, before the Nash Action was filed, Northfield denied the tender of the defense.

15. Counterclaimant is informed and believes and thereon alleges that Northfield failed and refused to:

   a. Conduct a prompt, full and complete investigation of the claims in addition to those matters which were alleged in the pleadings filed in the Nash Action;

   b. Defend their insureds from the claims asserted in the Nash Action;

   c. Indemnify their insureds from the claims asserted in the Nash Action;

   d. Conduct any investigation after they rejected the tender of defenses;

   e. Promptly respond to communications with respect to Plaintiff's claim for coverage;

16. Had Northfield conducted a reasonable investigation of the claim, or read the allegations of the Nash Action—which were available to the defendants at or about the time of the tender—Northfield would have learned that there was a potential for liability under "personal and advertising injury" coverage among others in the Northfield-Hudani Policy because the Nash Action claimed injuries arising from wrongful eviction and wrongful entry, among other causes of action.

17. However, not only did Northfield fail to conduct any reasonable investigation into the potential for coverage, but raised several strawman and bad faith arguments for denying Counterclaimant coverage

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

under his Policy. For example, Northfield argued that coverage for personal and advertising injury is unavailable insofar as the Nash Action alleges a "knowing violation of rights of another." Counterclaimant denies the allegations of the Nash Action; and, it is well-settled law that an unresolved factual dispute does not absolve an insurer of its duty to defend. As another example of bad faith, Northfield argued that the property address listed in the Nash Action was 228 Atlantic Avenue, whereas the Northfield-Hudani Policy lists 226 Atlantic Avenue. However, if Northfield performed even a modicum of due diligence, it would have learned that 226 is the legal address of the property, and 228 reflects a mailing address. Northfield's complaint for declaratory judgment, filed on February 21, 2020, does not cite to the correct operative complaint in the Nash Action, filed on or around November 21, 2020.  Further, Northfield waited until the Nash-Action had settled to file the instant action for declaratory judgement.

18.     On information and belief, Northfield is engaged in a systematic unlawful, unfair, and fraudulent business practice of denying its insureds coverage based on inapplicable and/or ambiguous policy exclusions. *See, e.g.,* Conway v. Northfield Ins. Co., 399 F. Supp. 3d 950, 964 (N.D. Cal. 2019) (holding that Northfield has a duty to defend insured in underlying action involving potential claims for constructive eviction, notwithstanding habitability exclusions).  Specifically, Northfield knows that an underlying action which involves potentially covered claims may trigger a duty to defend, but nevertheless has consistently and in bad faith sought to avoid its duty to defend and its duty to indemnify, in this instant action and, on information and belief, and in actions involving those similarly situated.

19.     Counterclaimant has performed all of the obligations under the Northfield-Nash Policy, except for those obligations which because of

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

the breach by Northfield of its obligations, Counterclaimant is excused or prevented from performing.

20.    Counterclaimant has been obliged to pay attorney's fees and costs to defend himself against the Nash Action, and was compelled to enter a settlement agreement and pay for a settlement out of pocket in order to resolve the Nash Action and avoid incurring further fees and expenses.

## NORTHFIELD BUSINESS PATTERN AND PRACTICE

21.    In purchasing the Policy, Hudani believed that he had purchased a commercial liability policy from Northfield that would cover personal injury and property damage claims that arose under the Policy coverage language.  He did not know and was not informed by Northfield that it inserted language that Northfield claims nullifies Northfield's duty to defend Hudani from lawsuits that involve both covered and potentially-covered claims as well as habitability claims.  (See Exhibit A, "Exclusion – Habitability Claims".)  Hudani and those similarly situated reasonably believed that they would not lose all coverage under the policy for covered claims just because a habitability claim was also alleged.  Had Northfield informed Hudani that the catchall habitability exclusion was intended by Northfield to negate coverage as described above, Hudani would not have purchased the Policy.

22.    For hundreds if not thousands of persons in California, Northfield has done and is doing the exact same thing.  Specifically, Northfield has sold, and continues to sell, thousands of these "standard form" adhesion commercial liability policies using so-called catchall language in the habitability exclusion buried deep within the policy as a tool and a pretext to deny coverage to its insureds who tender otherwise covered and potentially-covered claims.  As with the Policy sold to Hudani, the purported catchall habitability exclusion is ambiguous, unusual, and

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

extremely unfair.  While it knows this, Northfield purposefully buries the purported exclusion language deep within the policy, in a manner, in a location and in a font that is not only <u>not</u> conspicuous but is decidedly <u>in</u>conspicuous.

23.    Because the purported catchall language is not conspicuously placed within the Policy, it is unenforceable, and it did not relieve Northfield of its duties to investigate coverage, to defend all claims (even if some were not covered) as required by pertinent California authority, and to indemnify Hudani for claims that were in fact covered.

24.    Further, in the "Schedule of Forms and Endorsements" at the very front of the policy, some exclusions are listed with qualifiers like "Broad Form" or "Absolute" (e.g., "Exclusion - Cannabis or Marijuana - Absolute," "Exclusion - Cross Liability - Broad Form," "Exclusion – Liquor – Absolute.")  The habitability exclusion that contains the offending language is innocuously entitled: "Exclusion – Habitability of Premises."   The same title appears at the top of the exclusion itself buried on page 64 of the Policy.  Northfield uses that title to suggest that only claims for habitability are subject to the exclusion; the title does not suggest that buried within the exclusion there is small-font, inconspicuous language that would negate coverage and the duty to defend otherwise covered claims. In fact, the title of the exclusion itself is likely to mislead class members because it implies that the policy only excludes habitability claims; it does not suggest that it will nullify coverage under the Policy for otherwise covered claims.  Northfield could have, should have, but purposefully chose not to modify the title of the exclusion to reveal its undisclosed intention that the catchall exclusion would operate to negate all coverage of otherwise covered claims, as further described above.  Further, Northfield could have, should have, but purposefully chose not to make the catchall provision more

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

conspicuous, plain and clear, which it could have easily done in other ways (e.g., by changing the size, style, font, font size and location of the catchall language, and/or by adding words in the exclusion like "This insurance does not apply to" into the exclusion itself).

25.     Further, even if the purported catchall language was conspicuously placed, it is neither plain nor clear.  This is demonstrated by the language in other exclusion clauses within the policy.  For example, absent from the Habitability Exclusion are words like "coverage" or "This insurance does not apply to."  Compare the "Communicable Disease Exclusion," which stands alone, is complete in itself, and does not require the insured to refer to or incorporate different provisions located in different sections of the policy.  That exclusion states:

> The following exclusion is added to Paragraph 2.  Exclusions of Section I - Coverage A - Bodily Injury and Property Damage liability:
>
> Exclusions
>
> This insurance does not apply to:

(Emphasis added.)

Including such language (and other language that would have highlighted the catchall language) into the habitability exclusion was even more critical and necessary because, as noted, Northfield takes the position that the allegation of a single habitability claim negates coverage and the potential for coverage (and the insured's corresponding duties) for otherwise covered claims.

26.     In California, for nearly thirty years, insurers have had a legal duty to defend mixed actions in their entirety.   That is the established principle and that it was the ordinary insured reasonably expects.  This duty

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

1   is not rooted in the contract per se, but is imposed by law in support of

2   public policy.  To be meaningful, the insurer must defend immediately; to do

3   that, it must defend entirely.  In a fraudulent effort to avoid this duty and to

4   flout this established public policy, Northfield created a purported catchall

5   exclusion and buried the catchall language in its standard policy form, and,

6   as explained above, sought (and still seeks) to hide it from customers, until

7   after premiums had been paid, when it was too late for those customers to do

8   the most cost effective thing to protect themselves—Find an insurance

9   carrier who doesn't engage in these practices.

10          27.    Finally, Northfield's business practice conflates office and

11  residential operations, and uses the catchall language in the habitability

12  exclusion as a basis to deny coverage, the duty to defend and the duty to

13  indemnify when claims occur in the commercial/office context, where

14  habitability claims have no application. <u>Conway v. Northfield Ins. Co.</u>, 399

15  F. Supp. 3d 950, 964 (N.D. Cal. 2019).

16                    **CLASS ACTION ALLEGATIONS**

17          28.    Pursuant to Fed. R. Civ. P. 23(b)(1), 23(b)(2), and 23(b)(3),

18  Counterclaimant brings this action on behalf of himself and the following

19  class and subclasses.

20          **Definition of Subclasses**

21          29.    <u>Subclass A</u>: All California residents who purchased a

22  commercial liability policy from Northfield within the statutory period that

23  contains the exclusion called "Exclusion - Habitability of Premises" as found

24  in the Northfield-Hudani Policy ("habitability exclusion"), but a) who did

25  not tender a claim during the policy period or b) who did tender a claim

26  during the policy period but whose claim was not denied based on the

27  catchall language in the habitability exclusion.

28

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

30.     Subclass B: All California residents who purchased a commercial liability policy from Northfield within the statutory period that contains the habitability exclusion, and who tendered a claim during the policy period but whose claim was denied based on the catchall language in the habitability exclusion.

31.     Each member of each Subclass can be readily ascertained from Northfield's own records.

32.     As a matter of pleading convenience, sometimes the two Subclasses are referred to herein as "the Class."

**Allegations Concerning Fed. R. Civ. P. 23(a)**

33.     This case meets the requirements of Fed. R. Civ. P. 23(a), specifically:

34.     "Numerosity": The class and subclasses are so numerous that joinder of all members individually is "impracticable" (Fed. R. Civ. P. 23(a)(1).   There are over 40 class members, and Hudani believes that there are thousands.

35.     "Commonality": This case presents questions of law or fact common to the class, Fed. R. Civ. P. 23(a)(2).

36.     "Typicality": The claims or defenses of the class representative are typical of the claims or defenses of the class, Fed. R. Civ. P. 23(a)(3). Hudani is typical because he was subject to the same standardized insurance form, was subject to the standardized claims handling policies and practice of Northfield, was subject to a denial of coverage, a denial of the duty to defend and denial of the duty to indemnify based on the standardized catchall language in the habitability clause, and suffered the same injury of those similarly situated.

37.     "Adequacy of representation": The person representing the class is able to fairly and adequately protect the interests of all members of

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

the class Fed. R. Civ. P. 23(a)(4). Class counsel has been practicing since 1993 and has been involved in prosecuting and defending class actions since approximately 2002.

### Allegations Concerning Fed. R. Civ. P. Rule 23(b)(1)(A)

38. For members of both subclasses, there is a risk of prejudice from separate actions establishing incompatible standards of conduct. While the vast majority of class members do not have the financial resources to litigate against Northfield (a division of the Travelers Insurance Companies conglomerate), it is highly probable that other class members will at some point seek injunctive relief against Northfield based on the same or similar allegations contained in this lawsuit. This creates the high risk that Northfield will be subject to incompatible standards through inconsistent adjudications.

### Allegations Concerning Fed. R. Civ. P. 23(b)(1)(B)

39. For members of both subclasses, judgments in individual lawsuits would adversely affect the rights of other members of the class. Specifically, because of Northfield's use of standardized policy language, standardized claims procedures, and the widespread use of both with class members; and because the parties to this case contemplate an appeal to the Ninth Circuit, as a practical matter, the adjudication in this case will in effect be dispositive of all remaining suits and/or potential suits.

### Allegations Concerning Fed. R. Civ. P. Rule 23(b)(2)

40. For members of Subclass A, the party opposing the class has acted (or refused to act) in a manner applicable to the class generally, thereby making injunctive or declaratory relief appropriate with respect to the class as a whole. Again, because of Northfield's use of standardized policy language, standardized claims procedures, and the widespread use of both with class members, Hudani and those similarly situated will seek

1  injunctive relief that will apply to all class members equally.  As to these

2  class members, class membership, liability and claims for relief are the

3  same.  Specifically, with respect to Subclass A, Northfield should be subject

4  to an injunction that requires it to notify all class members that the catchall

5  language in the habitability exclusion is not enforceable, and that Northfield

6  will not seek to enforce it.

7  **<ins>Allegations Concerning Fed. R. Civ. P. Rule 23(b)(3)</ins>**

8      41.    For members of Subclass B, the questions of law or fact

9  common to the class "predominate" over questions affecting the individual

10 members and, on balance, a class action is superior to other methods

11 available for adjudicating the controversy.  Again, because of Northfield's

12 use of standardized policy language, standardized claims procedures, and the

13 widespread use of both with class members, the questions of law and fact

14 common to Hudani and those similarly situated predominate over questions

15 affecting the individual members.  For the foregoing reasons, the liability

16 analysis will be the same for all class members.  Further, damage and

17 restitution computations can be readily managed: Differences in the amount

18 of damages or restitution can be determined by reference to Northfield's

19 records (e.g., for purposes of determining the amount of premium paid by

20 each class member), and, as relevant, from records from class members

21 establishing how much they paid in defense costs and how much they paid in

22 settlements or judgments, for claims that Northfield was required to defend,

23 required to indemnify, or both.

24      42.    This case presents common issues of fact as follows:

25          a.   In the statutory period, Northfield's commercial liability

26 policy is and remains an adhesion contract; it is presented to its customers on

27 a take it or leave it basis; it is presented on a form containing standard

28 language; it is presented with a standard "Schedule of Forms and

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

Endorsements"; it contains the same so-called catch-all habitability exclusion language that is presented in the same manner, in the same location and in the same font within in the policy; it does not conspicuously call out the catchall language in the habitability exclusion in other places in the policy or in its marketing materials.

b.   Furthermore, Northfield maintains common policies and practices in its claims handling practices and procedures; that is, Northfield denies claims, the duty to defend and the duty to indemnify when insureds tender claims that include both covered claims and habitability claims.

c.   Hudani, and members of Subclass A paid a premium for a policy that contained the catchall language in the habitability exclusion; that did not have coverage that these class members would reasonably expected to be provided in the policy.

d.   Hudani and members of Subclass B tendered a claim to Northfield and were denied coverage, denied the duty to defend and denied the duty to indemnify otherwise covered claims, forcing members of this subclass to pay attorney's fees and/or payments for settlements or judgments that Northfield was obligated to pay.

43.   This case also presents the common legal issues, as follows:

a.   For members of both subclasses, whether the habitability exclusion is void, invalid or unenforceable a) because the catchall language in the habitability exclusion violates California law, including California public policy; b) because the catchall language in the habitability exclusion was not conspicuous, plain and clear; and, c) because Northfield's business practices, including its intentional use of ambiguous catchall language buried in the policy to deny its insured their rights to a defense and right to indemnity violates California's prohibition against unlawful, unfair, and fraudulent business practices.

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

b.  For Subclass A, whether Northfield' conduct harmed members of any of the Subclasses, entitling them to equitable relief, including injunction and restitution, involves legal issues common to all class members.

c.  For Subclass B: Whether persons in Subclass B are entitled to damages, restitution, punitive damages, or equitable relief including injunction.

44.  "Superiority":  Certifying this case as a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  In this case, class members have a low interest in individually controlling the prosecution or defense of separate actions.  While Northfield's practice was raised in one other case in this state, Hudani is not aware of other litigation concerning the controversy already begun by class members.  This shows that class members are not aware of Northfield's unfair practices, or don't have the financial wherewithal to challenge Northfield about the practice.  Further, concentrating the litigation of the claims in the particular forum is desirable because it will promote judicial economy and outcome consistency.  This case can be readily and efficiently managed as a class action:  The common questions of fact and law predominate, apply to the entire class, and are outcome-determinative.  To the extent that there are differences between class members, they have been addressed by pleading subclasses.  Thus, class certification will achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

## No Adequate Remedy at Law

45.  The conduct described herein, specifically Northfield's use of the same standardized insurance form, the standardized claims handling

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

policies and practice of Northfield, as more specifically described above, has occurred for years, continues to occur, and will continue to occur. In fact, Northfield will continue these practices in the future unless a Court enters an order enjoining said practices. There is little incentive or ability for class members to challenge Northfield, for the relatively small amount of premiums, for lack of attorney's fees clause in the policy and for lack of financial ability to challenge Northfield. Thus, there is no adequate remedy at law, and without equitable relief, including restitution, declaratory and injunctive relief, class members will receive no relief for the harm they have suffered and Northfield will continue its unlawful practices against its existing and future customers.

## FIRST COUNTERCLAIM FOR RELIEF

### [Breach of Contract]

### (Hudani and Subclass B Against Defendant Northfield Insurance Company and Does 1-10)

46.     Counterclaimant and Subclass B hereby incorporate by reference each and every allegation contained in the prior paragraph as though fully set forth herein.

47.     Northfield breached the Northfield-Hudani Policy, and further the policies of Subclass B, in the following manner: Relying on the invalid catchall language in the habitability exclusions, Northfield failed to conduct a full and complete investigation into the facts and circumstances of claims tendered to Northfield; failed and refused to defend Hudani and the Class from the claims tendered under Northfield-Hudani Policies and the policies of the Class; and failed and refused to indemnify Hudani and members of the Class from claims asserted in actions asserted against them; and by doing the acts and omissions alleged herein.

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

48.    As a result of the failure and refusal of Northfield to conduct an investigation and/or to defend Hudani and the Class, Northfield is estopped from relying upon any subsequently discovered information to support its denials of coverage; it also waived any obligation on the part of Hudani or members of Subclass B to cooperate with the Northfield and each of them in defense of the Hudani Action or actions that pertained to these class members.

49.    As a direct and proximate result of the breach by Northfield of their obligations under the relevant policies, Hudani and Subclass B have been damaged as follows: They have been required to retain attorneys to defend themselves from the claims that were covered under their respective policies, they faced settlement demands and paid for the settlement of claims (as Hudani did in the Nash Action), or in some cases they paid for judgments, according to proof at trial.

50.    Hudani and the Class believe that the denial of benefits was vexatious and without reasonable cause, and therefore under Insurance Code section 1619, they are entitled to reasonable attorney fees incurred in prosecuting this suit in an amount to be proved at time of trial.

## SECOND COUNTERCLAIM FOR RELIEF

### Breach of the Covenant of Good Faith and Fair Dealing

### (Hudani and Subclass B Against Defendant Northfield Insurance Company and Does 1-10)

51.    Counterclaimant and Subclass B hereby incorporate by reference each and every allegation contained in the prior paragraphs as though fully set forth herein.

52.    Northfield breached the implied covenant of good faith and fair dealing in the following respects: Northfield unreasonably and without proper cause failed and refused to conduct an investigation into the facts

which gave rise to the claims asserted in the Nash Action and actions that pertain to Subclass B; it unreasonably and narrowly made the catchall language inconspicuous and then interpreted policy language in a manner calculated to deny benefits due to Hudani and Subclass B; it unreasonably refused to defend Hudani or members of Subclass B, to pay for their defense of, or agree to indemnify them against covered claims, relying instead on invalid and unenforceable policy language. Instead, Northfield raised bad faith reasons for denying coverage as described herein.

53.    Northfield denied Hudani and Sublcass B policy benefits, and ignored their obligations under the policy and under law, without justification. Northfield knew that a duty to defend was owed to Hudani and to members of Subclass B, yet refused to provide such a defense. As a direct and proximate result of the unreasonable conduct of the Counter-Defendant, Hudani and Subclass B have been required to retain attorneys to obtain benefits due to them under their policies, and incurred additional damages related to the payment of settlements or judgments in the underlying actions.

54.    As a direct result of the tortious conduct of the Counter-Defendant, Counterclaimant and those similarly situated were damaged and harmed and are entitled to recover reasonable attorney fees incurred in obtaining policy benefits in an amount to be proven at time of trial, and other amounts that they paid (including defense costs, settlements  and/or judgments) because of the actions of Northfield.

55.    Northfield intentionally and with malice engaged in a course of conduct which was intended to defraud and oppress the Counterclaimant and those similarly situated, and to dissuade him/them from seeking policy benefits by raising bad faith arguments for denying coverage.

56.    The refusal of Northfield to carry out its obligations under the insurance policy to investigate, defend, indemnify and to promptly

communicate their coverage position to their insureds, and the acts of their agents were all done with a conscious disregard of the rights of Hudani and those similarly situated to receive the benefits due to them under their respective policies. These acts were done with the knowledge and approval and ratification of the Counter-Defendants and each of them. These acts continued even after Counterclaimant protested to Northfield and Northfield was held to have a duty to defend in at least one other similar case. Counterclaimant and those similarly situated were powerless to obtain from Northfield compliance with its obligation. Counterclaimant and those similarly situated are therefore entitled to recover punitive damages.

## THIRD COUNTERCLAIM FOR RELIEF

### Violation of Unfair Competition Law

### (Hudani and both Subclasses Against Defendant Northfield Insurance Company and Does 110)

57.    Counterclaimant and both subclasses hereby incorporate by reference all of the preceding paragraphs as though fully set forth herein.

58.    California Business and Professions Code section 17200, et seq. (the "UCL") prohibits any unfair, fraudulent, or unlawful business act or practice. Counter-Defendant's acts, omissions, misrepresentations, and practices as alleged herein constitute an "unfair" business act and practice because it is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous.  Northfield's conduct violates each prong of California's unfair competition law: its business practices, as described above, were and continue to be unfair, unlawful, and fraudulent business practices in violation of Bus. & Prof. Code § 17200.

59.    Here, Counter-Defendant's conduct in denying Counterclaimant, and those similarly situated, rightful coverage based on an inapplicable, unenforceable and ambiguous policy exclusion, and other

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

conduct alleged herein, constitutes an unlawful and unfair business practice within the meaning of the UCL.  Further, all members in Subclass A and Subclass B obtained a standardized policy, in substantially the same form, with the identical catchall exclusion language buried in the habitability exclusion, language that was not conspicuous, plain, or clear.  Under the objective standard applicable to UCL, Northfield's practices were also "likely to deceive."  Therefore, under this prong of the UCL, Northfield's actions were also fraudulent.  Northfield's conduct harmed each class member, and entitle each class member to equitable relief, including injunctive relief and restitution.

60.     Counter-Defendant's conduct has injured Counterclaimant and others similarly situated.  Northfield has deprived them of lawful coverage, deceived members of the public, including Counterclaimant, and has denied them of their right to a defense and their right to indemnity.

61.     Hudani and those similarly situated have no adequate remedy at law.

62.     Counterclaimant and those similarly situated are therefore entitled to judgment and equitable relief against Defendant, including restitution and injunctive relief, as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

THEREFORE, Counterclaimant and members of the Class and the Class pray for judgment against Northfield as follows:

1.     For an Order that this action may proceed as a class action as described above, including orders certifying the subclasses as described above, or, as the Court deems necessary, defining or making other subclasses as appropriate to this case;

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

2.    For a declaration that Northfield's practices are unlawful, unfair, and fraudulent, and for a declaration that the catchall language in the habitability exclusion in the policy is unenforceable;

3.    For an injunction preventing Northfield from continuing to engage in these practices;

4.    For Counterclaimant and Subclass A, that the Court enjoin Counter-Defendant as follows: To provide notice to all class members that the catchall language in the habitability exclusion has been declared unenforceable and that Northfield will not enforce it, and, as a subsidiary matter, that the Court orders Northfield to restore some portion of premiums paid by this subclass, based on the principles of equity;

5.    For Counterclaimant and Subclass B, for damages according to proof for breach of contract and for bad faith, including costs of defense incurred by Counterclaimant and Subclass B in defense of the underlying claims, and for the amounts paid in settlement of or judgments related to those claims, according to proof at trial;

6.    For an award of attorney fees as authorized by law, including Fed. R. Civ. P. 23(h), and based on creating a "common fund" upon a class of individuals not participating in the litigation and/or conferring a "substantial benefit" upon them. Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). In addition, and applicable, for attorney fees incurred in bringing this action pursuant to California Insurance Code § 1619;

7.    For prejudgment interest in an amount to be proven at time of trial;

8.    For Subclass B, punitive damages in an amount sufficient to deter and make an example of Counter-Defendant;

9.    For costs of suit incurred herein; and,

FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

1      10.    That the Court award such other and further relief, based on the

2   allegations above, including potential disgorgement, based on the facts that

3   are presented in this case, based on principles of law and equity at issue in

4   this matter, and not limited by the title of any claim for relief herein, nor

5   limited by the other prayer requests within this section, all as the Court, in its

6   discretion, deems just and proper.

7

8   DATED: August 24, 2020          **RUZICKA, WALLACE & COUGHLIN,**

9                                    **LLP**

10                                   By: /s/Steven E. Bolanos

11                                   Frank J. Coughlin
                                     Steven E. Bolanos

12                                   Attorneys for Defendants
                                     Altaf Hudani and Jasmine Hudani

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 22 -
FIRST AMENDED COUNTERCLAIM BY DEFENDANT ALTAF HUDANI

Exhibit A



**Northfield Insurance Company**

385 Washington Street, St. Paul, MN 55102

1-800-237-9334    Claims: 1-800-328-5972

# COMMERCIAL INSURANCE POLICY

**Your Policy Number:**  WS355533

This policy consists of this policy cover, the Declarations and the forms, schedules and endorsements listed.  READ YOUR POLICY CAREFULLY.

In return for the payment of the premium, the insuring company agrees with the Named Insured to provide the insurance afforded by this policy.  That insurance will be provided by the company indicated as insuring company in the Declarations.

**In Witness Whereof,** we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative for us.

Secretary                            President

S1-IL (9/05)

## NOTICES

| |
|---|
| IMPORTANT:  THIS POLICY IS NOT SUBJECT TO FLAT CANCELLATION. |

| |
|---|
| THIS POLICY IS SUBJECT TO AUDIT. EXPOSURES GREATER THAN THOSE ESTIMATED ON THIS POLICY WILL RESULT IN ADDITIONAL PREMIUM WHICH WILL BE DUE AND PAYABLE UPON RECEIPT OF BILLING. |

# NOTICE

1. **THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

2. **THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

3. **THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

4. **THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER.  YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357.  ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER.  YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.**

5. **FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

6. **FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS.  ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

7. **CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.**

8. **IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

**D-2 (Effective January 1, 2017)**

## IMPORTANT NOTICE REGARDING COMPENSATION DISCLOSURE

For information about how Northfield compensates its agents, brokers and program managers, please visit this
website:

> http://www.northlandins.com/Producer_Compensation_Disclosure.asp

If you prefer, you can call the following toll-free number: 1-866-904-8348.  Or you can write to us at Northfield
Insurance Company, c/o Law Department, 385 Washington St., St. Paul, MN 55102.

N-3384 (7/08)

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc. 1998

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

  **A.** Under any Liability Coverage, to "bodily injury" or "property damage":

  **(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

  **(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

  **B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

  **C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

  **(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

  **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

  **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

  "Hazardous properties" includes radioactive, toxic or explosive properties.

  "Nuclear material" means "source material", "special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   **(a)** Any "nuclear reactor";

   **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**Northfield Insurance Company**
**St. Paul, MN 55102**

**COMMON POLICY**
**DECLARATIONS**

Policy No: WS355533

Agency No: 412000001          Producer No:          Previous Policy No: WS325018

**POLICY PERIOD:**    From  09/01/2018   **To**  09/01/2019          **Term:** 1 Year
at 12:01 A.M. at your mailing address shown below.

**Named Insured:**
Altaf Hudani

**Mailing Address:** 28242 Lobrook

Rancho Palos Verdes                    CA   90275

**BUSINESS DESCRIPTION:** Building

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS  POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

**COVERAGE PART DESCRIPTION**                                          **PREMIUM**

Commercial General Liability Coverage Part ..................    $              795.00 MP
Commercial Property Coverage Part .............................    $              839.00 MP
                                   **PREMIUM TOTAL**    $           1,634.00
                                   Policy Fee    $              175.00
                                   Inspection Fee    $              100.00
                                   Stamping Fee    $                  3.27
                                   Surplus Lines Tax    $                49.02
                                   **POLICY TOTAL**    $           1,961.29

Minimum earned premium of 25% of the policy premium applies in the event of cancellation.
Policy Fee is fully earned at inception and non-refundable in the event of flat cancellation.
Inspection Fee is fully earned at inception and non-refundable in the event of flat cancellation.

**FORMS AND ENDORSEMENTS**

The schedule of coverage declarations, forms and endorsements shown on S1D-ILS make up your policy as of the effective date shown above.

Agency Name/Address:          949-954-5126
Hawkeye Wholesale Insurance Services, Inc.
23403 E. Mission Avenue, Ste 116
Liberty Lake, WA 99019                          ,

Countersigned:          09/07/2018  SH          By          _Nathan Tomlinson_
                                Date                                              Authorized Representative

S1D-IL (9/05)                    Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# SCHEDULE OF FORMS AND ENDORSEMENTS

**Effective Date:** 09/01/2018                                                      **Policy No:** WS355533

**Named Insured:**
Altaf Hudani

**The following schedule of coverage declarations, forms and endorsements make up your policy as of the effective date shown above.**

**COMMON POLICY DECLARATIONS - S1D-IL (9/05)**
The following forms and endorsements apply to coverage parts as stated on the form or endorsement:

| | |
|---|---|
| S1-IL (9/05) | Commercial Insurance Policy |
| N-3384 (7/08) | Important Notice - Producer Compensation |
| IL 00 17 (11/98) | Common Policy Conditions |
| IL 00 21 (09/08) | Nuclear Energy Liability Exclusion Endorsement |
| S1D-IL (9/05) | Common Policy Declarations |
| S1D-ILS (9/05) | Schedule of Forms and Endorsements |
| S1030-IL (7/08) | Service of Suit |
| S2612-IL (6/17) | Amendment - Non-Renewal |
| IL T4 14 (01/15) | Cap on Losses From Certified Acts of Terrorism |
| S2765-IL (1/14) | Amendment - Minimum Earned Premium |
| S2874-IL (6/17) | Exclusion - Animals |
| S2965-IL (3/15) | Amendment of Common Policy Conditions Prohibited Coverage - Unlicensed Insurance and Trade or Economic Sanctions |
| S2976-IL (8/15) | Exclusion Of Loss Due To Virus Or Bacteria |
| IL 09 35 (07/02) | Exclusion of Certain Computer-Related Losses |

**COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS - S2584D-CG (9/05)**
The following forms and endorsements apply to the Commercial General Liability Coverage Part only:

| | |
|---|---|
| S2584D-CG (9/07) | Commercial GL Coverage Part Declarations |
| CG 00 01 (12/07) | General Liability Coverage Form |
| S17-CG (7/09) | Limitation - Classification |
| S21-CG (6/16) | Deductible Liability Insurance |
| S23-CG (1/13) | Exclusion - Assault or Battery |
| S40-CG (2/16) | Exclusion - Abuse or Molestation |
| S42-CG (2/16) | Total Pollution Exclusion with Exceptions for Building Heating, Cooling, Dehumidifying and Personal Hot Water Heating Equipment and Hostile Fire |
| S46-CG (2/16) | Exclusion - Independent Contractors |
| S51-CG (1/16) | Exclusion - Waterslide |
| S94-CG (11/17) | Exclusion - Injury to Employees, Workers Or Contracted Persons |
| S267-CG (6/14) | Combination Endorsement Bodily Injury and Property Damage Liability |
| S2114-CG (4/14) | Exclusion - Exterior Insulation and Finish Systems |

# SCHEDULE OF FORMS AND ENDORSEMENTS

| | |
|---|---|
| S2582-CG (1/13) | Exclusion - Aircraft, Auto or Watercraft |
| S2608-CG (11/16) | Exclusion - Real Estate Development Activities |
| IL T3 68 (01/15) | Federal Terrorism Risk Insurance Act Disclosure |
| S2623-CG (6/14) | Combination Endorsement Personal and Advertising Injury Liability |
| S2953-CG (7/13) | Exclusion - Habitability of Premises |
| S2961-CG (6/14) | Exclusion - Cannabis or Marijuana - Absolute |
| S2996-CG (5/16) | Exclusion - Cross Liability - Broad Form |
| CG 21 32 (05/09) | Communicable Disease Exclusion |
| CG 21 36 (03/05) | Exclusion - New Entities |
| CG 21 39 (10/93) | Contractual Liability Limitation |
| CG 21 44 (04/17) | Limitation of Coverage to Designated Premises, Project or Operation |
| S43-CG (1/14) | Exclusion - Punitive or Exemplary Damages |
| S49-CG (10/04) | Exclusion - Voluntary Labor |
| S56-CG (10/04) | Amendment - Deposit Premium and Minimum Premium |
| S311-CG (3/11) | Exclusion - Professional Services |
| S354-CG (2/14) | Exclusion - Liquor - Absolute |

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS - S9D-CP (9/05)

The following forms and endorsements apply to the Commercial Property Coverage Part only:

| | |
|---|---|
| S9D-CP (9/05) | Commercial Property Coverage Part Declarations |
| CP 00 10 (10/12) | Building and Personal Property Coverage Form |
| CP 00 30 (10/12) | Business Income (and Extra Expense) Coverage Form |
| CP 00 90 (07/88) | Commercial Property Conditions |
| CP 10 30 (09/17) | Causes of Loss - Special Form |
| S69-CP (11/16) | Endorsement - Vacancy Restriction and Fungus Exclusion Changes |
| CP T3 81 (01/15) | Federal Terrorism Risk Insurance Act Disclosure |
| S2649-CP (4/18) | Multiple Deductible Form |
| S2971-CP (9/17) | Protective Safeguards |
| S2983-CP (11/15) | Theft Exclusion |
| CP 02 99 (06/07) | Cancellation Changes |
| CP 12 70 (09/96) | Joint or Disputed Loss Agreement |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## SERVICE OF SUIT

This policy is subject to the following:

In the event of our failure to pay any amount claimed to be due hereunder, we, at the request of the Insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practices of such court.

The service of process in such suit may be made upon our President or his nominee, at 385 Washington Street, St. Paul, MN 55102 and that in any suit instituted against one of them upon this contract, we will abide by the final decision of such court or of any Appellate court in the event of an appeal.

The above named are authorized and directed to accept service of process on our behalf in any such suit and/or upon the request of the Insured (or reinsured) to give a written undertaking to the Insured (or reinsured) that they will enter a general appearance upon our behalf in the event that a suit shall be instituted.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his/her successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designates the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

*Special rule for California.*  For the State of California we authorize CSC - Lawyers Incorporating Services, 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833 to be served and to mail us the papers.

*Special rule for Rhode Island.*  For the State of Rhode Island we authorize Corporate Service Company, 222 Jefferson Boulevard, Suite 200, Warwick, RI 02888 to be served and to mail us the papers.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT - NON-RENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

Paragraph **9., When We Do Not Renew**, of **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**, **SECTION IV - LIQUOR LIABILITY CONDITIONS** and **SECTION IV - PRODUCTS/COMPLETED OPERATIONS LIABILITY CONDITIONS** is deleted.

© 2017 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CYBERFIRST ESSENTIALS LIABILITY COVERAGE PART
CYBERFIRST LIABILITY COVERAGE
DELUXE PROPERTY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY⁺ WITH IDENTITY FRAUD EXPENSE REIMBURSEMENT
    COVERAGE PART
ENVIRONMENTAL HAZARD POLICY
EQUIPMENT BREAKDOWN COVERAGE PART
EXCESS (FOLLOWING FORM) LIABILITY INSURANCE
LAW ENFORCEMENT LIABILITY COVERAGE PART
LIMITED ABOVE GROUND POLLUTION LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDFIRST PRODUCTS/COMPLETED OPERATIONS, ERRORS AND OMISSIONS, AND
    INFORMATION SECURITY LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PUBLIC ENTITY MANAGEMENT LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY - NEW YORK DEPARTMENT OF
    TRANSPORTATION
TRIBAL BUSINESS MANAGEMENT LIABILITY COVERAGE PART
Any other Coverage Part or Coverage Form included in this policy that is subject to the federal Terrorism Risk
    Insurance Act of 2002 as amended

The following is added to this policy. This provision can limit coverage for any loss arising out of a "certified act of terrorism" if such loss is otherwise covered by this policy. This provision does not apply if and to the extent that coverage for the loss is excluded or limited by an exclusion or other coverage limitation for losses arising out of "certified acts of terrorism" in another endorsement to this policy.

If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our insurer deductible under "TRIA", we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of "TRIA", to be an act of terrorism pursuant to "TRIA". The criteria contained in "TRIA" for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to "TRIA"; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"TRIA" means the federal Terrorism Risk Insurance Act of 2002 as amended.

© 2015 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT - MINIMUM EARNED PREMIUM

\*This endorsement is **EFFECTIVE**  09/01/2018          \*and is part of Policy Number:  WS355533

\*issued to: Altaf Hudani

\*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The following is added to the Common Policy Conditions:

**Minimum Earned Premium**

If this insurance is cancelled at your request, we will retain a minimum earned premium in addition to all fully earned premiums and, if applicable, 100% of all fees.  After reduction for all fully earned premiums and applicable fees, we will calculate the minimum earned premium by one of the following three methods, whichever is shown by entry below:

**(1)**   25  % of the remaining premium for this insurance.

**(2)**  $ _____ .

**(3)**  _____ % of the remaining premium for this insurance or $ _____ , whichever is greater.

We will consider cancellation of this insurance for nonpayment of premium to be a request by the first Named Insured for cancellation of this insurance.

The provisions of this amendment apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months.  In that case, the additional period will be deemed part of the last preceding period for purposes of determining the minimum earned premium.

© 2014 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - ANIMALS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL PROFESSIONAL LIABILITY COVERAGE FORM

The following exclusion is added to Paragraph **2., Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** in the **COMMERCIAL GENERAL LIABILITY COVERAGE PART** and Paragraph **B., Exclusions**, of **SECTION I - COVERAGE** in the **COMMERCIAL PROFESSIONAL LIABILITY COVERAGE FORM**:

**Animals**

"Bodily injury" or "property damage" caused by any animal.

© 2017 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF COMMON POLICY CONDITIONS - PROHIBITED COVERAGE - UNLICENSED INSURANCE AND TRADE OR ECONOMIC SANCTIONS

This endorsement modifies insurance provided under the following:

ALL COVERAGES INCLUDED IN THIS POLICY

The following is added to the Common Policy Conditions:

**Prohibited Coverage - Unlicensed Insurance**

1. With respect to loss sustained by any insured, or loss to any property, located in a country or jurisdiction in which we are not licensed to provide this insurance, this insurance does not apply to the extent that insuring such loss would violate the laws or regulations of such country or jurisdiction.

2. We do not assume responsibility for:

   a. The payment of any fine, fee, penalty or other charge that may be imposed on any person or organization in any country or jurisdiction because we are not licensed to provide insurance in such country or jurisdiction; or

   b. The furnishing of certificates or other evidence of insurance in any country or jurisdiction in which we are not licensed to provide insurance.

**Prohibited Coverage - Trade Or Economic Sanctions**

We will provide coverage for any loss, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose us or any of our affiliated or parent companies to:

1. Any trade or economic sanction under any law or regulation of the United States of America; or

2. Any other applicable trade or economic sanction, prohibition or restriction.

© 2015 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART

**A.**  The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense, rental value or action of civil authority.

**B.**  We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

**C.**  With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.**  The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

© 2015 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

S2976-IL (8/15)

IL 09 35 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

   **1.** The failure, malfunction or inadequacy of:

      **a.** Any of the following, whether belonging to any insured or to others;

         **(1)** Computer hardware, including micro-processors;

         **(2)** Computer application software;

         **(3)** Computer operating systems and related software;

         **(4)** Computer networks;

         **(5)** Microprocessors (computer chips) not part of any computer system; or

         **(6)** Any other computerized or electronic equipment or components; or

      **b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

      due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times.  An example is the inability of computer software to recognize the year 2000.

   **2.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

   **1.** In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

   **2.** Under the Commercial Property Coverage Part:

      **a.** In a "Specified Cause of Loss", or in elevator collision resulting from mechanical break-down, under the Causes of Loss - Special Form; or

      **b.** In a Covered Cause of Loss under the Causes Of Loss - Basic Form or the Causes Of Loss - Broad Form;

   we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.

        Copyright, ISO Properties, Inc., 2001

**Northfield Insurance Company**
St. Paul, MN 55102

**COMMERCIAL GENERAL LIABILITY
COVERAGE PART DECLARATIONS**

**Effective Date:** 09/01/2018 12:01 A.M. at your mailing address          **Policy No:** WS355533

**Named Insured:**
Altaf Hudani

---

## LIMITS OF INSURANCE

| | | |
|---|---|---|
| Each Occurrence Limit | $ 1,000,000 | |
| Damage To Premises Rented To You Limit | $ 100,000 | Any One Premises |
| Medical Expense Limit | $ 5,000 | Any One Person |
| Personal and Advertising Injury Limit | $ 1,000,000 | Any One Person or Organization |
| General Aggregate Limit | $ 2,000,000 | |
| Products/Completed Operations Aggregate Limit | $ 1,000,000 | |

## BUSINESS INFORMATION

Form of Business: [X] Individual  [ ] Joint Venture  [ ] Partnership  [ ] Limited Liability Company  [ ] Trust
[ ] Organization, including a Corporation (but not including a partnership, joint venture, trust or limited liability company.)

Loc. #    Address of All Premises (Including Zip Code) That You Own, Rent or Occupy

001    226 Atlantic Ave                    Long Beach                    CA  90802

## PREMIUM

| Loc. # | Classification | Code No. | Premium Base | Rate Pr/CO | Rate All Other | Advance Premium Pr/CO | Advance Premium All Other |
|---|---|---|---|---|---|---|---|
| 001 | Buildings or Premises - bank or office - mercantile or manufacturing - maintained by the insured - (lessor's risk only) - For Profit. - Products-completed operations are subject to General Aggregate Limit. | 61217 | a+ | 1,947 | Included | 193.153 $ | Included | $ 376.00 |
| 001 | Dwellings - two-family (lessor's risk only). - Products-completed operations are subject to General Aggregate Limit. - Each Dwelling | 63011 | t+ | 1 | Included | 418.435 $ | Included | $ 418.00 |

|  |  |  |
|---|---|---|
| Subline Premiums | $ .00 | $ 794.00 |
| Total Advance Premium | $ 795.00 | MP |

---

## FORMS AND ENDORSEMENTS

The schedule of coverage declarations, forms and endorsements shown on S1D-ILS make up your policy as of the effective date shown above.

---

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

**"Area"** (premium basis symbol n) means:

The total number of square feet of floor space at the insured premises, computed as follows:

1. For entire buildings, by multiplying the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following:
   a. Courts and mezzanine types of floor openings.
   b. Portions of basements or floors where 50% or more of the area is used for shop or storage for building maintenance, dwelling by building maintenance employees, heating units, power plants or air-conditioning equipment.
2. For tenants, determine the area they occupy in the same manner as for the entire buildings.
3. The rates apply per 1,000 square feet of area.

**"Total Cost"** (premium basis symbol c) means:

The total cost of all work let or sublet in connection with each specific project including:

1. The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work, however, do not include the cost of finished equipment installed but not furnished by the subcontractor if the subcontractor does no other work on or in connection with such equipment; and
2. All fees, bonuses or commissions made, paid or due.
3. The rates apply per $1,000 of total cost.

**"Admissions"** (premium basis symbol m) means:

The total number of persons, other than employees of the named insured, admitted to the event insured or to events conducted on the premises whether on paid admissions, tickets, complimentary tickets or passes.

The rates apply per 1,000 admissions.

**"Payroll"** (premium basis symbol p) means:

1. Commissions;
2. Bonuses;
3. Extra pay for overtime work, except as provided in Paragraph 17;
4. Pay for holidays, vacations or periods of sickness;
5. Payment by an employer of amounts otherwise required by law to be paid by employees to statutory insurance or pension plans, such as the Federal Social Security Act;
6. Payment to employees on any basis other than time worked, such as piecework, profit sharing or incentive plans;
7. Payment or allowance for hand tools or power tools used by hand provided by employees and used in their work or operations to the insured;
8. The rental value of an apartment or a house provided for an employee based on comparable accommodations;
9. The value of lodging, other than an apartment or house, received by employees as part of their pay, to the extent shown on the insureds records;
10. The value of meals received by employees as part of their pay to the extent shown in the insured's records;
11. The value of store certificates, merchandise, credits or any other substitute for money received by employees as part of their pay;
12. The payroll of mobile equipment operators and their helpers, whether or not the operators are designated or licensed to operate automobiles. If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;
13. The payroll of executive officers of a corporation and individual insureds and co-partners. For the purposes of payroll determination, managers of limited liability companies shall be considered executive officers and members of limited liability companies shall be considered co-partners.
    The executive officers of a corporation are those persons holding any of the officer positions created by the named insured's charter, constitution or by-laws or any other similar governing document.
    The payroll of all executive officers of a corporation and individual insureds or co-partners engaged principally in clerical operations or as salespersons, and officers and co-partners who are inactive for the entire policy period, shall not be included for premium purposes.
    For part-time or seasonal businesses the payroll amounts may be reduced by 2 percent for each full calendar week in excess of twelve during which the risk performs no operations.
14. The payroll of leased workers furnished to the named insured by a labor leasing firm. Premium on such payroll shall be based on the classifications and rates which would have applied if the leased workers had been the direct employees of the named insured. If payroll is unavailable, use 100% of the total cost of the contract for leased workers as the payroll of leased workers. The premium shall be charged on that amount as payroll.
    If installation of a specific employee leasing contract discloses that a definite amount of the contract price represents payroll, such amount shall be considered payroll for premium computation purposes.
15. Fees paid to employment agencies for temporary personnel provided to the insured.
16. Payroll does not include:
    a. Tips and other gratuities received by employees;
    b. Payments by an employer to group insurance or group pension plans for employees other than payments covered by Paragraph 5. above.

c. The value of special rewards for individual invention or discovery;
d. Dismissal or severance payments except for time worked or accrued vacation;
e. The payroll of clerical office employees. Clerical office employees are those employees who work in an area which is physically separated by walls, floors or partitions from all other work areas of the insured and whose duties are strictly limited to keeping the insured's books or records or conducting correspondence, including any other employees engaged in clerical work in the same area;
f. The payroll of salesmen, collectors or messengers who work principally away from the insured's premises.
   Salesmen, collectors or messengers are those employees engaged principally in any such duties away from the premises of the employer;
   Exception: This term does not apply to any employee whose duties include the delivery of any merchandise handled, treated or sold.
g. The payroll of drivers and their helpers if their principal duties are to work on or in connection with automobiles.
h. The payroll of aircraft pilots or co-pilots if their principal duties are to work on or in connection with aircraft in either capacity.
i. The payroll of draftsmen if their duties are limited to office work only and who are engaged strictly as draftsmen in such a manner that they are not exposed to the operative hazards of the business. The payroll of these draftsmen shall be assigned to the classification "Draftsmen" - Code 91805.

**17. Overtime**
a. Definition
   Overtime means those hours worked for which there is an increase in the rate of pay:
   (1) For work in any day or in any week in excess of the number of hours normally worked; or
   (2) For hours worked in excess of 8 hours in any day or 40 hours in any week; or
   (3) For work on Saturdays, Sundays or holidays.
   In the case of guaranteed wage agreements, overtime means only those hours worked in excess of the number specified in such agreement.
b. Exclusion Of Overtime Payroll
   The extra pay for overtime shall be excluded from the payroll on which premium is computed as indicated in **(1)** or **(2)**, provided the insured's books and records are maintained to show overtime pay separately by employee and in summary by classification.
   (1) If the records show separately the extra pay earned for overtime, the entire extra pay shall be excluded.
   (2) If the records show the total pay earned for overtime (regular pay plus overtime pay) in one combined amount, 1/3 of this total pay shall be excluded. If double time is paid for overtime and the total pay for such overtime is recorded separately, 1/2 of the total pay for double time shall be excluded.
   Exclusion of overtime pay does not apply to payroll assigned to the "Stevedoring" classifications.
   The rates apply per $1,000 of payroll.

**"Gross Sales"** (premium basis symbol s) means:

a. The gross amount charged by the named insured, concessionaires of the named insured or by others trading under the insured's name for:
   (1) All goods or products, sold or distributed;
   (2) Operations performed during the policy period;
   (3) Rentals; and
   (4) Dues and fees.
b. Inclusions
   The following items shall not be deducted from gross sales:
   (1) Foreign exchange discounts;
   (2) Freight allowance to customers;
   (3) Total sales of consigned goods and warehouse receipts;
   (4) Trade or cash discounts;
   (5) Bad debts; and
   (6) Repossession of items sold on installments (amount actually collected).
c. Exclusions
   The following items shall be deducted from gross sales:
   (1) Sales or excise taxes which are collected and submitted to a governmental division;
   (2) Credits for repossessed merchandise and products returned. Allowances for damaged and spoiled goods;
   (3) Finance charges for items sold on installments;
   (4) Freight charges on sales if freight is charged as a separate item on customer's invoice;
   (5) Royalty income from patent rights or copyrights which are not product sales; and
   (6) Rental receipts from products liability coverage only.
d. The rates apply per $1,000 of gross sales.

**"Units"** (premium basis symbol u) means:

A single room or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone. The rates apply per each unit

Premium basis symbol t means: Refer to classification description.

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

Copyright, ISO Properties, Inc., 2006

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

    Copyright, ISO Properties, Inc., 2006    CG 00 01 12 07

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for;

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate rate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** - Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

    Copyright, ISO Properties, Inc., 2006    CG 00 01 12 07

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed to the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of the oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of any insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods - Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web-sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand or order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

## COVERAGE C MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazards**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

Copyright, ISO Properties, Inc., 2006

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II - WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

Copyright, ISO Properties, Inc., 2006

**2.** Each of the following is also an insured:

   **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

   **(1)** "Bodily injury" or "personal and advertising injury":

   **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

   **(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(1)(a)** above;

   **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

   **(d)** Arising out of his or her providing or failing to provide professional health care services.

   **(2)** "Property damage" to property:

   **(a)** Owned, occupied or used by,

   **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

   you, any of your "employees", "volunteer workers," any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   **b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   **c.** Any person or organization having proper temporary custody of your property if you die, but only:

   **(1)** With respect to liability arising out of the maintenance or use of that property; and

   **(2)** Until your legal representative has been appointed.

   **d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   **b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   **c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

   **a.** Medical expenses under Coverage **C**;

   **b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   **c.** Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   **a.** Damages under Coverage **A**; and

   **b.** Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

### 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

Copyright, ISO Properties, Inc., 2006

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date of the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

 Copyright, ISO Properties, Inc., 2006

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V - DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purposes of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

Copyright, ISO Properties, Inc., 2006

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

Copyright, ISO Properties, Inc., 2006

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement."

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

Copyright, ISO Properties, Inc., 2006

**17.** "Property damage" means:

  **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

  For the purposes of this insurance, electronic data is not tangible property.

  As used in this definition, electronic data means information, factors or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

  **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

  **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee," and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

  **a.** Means:

    **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      **(a)** You;

      **(b)** Others trading under your name; or

      **(c)** A person or organization whose business or assets you have acquired; and

    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **(2)** The providing of or failure to provide warnings or instructions.

 Copyright, ISO Properties, Inc., 2006

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## LIMITATION - CLASSIFICATION

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**A.** The following is added to Paragraph **1.b., Insuring Agreement** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

This insurance applies to "bodily injury" and "property damage" caused by only those operations which are classified and shown on the Commercial General Liability Coverage Declarations, its endorsements, and supplements.

**B.** The following is added to Paragraph **1.b., Insuring Agreement** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

This insurance applies to "personal and advertising injury" caused by only those operations which are classified and shown on the Commercial General Liability Coverage Declarations, its endorsements, and supplements.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE LIABILITY INSURANCE

*This endorsement is **EFFECTIVE** 09/01/2018          *and is part of Policy Number: WS355533

*issued to: Altaf Hudani

*Entry optional if shown in the Policy Declarations.  If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE OF DEDUCTIBLES**

| Coverage | Amount of Deductible | |
|---|---|---|
| Bodily Injury Liability | $ | Each Claim |
| | $ | Each Occurrence |
| Property Damage Liability | $ | Each Claim |
| | $ | Each Occurrence |
| Bodily Injury Liability and Property Damage Liability Combined | $ | Each Claim |
| | $   500 | Each Occurrence |
| Personal and Advertising Injury Liability | $ | Each Claim |

**PROVISIONS**

The following Section is added:

**DEDUCTIBLE LIABILITY INSURANCE**

1.  Our obligation under the Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amount shown in the Schedule Of Deductibles as applicable to such coverages.

2.  The applicable limit of insurance will be reduced by the amount of any damages within the deductible amount. Any aggregate limit will not be reduced by the application of the deductible amount.

3.  The deductible amount will also apply towards handling, investigation, adjustment, and legal expenses, even when no payment is made to the claimant, when a compromise settlement is reached, or when the claim is denied.

4.  The deductible amount shown in the Schedule Of Deductibles applies as follows:

    a.  Each Claim.  If the deductible amount is shown as Each Claim, the deductible amount applies as follows:

        (1)  Under Bodily Injury Liability coverage, to all damages because of "bodily injury" sustained by any one person as a result of any one "occurrence".

        (2)  Under Property Damage Liability, to all damages because of "property damage" sustained by any one person or organization as a result of any one "occurrence".

© 2016 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**(3)** Under Bodily Injury Liability and Property Damage Liability combined, to all damages because of "bodily injury" and "property damage" sustained by any one person or organization as a result of any one "occurrence".

**(4)** Under Personal and Advertising Injury Liability, to all damages because of "personal and advertising injury" sustained by any one person or organization.

**b.** Each Occurrence.  If the deductible amount is shown as Each Occurrence, the deductible amount applies as follows:

**(1)** Under Bodily Injury Liability, to the sum of all damages because of "bodily injury" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**(2)** Under Property Damage Liability, to the sum of all damages because of "property damage" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**(3)** Under Bodily Injury Liability and Property Damage Liability combined, to the sum of all damages because of all "bodily injury" and "property damage" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**5.** The terms of this insurance, including those with respect to:

**a.** Our right and duty to defend the insured against any "suits" seeking those damages; and

**b.** Your duties in the event of an "occurrence", claim or "suit";

apply irrespective of the application of the deductible amount.

**6.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you will promptly reimburse us for the part of the deductible amount paid by us.

© 2016 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCLUSION - ASSAULT OR BATTERY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1.** The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Assault Or Battery**

"Bodily injury" or "property damage" arising out of any act of "assault" or "battery" committed by any person, including any act or omission in connection with the prevention or suppression of such "assault" or "battery".

**2.** The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Assault Or Battery**

"Personal and advertising injury" arising out of any act of "assault" or "battery" committed by any person, including any act or omission in connection with the prevention or suppression of such "assault" or "battery".

**3.** The following is added to the **DEFINITIONS** Section:

"Assault" means any attempt or threat to inflict injury to another, including any conduct that would reasonably place another in apprehension of such injury.

"Battery" means any intentional, reckless or offensive physical contact with, or any use of force against, a person without his or her consent that inflicts some injury, regardless of whether the resulting injury inflicted is intended or expected.

          © 2013 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - ABUSE OR MOLESTATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Abuse Or Molestation**

"Bodily injury" or "property damage" arising out of any act of "abuse or molestation" committed by any person, including any act or omission in connection with the prevention or suppression of such "abuse or molestation".

**2.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Abuse Or Molestation**

"Personal and advertising injury" arising out of any act of "abuse or molestation" committed by any person, including any act or omission in connection with the prevention or suppression of such "abuse or molestation".

**3.** The following is added to the **DEFINITIONS** Section:

"Abuse or molestation" means any intentional, reckless or offensive physical contact of a sexual nature with a person without his or her consent that inflicts some injury, regardless of whether the resulting injury inflicted is intended or expected.

      © 2016 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH EXCEPTIONS FOR BUILDING HEATING, COOLING, DEHUMIDIFYING AND PERSONAL HOT WATER HEATING EQUIPMENT AND HOSTILE FIRE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1.** The following replaces Exclusion **f.**, **Pollution**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

   **f.  Pollution**

     **(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants".

     This paragraph does not apply to:

       **(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or produced by or originating from equipment that is used to heat water for personal use by the building's occupants or their guests; or

       **(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

         **(i)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

         **(ii)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are or were at any time performing operations to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

     **(2)** Any loss, cost or expense arising out of any:

       **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

       **(b)** Claim or "suit" by or on behalf of a government authority or others because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**2.** The following replaces the last paragraph of Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

Exclusions **c.** through **e.** and **g.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in **SECTION III - LIMITS OF INSURANCE**.

© 2016 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - INDEPENDENT CONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**1.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Independent Contractors**

"Bodily injury" or "property damage" arising out of the operations of any independent contractor performed for or on behalf of any insured.

**2.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Independent Contractors**

"Personal and advertising injury" arising out of the operations of any independent contractor performed for or on behalf of any insured.

© 2016 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

S46-CG (2/16)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - WATERSLIDE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1.**  The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Waterslide**

"Bodily injury" or "property damage" arising out of the ownership, maintenance or use of any waterslide.

**2.**  The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Waterslide**

"Personal and advertising injury" arising out of the ownership, maintenance or use of any waterslide.

© 2016 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - INJURY TO EMPLOYEES, WORKERS OR CONTRACTED PERSONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**1.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Bodily Injury To Employees, Workers Or Contracted Persons**

This insurance does not apply to "bodily injury" to:

**(1)** Any person who is an "employee", "leased worker", "temporary worker" or "volunteer worker" of you or any insured arising out of and in the course of:

**(a)** Employment by you or any insured; or

**(b)** Performing duties related to the conduct of your business or any insured's business;

**(2)** Any person who contracted with you or with any insured for the performance of services, whether the services are to be performed by or for you, or by or for any insured, arising out of and in the course of performing duties related to the conduct of your business or any insured's business;

**(3)** Any person who is employed by, is leased to, or contracted with any other person or any organization that:

**(a)** Contracted with you or with any insured for the performance of services, whether the services are to be performed by or for that other person or organization; or

**(b)** Contracted with others on your behalf for the performance of services, whether the services are to be performed by or for that other person or organization;

arising out of and in the course of employment by, or in the course of performing duties for, that other person or organization and while performing the contracted services; or

**(4)** The spouse, child, parent, brother or sister of any of those persons as a consequence of the "bodily injury" described in Paragraphs **(1)**, **(2)** or **(3)** above.

For the purposes of this exclusion, contracted includes entering into an oral or written contract.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** Whether the insured may have any obligation to share damages with or repay someone else who must pay damages because of the injury.

**2.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Injury To Employees, Workers Or Contracted Persons**

This insurance does not apply to "personal and advertising injury" to:

**(1)** Any person who is an "employee", "leased worker", "temporary worker" or "volunteer worker" of you or any insured arising out of and in the course of:

**(a)** Employment by you or any insured; or

 © 2017 The Travelers Indemnity Company.  All rights reserved.

**(b)** Performing duties related to the conduct of your business or any insured's business;

**(2)** Any person who contracted with you or with any insured for the performance of services, whether the services are to be performed by or for you, or by or for any insured, arising out of and in the course of performing duties related to the conduct of your business or any insured's business;

**(3)** Any person who is employed by, is leased to, or contracted with any other person or any organization that:

    **(a)** Contracted with you or with any insured for the performance of services, whether the services are to be performed by or for that other person or organization; or

    **(b)** Contracted with others on your behalf for the performance of services, whether the services are to be performed by or for that other person or organization;

    arising out of and in the course of employment by, or in the course of performing duties for, that other person or organization and while performing the contracted services; or

**(4)** The spouse, child, parent, brother or sister of any of those persons as a consequence of the "personal and advertising injury" described in Paragraphs **(1)**, **(2)** or **(3)** above.

For the purposes of this exclusion, contracted includes entering into an oral or written contract.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** Whether the insured may have any obligation to share damages with or repay someone else who must pay damages because of the injury.

 © 2017 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMBINATION ENDORSEMENT

# BODILY INJURY AND PROPERTY DAMAGE LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**A. AMENDMENT OF EXCLUSIONS**

    **1. EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY**

        The following replaces Exclusion **p.**, **Electronic Data**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

        **p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

        "Bodily injury" and "property damage" arising out of:

        **(1)** Any access to or disclosure of any person's or organization's confidential or personal information; or

        **(2)** The loss of, loss of use of, damage to, corruption of, inability to access or inability to manipulate data, including information, facts or programs in any electronic or other format.

    **2. EXCLUSION - UNSOLICITED COMMUNICATION**

        The following replaces Exclusion **q.**, **Distribution Of Material In Violation Of Statutes**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

        **q. Unsolicited Communication**

        "Bodily injury" or "property damage" arising out of any actual or alleged violation of any law that restricts or prohibits the sending, transmitting or distributing of "unsolicited communication".

    **3. EXCLUSION - AIRCRAFT PRODUCTS AND GROUNDING**

        The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

        **Aircraft Products and Grounding**

        "Bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any "aircraft product" or the "grounding" of any aircraft.

    **4. EXCLUSION - ASBESTOS OR SILICA**

        The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

        **Asbestos or Silica**

        "Bodily injury" or "property damage" arising out of the actual or alleged presence or actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation or respiration of:

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(1)** Asbestos, asbestos fibers or products containing asbestos, provided that the "bodily injury" or "property damage" is caused, or contributed to, by the hazardous properties of asbestos; or

**(2)** Silica or products or substances containing silica.

## 5. EXCLUSION - DISCRIMINATION

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Discrimination**

"Bodily injury" arising out of discrimination, whether intentional or unintentional, based upon a person's sex, sexual orientation, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

## 6. EXCLUSION - EMPLOYMENT-RELATED PRACTICES

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Employment-Related Practices**

"Bodily injury" to:

**(1)** A person, other than an "independent contractor", arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment or "temporary worker" status; or

   **(c)** Other practice, policy, act or omission related to that person's employment or "temporary worker" status, such as coercion, demotion, evaluation, reassignment, discipline, harassment, humiliation, discrimination, libel, slander, violation of the person's right of privacy, malicious prosecution or false arrest, detention or imprisonment, regardless of whether such practice, policy, act or omission occurs, is applied or is committed before, during or after the time of that person's employment or "temporary worker" status; or

**(2)** The spouse, child, parent, brother, sister, domestic partner or member of the household of that person as a consequence of "bodily injury" described in Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be held liable as an employer or in any other capacity; and

**(2)** Whether the insured may have any obligation to share damages with or repay someone else who must pay damages because of the injury.

## 7. EXCLUSION - FUNGI OR BACTERIA

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I -  COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Fungi or Bacteria**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to the "bodily injury" or "property damage".

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(2) Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**8. EXCLUSION - LEAD**

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Lead**

(1) "Bodily injury" or "property damage" arising out of the actual or alleged presence or actual, alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead compounds or lead which is or was contained or incorporated into any material or substance.

(2) Any loss, cost or expense arising out of any request, order or requirement to abate, mitigate, remediate, contain, remove or dispose of lead, lead compounds or materials or substances containing lead.

**9. EXCLUSION - VIOLATION OF CONSUMER FINANCIAL PROTECTION LAWS**

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Violation of Consumer Financial Protection Laws**

"Bodily injury" or "property damage" arising out of any actual or alleged violation of a "consumer financial protection law", or any other "bodily injury" or "property damage" alleged in any claim or "suit" that also alleges any such violation.

**B. AMENDMENT OF LIMITS OF INSURANCE - NONCUMULATION OF LIMITS**

The following replaces Paragraph **5.** of **SECTION III - LIMITS OF INSURANCE**:

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of all:

**a.** Damages under Coverage **A** because of all "bodily injury" and "property damage"; and

**b.** Medical expenses under Coverage **C** because of all "bodily injury";

arising out of any one "occurrence".

Noncumulation of Each Occurrence Limit - If any one "occurrence" causes:

**a.** "Bodily injury" or "property damage" to which this insurance applies; and

**b.** "Bodily injury" or "property damage" to which commercial general liability coverage included in one or more prior or future policies issued to you by us, or any of our affiliated insurance companies, applies;

this policy's Each Occurrence Limit applicable to that "occurrence" also will be reduced by the amount of each payment made because of the "bodily injury" or "property damage" described in Paragraph **b.** above by us or any of our affiliated insurance companies under, and within the applicable limit of insurance of, each such other policy.

**C. AMENDMENT OF CONDITIONS - OTHER INSURANCE**

**1.** The following replaces the part of the first paragraph of Paragraph **4.**, **Other Insurance**, of **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** that precedes Paragraph **a.**:

If valid and collectible other insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as described in Paragraphs **a.** and **b.** below.

As used anywhere in this Coverage Part, other insurance means insurance, or the funding of losses, that is provided by, through or on behalf of:

**(i)** Another insurance company;

**(ii)** Us or any of our affiliated insurance companies, except when the Noncumulation of Each Occurrence Limit provision of Paragraph **5.** of Section **III** - Limits Of Insurance applies or when the Noncumulation of Personal and Advertising Injury Limit provision of Paragraph **4.** of Section **III** - Limits of Insurance applies if that provision is part of this policy;

**(iii)** Any risk retention group;

**(iv)** Any self-insurance method or program, including any failure to buy insurance, or decision to not buy insurance, for any reason, in which case the insured will be deemed to be the provider of other insurance; or

**(v)** Any similar risk transfer or risk management method.

Other insurance does not include umbrella insurance, or excess insurance, that you bought specifically to apply in excess of the Limits of Insurance shown in the Declarations for this Coverage Part.

**2.** The following replaces Paragraph **4.b.**, **Excess Insurance**, of **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**:

**b.  Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

**(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for "your work";

**(2)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(3)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner;

**(4)** If the loss arises out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft to the extent not subject to Exclusion **g.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability; or

**(5)** That is available to the insured when the insured has been added as an additional insured by attachment of an endorsement under any other insurance or is any other insured that is not a named insured under such insurance.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any provider of other insurance has a duty to defend the insured against that "suit".  If no provider of other insurance defends, we will undertake to do so, but we will be entitled to the insured's rights against all those providers of other insurance.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all such other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**D. AMENDMENT OF DEFINITIONS**

**1. COVERAGE TERRITORY**

The following replaces the definition of "coverage territory" in the **DEFINITIONS** Section:

"Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place; or

**(2)** The "personal and advertising injury" is caused by an offense committed;

in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses committed through the Internet or other electronic means of communication.

provided that the insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in Paragraph **a.** above, or in a settlement we agree to.

**2. LEASED WORKER**

The following replaces the definition of "leased worker" in the **DEFINITIONS** Section:

"Leased worker" means a person hired from a labor leasing firm under an agreement between the hirer and that firm to perform duties related to the conduct of the hirer's business.  However, "leased worker" does not include a "temporary worker".

**3. LOADING OR UNLOADING**

The following replaces the definition of "loading or unloading" in the **DEFINITIONS** Section:

"Loading or unloading" means the handling of any person or property:

**a.** After it is moved from the place where the person or property is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While in or on an aircraft, watercraft or "auto"; or

**c.** While being moved from an aircraft, watercraft or "auto" to the place where the person or property is finally delivered.

However, "loading or unloading" does not include the movement of any person or property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**4. PROPERTY DAMAGE**

The following replaces the definition of "property damage" in the **DEFINITIONS** Section:

"Property damage" means:

**a.** Physical damage to tangible property of others, including all resulting loss of use of that property.  All such loss of use will be deemed to occur at the time of the physical damage that caused it; or

**b.** Loss of use of tangible property of others that is not physically damaged.  All such loss of use will be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, data including information, facts or programs in any electronic or other format, is not tangible property.

**5. TEMPORARY WORKER**

The following replaces the definition of "temporary worker" in the **DEFINITIONS** Section:

"Temporary worker" means a person who is hired to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**6. AIRCRAFT PRODUCT**

The following is added to the **DEFINITIONS** Section:

"Aircraft product" means:

**a.** Aircraft, including missile or spacecraft, and any ground support or control equipment used with any aircraft, missile or spacecraft;

**b.** Any of "your products" manufactured for, used in connection with, or incorporated into aircraft, aircraft parts, aircraft equipment or aircraft accessories, including ground handling tools and equipment;

**c.** Any of "your products" used for the purpose of guidance, navigation or direction of aircraft, whether an aircraft is in flight or on the ground; or

**d.** Training aids, navigation charts, navigation aids, manuals, blueprints, engineering or other data or advice, and services and labor relating to such aircraft or products.

**7. CONSUMER FINANCIAL IDENTITY INFORMATION**

The following is added to the **DEFINITIONS** Section:

"Consumer financial identity information" means any of the following information for a person that is used or collected for the purpose of serving as a factor in establishing such person's eligibility for personal credit, insurance or employment, or for the purpose of conducting a business transaction:

**a.** Part or all of the account number, the expiration date or the balance of any credit, debit, bank or other financial account.

**b.** Information bearing on a person's credit worthiness, credit standing or credit capacity.

**c.** Social security number.

**d.** Drivers license number.

**e.** Birth date.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**8. CONSUMER FINANCIAL PROTECTION LAW**

The following is added to the **DEFINITIONS** Section:

"Consumer financial protection law" means:

**a.** The Fair Credit Reporting Act (FCRA) and any of its amendments, including the Fair and Accurate Credit Transactions Act (FACTA);

**b.** California's Song-Beverly Credit Card Act and any of its amendments; or

**c.** Any other law or regulation that restricts or prohibits the collection, dissemination, transmission, distribution or use of "consumer financial identity information".

**9. FUNGI**

The following is added to the **DEFINITIONS** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

**10. GROUNDING**

The following is added to the **DEFINITIONS** Section:

"Grounding" means the withdrawal of one or more aircraft from flight operations or the imposition of speed, passenger or load restrictions on such aircraft, by reason of the actual, alleged or suspected existence of any defect, fault or condition in such aircraft or any part thereof:

**a.** Sold, handled or distributed by the insured; or

**b.** Manufactured, assembled or processed by any other person or organization

    **(1)** According to specifications, plans, suggestions, orders, or drawings of the insured; or

    **(2)** With tools, machinery or other equipment furnished to such persons or organizations by the insured.

Whether such aircraft so withdrawn or restricted are owned or operated by the same or different persons or organizations.

**11. INDEPENDENT CONTRACTOR**

The following is added to the **DEFINITIONS** Section:

"Independent contractor" means any person who is not the insured's "employee", "temporary worker" or "volunteer worker", but who performs duties related to the conduct of the insured's business because of a contract or agreement between the insured and that person for specified services.

**12. UNSOLICITED COMMUNICATION**

The following is added to the **DEFINITIONS** Section:

"Unsolicited communication" means any communication, in any form, that the recipient of such communication did not specifically request to receive.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Exterior Insulation And Finish System**

"Bodily injury" or "property damage" arising out of "your product" or "your work" that is, that is on, that is in or that is part of:

**(1)** Any "exterior insulation and finish system" (commonly referred to as synthetic stucco or EIFS), or any substantially similar system, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**(2)** Any component, fixture, or any other feature of, or on, the exterior of any building or other structure if an "exterior insulation and finish system", or any substantially similar system, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system, is on, in or part of, such building or structure.

**2.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Exterior Insulation And Finish System**

"Personal and advertising injury" arising out of "your product" or "your work" that is, that is on, that is in or that is part of:

**(1)** Any "exterior insulation and finish system" (commonly referred to as synthetic stucco or EIFS), or any substantially similar system, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**(2)** Any component, fixture, or any other feature of, or on, the exterior of any building or other structure if an "exterior insulation and finish system", or any substantially similar system, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system, is on, in or part of, such building or structure.

**3.** The following is added to the **DEFINITIONS** section:

"Exterior insulation and finish system" means, an exterior cladding or finish system, used on any part of any structure, and consisting of:

**a.** A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

**b.** The adhesive or mechanical fasteners used to attach the insulation board to the substrate;

**c.** A reinforced base coat; and

**d.** A finish coat providing surface texture and color.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - AIRCRAFT, AUTO OR WATERCRAFT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

1.  The following replaces Exclusion **g., Aircraft, Auto or Watercraft**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

    **g. Aircraft, Auto Or Watercraft**

    "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured, an agent of any insured, or an independent contractor providing services for or on behalf of any insured.  Use includes operation and "loading or unloading".

    This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured, an agent of any insured, or an independent contractor providing services for or on behalf of any insured.

    This exclusion does not apply to:

    **(1)** A watercraft while ashore on premises you own or rent;

    **(2)** A watercraft you do not own that is:

      **(a)** Less than 26 feet long; and

      **(b)** Not being used to carry any person or property for a charge;

    **(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided that the "auto" is not owned by or rented or loaned to you, any insured, any employee of the insured, any of your "volunteer workers" or any "volunteer workers" of the insured.

    **(4)** Liability assumed by you under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft, provided that the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement;

    **(5)** "Bodily injury" or "property damage" arising out of:

      **(a)** The operation of any "supplementary machinery or equipment" that is attached to, or part of, a land vehicle that would qualify as "mobile equipment" under the definition of "mobile equipment" if such land vehicle were not:

        **(i)** Subject to a compulsory or financial responsibility law, or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

        **(ii)** Designated as a covered "auto" under your automobile liability insurance; or

      **(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment"; or

    **(6)** An aircraft chartered with a pilot to any insured.  This exception does not apply if:

      **(a)** The aircraft is owned by any insured; or

      **(b)** Any insured is using the aircraft to carry any person or property for a charge.

© 2013 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**2.** The following is added to the **DEFINITIONS** Section:

"Supplementary machinery or equipment" means machinery or equipment designed for work, other than the transportation of any person or property on a public road.  However, "supplementary machinery or equipment" does not include:

**a.** Any communication device, such as a radio or telephone; or

**b.** Any machinery or equipment that is designed to perform any function normal to the operation of the land vehicle during travel on public roads, such as a steering mechanism.

© 2013 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - REAL ESTATE DEVELOPMENT ACTIVITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Real Estate Development Activities**

"Bodily injury" or "property damage" arising out of any "real estate development activities" by or on behalf of any insured.

This exclusion does not apply to the repair, maintenance, renovation, alteration or addition to an existing building owned by the Named Insured.

**2.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Real Estate Development Activities**

"Personal And Advertising Injury" arising out of any "real estate development activities" by or on behalf of any insured.

This exclusion does not apply to the repair, maintenance, renovation, alteration or addition to an existing building owned by the Named Insured.

**3.** The following is added to the **DEFINITIONS** Section:

"Real Estate Development Activities" means the demolition, design, site preparation, construction, marketing or sales of residential, commercial or industrial buildings.

© 2016 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FEDERAL TERRORISM RISK INSURANCE ACT DISCLOSURE

This endorsement applies to the insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE
COMMERCIAL GENERAL LIABILITY COVERAGE PART
CYBERFIRST ESSENTIALS LIABILITY COVERAGE PART
CYBERFIRST LIABILITY COVERAGE
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY[+] WITH IDENTITY FRAUD EXPENSE REIMBURSEMENT
   COVERAGE PART
ENVIRONMENTAL HAZARD POLICY
EXCESS (FOLLOWING FORM) LIABILITY INSURANCE
LAW ENFORCEMENT LIABILITY COVERAGE PART
LIMITED ABOVE GROUND POLLUTION LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDFIRST PRODUCTS/COMPLETED OPERATIONS, ERRORS AND OMISSIONS, AND
   INFORMATION SECURITY LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PUBLIC ENTITY MANAGEMENT LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY - NEW YORK DEPARTMENT OF
   TRANSPORTATION
TRIBAL BUSINESS MANAGEMENT LIABILITY COVERAGE PART
Any other Commercial Liability coverage included in this policy that is subject to the federal Terrorism
   Risk Insurance Act of 2002 as amended

**PROVISIONS**

The federal Terrorism Risk Insurance Act of 2002 as amended ("TRIA") establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in TRIA) caused by "Acts Of Terrorism" (as defined in TRIA). Act Of Terrorism is defined in Section 102(1) of TRIA to mean any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for such Insured Losses is established by TRIA and is a percentage of the amount of such Insured Losses in excess of each Insurer's "Insurer Deductible" (as defined in TRIA), subject to the "Program Trigger" (as defined in TRIA). Through 2020, that percentage is established by TRIA as follows:

85% with respect to such Insured Losses occurring in calendar year 2015.

84% with respect to such Insured Losses occurring in calendar year 2016.

83% with respect to such Insured Losses occurring in calendar year 2017.

82% with respect to such Insured Losses occurring in calendar year 2018.

81% with respect to such Insured Losses occurring in calendar year 2019.

80% with respect to such Insured Losses occurring in calendar year 2020.

© 2015 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

In no event, however, will the Federal Government be required to pay any portion of the amount of such Insured Losses occurring in a calendar year that in the aggregate exceeds $100 billion, nor will any Insurer be required to pay any portion of such amount provided that such Insurer has met its Insurer Deductible. Therefore, if such Insured Losses occurring in a calendar year exceed $100 billion in the aggregate, the amount of any payments by the Federal Government and any coverage provided by this policy for losses caused by Acts Of Terrorism may be reduced.

For each coverage provided by this policy that applies to such Insured Losses, the charge for such Insured Losses is included in the premium for such coverage. The charge for such Insured Losses that has been included for each such coverage is indicated below, and does not include any charge for the portion of such Insured Losses covered by the Federal Government under TRIA.

- **1% of each applicable Commercial Liability Coverage premium.**

© 2015 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
IL T3 68 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMBINATION ENDORSEMENT

# PERSONAL AND ADVERTISING INJURY LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**A. AMENDMENT OF EXCLUSIONS**

**1. EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION**

The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information.

**2. EXCLUSION - KNOWING VIOLATION OF RIGHTS OF ANOTHER**

The following replaces Exclusion **a., Knowing Violation Of Rights Of Another,** in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict that "personal and advertising injury".

This exclusion does not apply to "personal and advertising injury" caused by malicious prosecution.

**3. EXCLUSION - MATERIAL PUBLISHED WITH KNOWLEDGE OF FALSITY**

The following replaces Exclusion **b., Material Published With Knowledge Of Falsity**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, including publication by electronic means, of material, if done by or at the direction of the insured with knowledge of its falsity.

**4. EXCLUSION - MATERIAL PUBLISHED OR USED PRIOR TO POLICY PERIOD**

The following replaces Exclusion **c., Material Published Prior To Policy Period**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**c. Material Published Or Used Prior To Policy Period**

"Personal and advertising injury" arising out of:

**(1)** Oral or written publication, including publication by electronic means, of material whose first publication took place prior to the policy period; or

**(2)** Infringement of copyright, "title" or "slogan" in your "advertisement" whose first infringement in your "advertisement" was committed prior to the policy period.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**5.  EXCLUSION - BREACH OF CONTRACT**

The following replaces Exclusion **f.**, **Breach Of Contract**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**f.  Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract.

**6.  EXCLUSION - INTELLECTUAL PROPERTY**

The following replaces Exclusion **i.**, **Infringement Of Copyright, Patent, Trademark Or Trade Secret**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**i.  Intellectual Property**

"Personal and advertising injury" arising out of any actual or alleged infringement or violation of any of the following rights or laws, or any other "personal  and advertising injury" alleged in any claim or "suit" that also alleges any such infringement or violation:

**(1)** Copyright;

**(2)** Patent;

**(3)** Trade dress;

**(4)** Trade name;

**(5)** Trademark;

**(6)** Trade secret; or

**(7)** Other intellectual property rights or laws.

This exclusion does not apply to:

**(1)** "Personal and advertising injury" arising out of any actual or alleged infringement or violation of another's copyright, "title" or "slogan" in your "advertisement"; or

**(2)** Any other "personal and advertising injury" alleged in any claim or "suit" that also alleges any such infringement or violation of another's copyright, "title" or "slogan" in your "advertisement".

**7.  EXCLUSION - INSUREDS IN MEDIA AND INTERNET TYPE BUSINESSES**

The following replaces Exclusion **j.**, **Insureds In Media And Internet Type Businesses**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**j.  Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" arising out of an offense committed by an insured whose business is:

**(1)** Advertising, "broadcasting" or publishing;

**(2)** Designing or determining content of web-sites for others; or

**(3)** An Internet search, access, content or service provider.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

This exclusion does not apply to Paragraphs **a.(1)**, **(2)** and **(3)** of the definition of "personal and advertising injury".

For the purposes of this exclusion:

**(1)** Creating and producing correspondence written in the conduct of your business, bulletins, financial or annual reports, or newsletters about your goods, products or services will not be considered the business of publishing; and

**(2)** The placing of frames, borders or links, or advertising, for you or others anywhere on the Internet will not, by itself, be considered the business of advertising, "broadcasting" or publishing.

**8. EXCLUSION - POLLUTION-RELATED**

The following replaces Paragraph **(2)** of Exclusion **n., Pollution-Related**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**(2)** Claim or "suit" by or on behalf of a governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**9. EXCLUSION - WAR**

The following replaces Exclusion **o., War**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**o. War**

"Personal and advertising injury" arising out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**10. EXCLUSION - ASBESTOS OR SILICA**

The following exclusion is added to Paragraph **2., Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Asbestos or Silica**

"Personal and advertising injury" arising out of the actual or alleged presence or actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation or respiration of:

**(1)** Asbestos, asbestos fibers or products containing asbestos, provided that the "personal and advertising injury" is caused, or contributed to, by the hazardous properties of asbestos; or

**(2)** Silica or products or substances containing silica.

**11. EXCLUSION - DISCRIMINATION**

The following exclusion is added to Paragraph **2., Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Discrimination**

"Personal and advertising injury" arising out of discrimination, whether intentional or unintentional, based upon a person's sex, sexual orientation, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

## 12. EXCLUSION - EMPLOYMENT-RELATED PRACTICES

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Employment-Related Practices**

"Personal and advertising injury" to:

**(1)** A person, other than an "independent contractor", arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment or "temporary worker" status; or

    **(c)** Other practice, policy, act or omission related to that person's employment or "temporary worker" status, such as coercion, demotion, evaluation, reassignment, discipline, harassment, humiliation, discrimination, libel, slander, violation of the person's right of privacy, malicious prosecution or false arrest, detention or imprisonment, regardless of whether such practice, policy, act or omission occurs, is applied or is committed before, during or after the time of that person's employment or "temporary worker" status; or

**(2)** The spouse, child, parent, brother, sister, domestic partner or member of the household of that person as a consequence of "personal and advertising injury" described in Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be held liable as an employer or in any other capacity; and

**(2)** Whether the insured may have any obligation to share damages with or repay someone else who must pay damages because of the injury.

## 13. EXCLUSION - FUNGI OR BACTERIA

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Fungi or Bacteria**

**(1)** "Personal and advertising injury" arising out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to the "personal and advertising injury"

**(2)** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

## 14. EXCLUSION - LEAD

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Lead**

**(1)** "Personal and advertising injury" arising out of the actual or alleged presence or actual, alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead compounds or lead which is or was contained or incorporated into any material or substance.

**(2)** Any loss, cost or expense arising out of any request, order or requirement to abate, mitigate, remediate, contain, remove or dispose of lead, lead compounds or materials or substances containing lead.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

### 15. EXCLUSION - UNSOLICITED COMMUNICATION

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Unsolicited Communication**

"Personal and advertising injury" arising out of any actual or alleged violation of any law that restricts or prohibits the sending, transmitting or distributing of "unsolicited communication".

### 16. EXCLUSION - VIOLATION OF CONSUMER FINANCIAL PROTECTION LAWS

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Violation of Consumer Financial Protection Laws**

"Personal and advertising injury" arising out of any actual or alleged violation of a "consumer financial protection law", or any other "personal and advertising injury" alleged in any claim or "suit" that also alleges any such violation.

## B. AMENDMENT OF CONTRACTUAL LIABILITY EXCLUSION - EXCEPTION FOR "PERSONAL AND ADVERTISING INJURY" ASSUMED IN AN "INSURED CONTRACT"

1. The following is added to Exclusion **e.**, **Contractual Liability**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

   This exclusion also does not apply to liability for damages because of "personal and advertising injury" assumed by you in a contract or agreement that is an "insured contract", provided that the "personal and advertising injury" is caused by an offense committed subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed by you in an "insured contract", reasonable attorneys fees and necessary litigation expenses incurred by or for a party other than an insured will be deemed to be damages because of "personal and advertising injury", provided that:

   **(1)** Liability to such party for, or for the cost of, that party's defense has also been assumed by you in the same "insured contract"; and

   **(2)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages because of "personal and advertising injury" to which this insurance applies are alleged.

2. The following replaces Paragraph **2.d.** of **SUPPLEMENTARY PAYMENTS - COVERAGES A  AND B** of **SECTION I - COVERAGES**:

   **d.**  The allegations in the "suit" and the information we know about the "occurrence" or offense are such that no conflict appears to exist between your interests and the interests of the indemnitee;

3. The following replaces the third sentence of Paragraph **2.** of **SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**:

   Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, or the provisions of Paragraph **2.e.** of Section **I** - Coverage **B** - Personal and Advertising Injury Liability, such payments will not be deemed to be damages because of "bodily injury" or "property damage", or damages because of "personal and advertising injury", and will not reduce the limits of insurance.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

4.  The following replaces the first paragraph of Paragraph **f.** of the definition of "insured contract" in the
    **DEFINITIONS** Section:

    **f.**  That part of any other contract or agreement pertaining to your business (including an indemnification of a
    municipality in connection with work performed for a municipality) under which you assume the tort liability of
    another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third party
    or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or
    agreement.

## C. AMENDMENT OF LIMITS OF INSURANCE - NONCUMULATION OF LIMITS

The following is added to Paragraph **4.** of **SECTION III - LIMITS OF INSURANCE**:

Noncumulation of Personal and Advertising Injury Limit - If any one person or organization sustains:

**a.**  "Personal and advertising injury" to which this insurance applies; and

**b.**  "Personal and advertising injury" to which commercial general liability coverage included in one or more prior or
    future policies issued to you by us, or any of our affiliated insurance companies, applies;

this policy's Personal and Advertising Injury Limit applicable to that person or organization also will be reduced by
the amount of each payment made because of the "personal and advertising injury" described in Paragraph **b.** above
by us or any of our affiliated insurance companies under, and within the applicable limit of insurance of, each other
such policy.

## D. AMENDMENT OF DEFINITIONS

### 1. PERSONAL AND ADVERTISING INJURY

The following replaces the definition of "personal and advertising injury" in the **DEFINITIONS** Section:

"Personal and advertising injury":

**a.**  Means injury caused by one or more of the following offenses committed by or on behalf of the insured:

    **(1)** False arrest, detention or imprisonment, provided that the claim is made or the "suit" is brought by a person
    who claims to have been falsely arrested, detained or imprisoned;

    **(2)** Malicious prosecution, provided that the claim is made or the "suit" is brought by a person or organization
    that claims to have been maliciously prosecuted;

    **(3)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room,
    dwelling or premises that a person occupies, provided that the wrongful eviction, wrongful entry or invasion
    of the right of private occupancy is committed by or on behalf of the owner, landlord or lessor of that room,
    dwelling or premises;

    **(4)** Oral or written publication, including publication by electronic means, of material that slanders or libels a
    person or organization or disparages a person's or organization's goods, products or services, provided
    that the claim is made or the "suit" is brought by a person or organization that claims to have been
    slandered or libeled, or that claims to have had its goods, products or services disparaged;

    **(5)** Oral or written publication, including publication by electronic means, of material that:

        **(a)** Appropriates a person's name, voice, photograph or likeness; or

        **(b)** Unreasonably places a person in a false light; or

    **(6)** Infringement of copyright, "title" or "slogan" in your "advertisement", provided that the claim is made or the
    "suit" is brought by a person or organization that claims ownership of such copyright, "title" or "slogan".

**b.**  Includes "bodily injury" caused by one or more of the offenses described in Paragraph **a.** above.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

2. **BROADCASTING**

The following is added to the **DEFINITIONS** Section:

"Broadcasting" means transmitting any audio or visual material for any purpose:

**a.** By radio or television; or

**b.** In, by or with any other electronic means of communication, such as the Internet, if that material is part of:

**(1)** Radio or television programming being transmitted;

**(2)** Other entertainment, educational, instructional, music or news programming being transmitted; or

**(3)** Advertising transmitted with any of such programming.

3. **CONSUMER FINANCIAL IDENTITY INFORMATION**

The following is added to the **DEFINITIONS** Section:

"Consumer financial identity information" means any of the following information for a person that is used or collected for the purpose of serving as a factor in establishing such person's eligibility for personal credit, insurance or employment, or for the purpose of conducting a business transaction:

**a.** Part or all of the account number, the expiration date or the balance of any credit, debit, bank or other financial account.

**b.** Information bearing on a person's credit worthiness, credit standing or credit capacity.

**c.** Social security number.

**d.** Drivers license number.

**e.** Birth date.

4. **CONSUMER FINANCIAL PROTECTION LAW**

The following is added to the **DEFINITIONS** Section:

"Consumer financial protection law" means:

**a.** The Fair Credit Reporting Act (FCRA) and any of its amendments, including the Fair and Accurate Credit Transactions Act (FACTA);

**b.** California's Song-Beverly Credit Card Act and any of its amendments; or

**c.** Any other law or regulation that restricts or prohibits the collection, dissemination, transmission, distribution or use of "consumer financial identity information".

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**5. SLOGAN**

The following is added to the **DEFINITIONS** Section:

"Slogan":

   **a.** Means a phrase that others use for the purpose of attracting attention in their advertising.

   **b.** Does not include a phrase used as, or in, the name of:

      **(1)** Any person or organization, other than you; or

      **(2)** Any business, or any of the premises, goods, products, services or work, of any person or organization, other than you.

**6. TITLE**

The following is added to the **DEFINITIONS** Section:

"Title" means a name of a literary or artistic work.

**7. UNSOLICITED COMMUNICATION**

The following is added to the **DEFINITIONS** Section:

"Unsolicited communication" means any communication, in any form, that the recipient of such communication did not specifically request to receive.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - HABITABILITY OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

1.  The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

    **Habitability Of Premises**

    "Bodily injury" or "property damage":

    **(1)** Arising out of the:

    **(a)** Actual or alleged violation of any federal, state or local law, code, regulation, ordinance or rule relating to the habitability of any premises;

    **(b)** Breach of any lease, rental agreement, warranty or covenant to maintain a premises in a habitable condition; or

    **(c)** Wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling or premises, whether actual or constructive, due to failure to maintain a premises in a habitable condition;

    **(2)** Alleged in any claim or "suit" that also alleges any violation, breach or wrongful eviction, entry or invasion as set forth in Paragraphs **(1) (a) - (c)** above.

2.  The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

    **Habitability Of Premises**

    "Personal and advertising injury":

    **(1)** Arising out of the:

    **(a)** Actual or alleged violation of any federal, state or local law, code, regulation, ordinance or rule relating to the habitability of any premises;

    **(b)** Breach of any lease, rental agreement, warranty or covenant to maintain a premises in a habitable condition; or

    **(c)** Wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling or premises, whether actual or constructive, due to failure to maintain a premises in a habitable condition;

    **(2)** Alleged in any claim or "suit" that also alleges any violation, breach or wrongful eviction, entry or invasion as set forth in Paragraphs **(1) (a) - (c)** above.

© 2013 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - CANNABIS OR MARIJUANA - ABSOLUTE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Cannabis Or Marijuana**

"Bodily injury" or "property damage" arising out of the manufacture, sale, gift, distribution, consumption or use of any product that contains cannabis or marijuana.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

S2961-CG (6/14)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - CROSS LIABILITY - BROAD FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

1.  The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

    **Cross Liability**

    "Bodily injury" or "property damage" sustained or alleged by:

    **(1)** Any business enterprise in which any insured owns an interest, is a partner, or which is a parent, affiliate, subsidiary or sister company of any insured;

    **(2)** Any business enterprise directly or indirectly controlled, operated or managed by a business enterprise described in **(1)**;

    **(3)** A present, former, future or prospective partner, officer, director, stockholder or employee of any insured;

    **(4)** Any named insured; or

    **(5)** The spouse, child, parent or sibling of any of the above as consequence of **(1)**, **(2)**, **(3)** or **(4)**.

2.  The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

    **Cross Liability**

    "Personal and advertising injury" sustained or alleged by:

    **(1)** Any business enterprise in which any insured owns an interest, is a partner, or which is a parent, affiliate, subsidiary or sister company of any insured;

    **(2)** Any business enterprise directly or indirectly controlled, operated or managed by a business enterprise described in **(1)**;

    **(3)** A present, former, future or prospective partner, officer, director, stockholder or employee of any insured;

    **(4)** Any named insured; or

    **(5)** The spouse, child, parent or sibling of any of the above as consequence of **(1)**, **(2)**, **(3)** or **(4)**.

© 2016 The Travelers Indemnity Company.  All rights reserved.

COMMERCIAL GENERAL LIABILITY
CG 21 32 05 09

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I - Coverage A - Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Bodily injury" or "property damage" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Personal and advertising injury" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

Copyright, Insurance Services Office, Inc., 2008

COMMERCIAL GENERAL LIABILITY
CG 21 36 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **3.** of **Section II - Who Is An Insured** does not apply.

Copyright, ISO Properties, Inc., 2004

CG 21 39 10 93

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CONTRACTUAL LIABILITY LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the DEFINITIONS Section is replaced by the following:

"Insured contract" means:

**a.** A contract for a lease of premises.  However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement.

CG 21 39 10 93

Copyright, Insurance Services Office, Inc., 1992

POLICY NUMBER: WS355533

**COMMERCIAL GENERAL LIABILITY
CG 21 44 04 17**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| |
|---|
| **Premises:** |
| All Covered Locations as Scheduled on the Declarations |
| **Project Or Operation:** |
| |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 01,** the provisions under this Paragraph **A.** apply:

1. Paragraph **1.b.** under **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

    **b.** This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

    **(1)** The "bodily injury" or "property damage":

    **(a)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

    **(b)** Arises out of the project or operation shown in the Schedule;

    **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

2. Paragraph **1.b.** under **Section I - Coverage B - Personal And Advertising Injury Liability** is replaced by the following:

    **b.** This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

    **(1)** The offense arises out of your business:

    **(a)** Performed on the premises shown in the Schedule; or

**(b)** In connection with the project or operation shown in the Schedule; and

**(2)** The offense was committed during the policy period.

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

**(1)** False arrest, detention or imprisonment; or

**(2)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

**3.** Paragraph **1.a.** under **Section I - Coverage C - Medical Payments** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

**(1)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(2)** Arises out of the project or operation shown in the Schedule;

provided that:

**(a)** The accident takes place during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**B.** If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 02,** the provisions under this Paragraph **B.** apply:

**1.** Paragraph **1.b.** under **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**b.** This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

**(1)** The "bodily injury" or "property damage":

**(a)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(b)** Arises out of the project or operation shown in the Schedule;

**(2)** The "bodily injury" or "property damage" did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

**(3)** A claim for damages because of the "bodily injury" or "property damage" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V** - Extended Reporting Periods.

**2.** Paragraph **1.b.** under **Section I - Coverage B - Personal And Advertising Injury Liability** is replaced by the following:

**b.** This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

**(1)** The offense arises out of your business:

**(a)** Performed on the premises shown in the Schedule; or

**(b)** In connection with the project or operation shown in the Schedule;

**(2)** The offense was not committed before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

**(3)** A claim for damages because of the "personal and advertising injury" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V** - Extended Reporting Periods.

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

**(1)** False arrest, detention or imprisonment; or

**(2)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

**3.** Paragraph **1.a.** under **Section I - Coverage C - Medical Payments** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

**(1)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(2)** Arises out of the project or operation shown in the Schedule;

provided that:

**(a)** The accident takes place during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

Copyright, Insurance Services Office, Inc., 2016

**Northfield Insurance Company**
**St. Paul, MN 55102**

**COMMERCIAL PROPERTY**
**COVERAGE PART DECLARATIONS**

**Effective Date:** 09/01/2018  12:01 A.M. at your mailing address          **Policy No:** WS355533

**Named Insured:**
Altaf Hudani

---

### DESCRIPTION OF PREMISES

| PREM. # | BLDG. # | Location (Including County, Zip Code), # of Stories, Construction, Occupancy, Protection Class |
|---|---|---|
| 001 | 001 | 226 Atlantic Ave, Long Beach, CA, Los Angeles, 90802, 1 Story, Frame, Lessor's risk, PC3 |
| 001 | 002 | 226 Atlantic Ave, Long Beach, CA, Los Angeles, 90802, 1 Story, Frame, Dwelling, PC3 |

### COVERAGES PROVIDED

Insurance at the Described Premises applies only for Coverages for which a Limit of Insurance is shown below.
**IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENTS
FE - Fully Earned

| PREM. # | BLDG. # | Coverage | Limit of Insurance | Percent of Coinsurance** | Covered Causes of Loss | Rates | Premium |
|---|---|---|---|---|---|---|---|
| 001 | 001 | Building | $ 200,000 | 90% | Special Excl Theft | .1720 | $ 344.00 |
| 001 | 002 | Building | $ 200,000 | 90% | Special Excl Theft | .2170 | $ 434.00 |
| 001 | 002 | Business Income with Extra Expense | $ 30,000 | 90% | Special Excl Theft | .1290 | $ 39.00 |

### COVERAGE OPTIONS

Applicable only when entries are made in the Schedule below.          *APPLIES TO BUSINESS INCOME ONLY

| PREM. # | BLDG. # | Coverage | Agreed Value Expir. Date | Agreed Value Amount | Replacement Cost | *Mo. Limit of Indemnity | *Max. Period of Indemnity | *Extended Period of Indemnity | Inflation Guard % |
|---|---|---|---|---|---|---|---|---|---|
| 001 | 001 | Building | | | X | | | | |
| 001 | 002 | Building | | | X | | | | |

| | | |
|---|---|---|
| | **DEDUCTIBLE** | **$ See S2649-CP** |
| | **COVERAGE PART PREMIUM $ 839.00** | MP |

---

### MORTGAGE HOLDERS

Mortgage Holders as scheduled on S2767-CP, if applicable.

### FORMS AND ENDORSEMENTS

The schedule of coverage declarations, forms and endorsements shown on S1D-ILS make up your policy as of the effective date shown above.

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

COMMERCIAL PROPERTY
CP 00 10 10 12

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H.** Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery; and

(b) Equipment;

(4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

(a) Fire-extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(5) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the building or structure;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

(1) Furniture and fixtures;

(2) Machinery and equipment;

(3) "Stock";

(4) All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by you on personal property of others;

(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

(1) In your care, custody or control; and

**(2)** Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

**(1)** The lowest basement floor; or

**(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph **n.,** does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

**o.** The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

**p.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

**(1)** Are licensed for use on public roads: or

**(2)** Are operated principally away from the described premises.

This paragraph does not apply to:

**(a)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

**(b)** Vehicles of self-propelled machines, other than autos, you hold for sale;

     Copyright, Insurance Services Office, Inc., 2011

**(c)** Rowboats or canoes out of water at the described premises; or

**(d)** Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers.

**q.** The following property while outside of buildings:

**(1)** Grain, hay, straw or other crops;

**(2)** Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Coverages**

**a. Debris Removal**

**(1)** Subject to Paragraphs **(2)**, **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** Debris Removal does not apply to costs to:

**(a)** Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

**(b)** Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

**(c)** Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

**(d)** Remove property of others of a type that would not be Covered Property under this Coverage Form;

**(e)** Remove deposits of mud or earth from the grounds of the described premises;

**(f)** Extract "pollutants" from land or water; or

**(g)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4)**, the following provisions apply:

**(a)** The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

**(4)** We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)(a)** and/or **(4)(b)** applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

Copyright, Insurance Services Office, Inc., 2011

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**Example 1**

| | |
|---|---|
| Limit of Insurance: | $90,000 |
| Amount of Deductible: | $    500 |
| Amount of Loss: | $50,000 |
| Amount of Loss Payable: | $49,500 |
| | ($50,000 - $500) |
| Debris Removal Expense: | $10,000 |
| Debris Removal Expense Payable: | $10,000 |

($10,000 is 20% of $50,000)

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**Example 2**

| | |
|---|---|
| Limit of Insurance: | $90,000 |
| Amount of Deductible: | $    500 |
| Amount of Loss: | $80,000 |
| Amount of Loss Payable: | $79,500 |
| | ($80,000 - $500) |
| Debris Removal Expense: | $40,000 |
| Debris Removal Expense Payable | |
| Basic Amount: | $10,500 |
| Additional Amount: | $25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4)**. Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

**b.  Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c.  Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for service at each premises described in the Declarations, unless a higher limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d.  Pollutant Clean-Up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

   Copyright, Insurance Services Office, Inc., 2011   CP 00 10 10 12

**e.  Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced, at the same or another premises; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

Copyright, Insurance Services Office, Inc., 2011

**(9)** The costs addressed in the Loss Payment and Valuation Conditions and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f.  Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss.  To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss - Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(b)** If the Causes of Loss - Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

**(c)** If the Causes of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Electronic Data, is $2,500 (unless a higher limit is shown in the Declarations) for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5.  Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a.  Newly Acquired Or Constructed Property**

**(1)** Buildings

If this policy covers Building, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

Copyright, Insurance Services Office, Inc., 2011

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

**(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

**(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or

**(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss - Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(3)** If the Causes Of Loss - Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore, coverage of such costs is not additional insurance.

Copyright, Insurance Services Office, Inc., 2011

**d. Property Off-Premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

**(2)** This Extension does not apply to property:

**(a)** In or on a vehicle; or

**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

**f. Non-Owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

**(a)** The trailer is used in your business;

**(b)** The trailer is in your care, custody or control at the premises described in the Declarations; and

**(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

**(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

**(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**g. Business Personal Property Temporarily In Portable Storage Units**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the building or structure described in the Declarations or within 100 feet of the premises described in the Declarations, whichever distance is greater.

**(2)** If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

**(3)** Coverage under this Extension:

**(a)** Will end 90 days after the business personal property has been placed in the storage unit;

Copyright, Insurance Services Office, Inc., 2011

**(b)** Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the business personal property has been stored there for 90 or fewer days as of the time of loss or damage.

**(4)** Under this Extension, the most we will pay for the total of all loss or damage to business personal property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units. Such limit is part of, not in addition to, the applicable Limit of Insurance on Your Business Personal Property. Therefore, payment under this Extension will not increase the applicable Limit of Insurance on Your Business Personal Property.

**(5)** This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form or policy, and does not apply to loss or damage to the storage unit itself.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage:

**1.** Fire Department Service Charge;

**2.** Pollutant Clean-up And Removal;

**3.** Increased Cost Of Construction; and

**4.** Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example 1**

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---|
| Deductible: | $      250 |
| Limit of Insurance - Building 1: | $   60,000 |
| Limit of Insurance - Building 2: | $   80,000 |
| Loss to Building 1: | $   60,100 |
| Loss to Building 2: | $   90,000 |

The amount of loss to Building 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building 1:

$  60,100
-      250
$  59,850 Loss Payable - Building 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building 2. Loss payable for Building 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:
$59,850 + 80,000 = $139,850

**Example 2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example 1.

| | |
|---|---|
| Loss to Building 1: | $   70,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss to Building 2: | $   90,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss Payable - Building 1: | $   60,000 |
| (Limit of Insurance) | |
| Loss Payable - Building 2: | $   80,000 |
| (Limit of Insurance) | |
| Total amount of loss payable: | $  140,000 |

## E. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Abandonment

There can be no abandonment of any property to us.

### 2. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 3. Duties In The Event Of Loss Or Damage

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

### 4. Loss Payment

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

Copyright, Insurance Services Office, Inc., 2011

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

 Copyright, Insurance Services Office, Inc., 2011

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d.,** and **e.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value, even when attached to the building:

**(1)** Awnings or floor coverings;

**(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

**(3)** Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety-glazing material if required by law.

**e.** Tenants' Improvements and Betterments at:

**(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1);**

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2);** and

**(4)** Subtract the deductible from the figure determined in Step **(3).**

We will pay the amount determined in Step **(4)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example 1 (Underinsurance)**

| When: | The value of the property is: | $ 250,000 |
|---|---|---|
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 100,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

Step **(1):**   $250,000 x 80% = $200,000
(the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2):**   $100,000 ÷ $200,000 =.50

Step **(3):**   $40,000 x .50 = $20,000

Step **(4):**   $20,000 - $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

Copyright, Insurance Services Office, Inc., 2011

**Example 2 (Adequate Insurance)**

When:  The value of the property is:             $ 250,000

          The Coinsurance percentage for it is:              80%

          The Limit of Insurance for it is:          $ 200,000

          The Deductible is:                        $      250

          The amount of loss is:                    $   40,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate, and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

  **b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example 3**

When:  The value of property is:
          Building at Location 1:          $   75,000
          Building at Location 2:          $ 100,000
          Personal Property at
          Location 2:                      $   75,000
                                           $ 250,000

          The Coinsurance percentage for it is:          90%
          The Limit of Insurance for
            Buildings and Personal Property
            at Locations 1 and 2 is:       $ 180,000
          The Deductible is:               $    1,000

          The amount of loss is:
          Building at Location 2:          $   30,000
          Personal Property at
            Location 2:                    $   20,000
                                           $   50,000

Step **(1):** $250,000 x 90% = $225,000
          (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step **(2):** $180,000 : $225,000 = .80

Step **(3):** $50,000 x .80 = $40,000

Step **(4):** $40,000 - $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

  **a.** The term mortgageholder includes trustee.

  **b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

  **c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

  **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

  **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

  **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

  **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

  All of the terms of this Coverage Part will then apply directly to the mortgageholder.

  **e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

  **(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

  **(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

  At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

  **f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

  **(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

## G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

### 1. Agreed Value

**a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

**b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

**(1)** On or after the effective date of this Optional Coverage; and

**(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

### 2. Inflation Guard

**a.** The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

**b.** The amount of increase will be:

**(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

**(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example**

If:  The applicable Limit of Insurance is:          $  100,000
     The annual percentage increase is:                        8%
     The number of days since the beginning
     of the policy year (or last policy change) is:         146

     The amount of increase is:
     $100,000 x .08 x 146 ÷ 365 =                   $    3,200

### 3. Replacement Cost

**a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

**b.** This Optional Coverage does not apply to:

**(1)** Personal property of others;

**(2)** Contents of a residence;

**(3)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

**(4)** "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced; and

**(2)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

**(3)** If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

Copyright, Insurance Services Office, Inc., 2011

**(4)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

**a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

**b.** With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

 Copyright, Insurance Services Office, Inc., 2011

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit Of Insurance is shown in the Declarations:

**(1)** Business Income Including "Rental Value".

**(2)** Business Income Other Than "Rental Value".

**(3)** "Rental Value".

If option **(1)** above is selected, the term Business Income will include "Rental Value". If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises means:

**(a)** The portion of the building which you rent, lease or occupy;

**(b)** The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

**(c)** Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

### 2. Extra Expense

**a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

 Copyright, Insurance Services Office, Inc., 2011

**(2)** Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

**3. Covered Causes Of Loss, Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Limitation - Interruption Of Computer Operations**

**a.** Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**b.** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**c.** Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**d.** This Additional Limitation does not apply when loss or damage to electronic data involves only electronic data which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**5. Additional Coverages**

**a. Civil Authority**

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.

Copyright, Insurance Services Office, Inc., 2011

**b. Alterations And New Buildings**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

**(a)** Used in the construction, alterations or additions; or

**(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**c. Extended Business Income**

**(1) Business Income Other Than "Rental Value"**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 60 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(2) "Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 60 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**d. Interruption Of Computer Operations**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Additional Limitation - Interruption Of Computer Operations.

 Copyright, Insurance Services Office, Inc., 2011

**(2)** Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss. However, we will not provide coverage under this Additional Coverage when the Additional Limitation - Interruption Of Computer Operations does not apply based on Paragraph **A.4.d.** therein.

**(3)** With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

   **(a)** If the Causes Of Loss - Special Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

   **(b)** If the Causes Of Loss - Broad Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, includes Collapse as set forth in that form.

   **(c)** If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Interruption Of Computer Operations.

   **(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Interruption Of Computer Operations, is $2,500 (unless a higher limit is shown in the Declarations) for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

**(5)** This Additional Coverage, Interruption Of Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(4)** above has not been exhausted.

**6.** **Coverage Extension**

   If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

   **Newly Acquired Locations**

   **a.** You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

   **b.** The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location, unless a higher limit is shown in the Declarations.

   **c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

      **(1)** This policy expires;

**(2)** 30 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

## B. Limits Of Insurance

The most we will pay for loss in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

**1.** Alterations And New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage.

## C. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 2. Duties In The Event Of Loss

**a.** You must see that the following are done in the event of loss:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the direct physical loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(7)** Cooperate with us in the investigation or settlement of the claim.

**(8)** If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Loss Determination**

**a.** The amount of Business Income loss will be determined based on:

**(1)** The Net Income of the business before the direct physical loss or damage occurred;

**(2)** The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

**(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

**(4)** Other relevant sources of information, including:

**(a)** Your financial records and accounting procedures;

**(b)** Bills, invoices and other vouchers; and

**(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

**(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred.  We will deduct from the total of such expenses:

**(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

**(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(2)** Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c. Resumption Of Operations**

We will reduce the amount of your:

**(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**4. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**a.** We have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

**D. Additional Condition**

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

**1.** The Coinsurance percentage shown for Business Income in the Declarations; times

**2.** The sum of:

**a.** The Net Income (Net Profit or Loss before income taxes), and

**b.** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

Step **(1):** Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

Step **(2):** Divide the Limit of Insurance for the described premises by the figure determined in Step **(1);** and

Step **(3):** Multiply the total amount of loss by the figure determined in Step **(2).**

We will pay the amount determined in Step **(3)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**(1)** Prepaid freight - outgoing;

**(2)** Returns and allowances;

**(3)** Discounts;

**(4)** Bad debts;

**(5)** Collection expenses;

**(6)** Cost of raw stock and factory supplies consumed (including transportation charges);

**(7)** Cost of merchandise sold (including transportation charges);

**(8)** Cost of other supplies consumed (including transportation charges);

**(9)** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

**(10)** Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

**(11)** All payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

**(12)** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion - not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example 1 (Underinsurance)**

When:   The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $ 400,000

The Coinsurance percentage is: 50%

The Limit of Insurance is: $ 150,000

The amount of loss is: $ 80,000

Step **(1):** $400,000 x 50% = $200,000
(the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2):** $150,000 / $200,000 = .75

Step **(3):** $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example 2 (Adequate Insurance)**

When:   The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $ 400,000

The Coinsurance percentage is: 50%

The Limit of Insurance is: $ 200,000

The amount of loss is: $ 80,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

**E. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Maximum Period Of Indemnity**

   **a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

**b.** The most we will pay for the total of Business Income loss and Extra Expense is the lesser of:

**(1)** The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or

**(2)** The Limit Of Insurance shown in the Declarations.

**2. Monthly Limit Of Indemnity**

**a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

**b.** The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

**(1)** The Limit of Insurance, multiplied by

**(2)** The fraction shown in the Declarations for this Optional Coverage.

**Example**

| | | |
|---|---|---|
| When: The Limit of Insurance is: | $ | 120,000 |
| The fraction shown in the Declarations for this Optional Coverage is: | | 1/4 |
| The most we will pay for loss in each period of 30 consecutive days is: ($120,000 x 1/4 = $ 30,000) | $ | 30,000 |
| If, in this example, the actual amount of loss is: | | |
| Days 1-30: | $ | 40,000 |
| Days 31-60: | $ | 20,000 |
| Days 61-90: | $ | 30,000 |
| | $ | 90,000 |
| We will pay: | | |
| Days 1-30: | $ | 30,000 |
| Days 31-60: | $ | 20,000 |
| Days 61-90: | $ | 30,000 |
| | $ | 80,000 |

The remaining $10,000 is not covered.

**3. Business Income Agreed Value**

**a.** To activate this Optional Coverage:

**(1)** A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

**(a)** During the 12 months prior to the date of the Work Sheet; and

**(b)** Estimated for the 12 months immediately following the inception of this Optional Coverage.

**(2)** The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

**(a)** The Coinsurance percentage shown in the Declarations; multiplied by

**(b)** The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

**b.** The Additional Condition, Coinsurance, is suspended until:

**(1)** 12 months after the effective date of this Optional Coverage; or

**(2)** The expiration date of this policy;

whichever occurs first.

**c.** We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

**(1)** Within 12 months of the effective date of this Optional Coverage; or

**(2)** When you request a change in your Business Income Limit of Insurance.

**d.** If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

**(1)** The Business Income Limit of Insurance; divided by

**(2)** The Agreed Value.

**Example**

| | | |
|---|---|---|
| When: The Limit of Insurance is: | $ | 100,000 |
| The Agreed Value is: | $ | 200,000 |
| The amount of loss is: | $ | 80,000 |

**Step (1):** $100,000 / $200,000 = .50

**Step (2):** .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

**4. Extended Period Of Indemnity**

Under Paragraph **A.5.c., Extended Business Income,** the number 60 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

 Copyright, Insurance Services Office, Inc., 2011    CP 00 30 10 12

## F. Definitions

1. "Finished stock" means stock you have manufactured.

   "Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

   "Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

2. "Operations" means:

   a. Your business activities occurring at the described premises; and

   b. The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

3. "Period of restoration" means the period of time that:

   a. Begins:

      (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

      (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

      caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the earlier of:

      (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      (2) The date when business is resumed at a new permanent location.

   "Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

      (1) Regulates the construction, use or repair, or requires the tearing down, of any property; or

      (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

   The expiration date of this policy will not cut short the "period of restoration".

4. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

5. "Rental Value" means Business Income that consists of:

   a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

   b. Continuing normal operating expenses incurred in connection with that premises, including:

      (1) Payroll; and

      (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

6. "Suspension" means:

   a. The slowdown or cessation of your business activities; or

   b. That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

Copyright, Insurance Services Office, Inc., 2011

CP 00 90 07 88

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in **1.** above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

**1.** We cover loss or damage commencing:

   **a.** During the policy period shown in the Declarations; and

   **b.** Within the coverage territory.

**2.** The coverage territory is:

   **a.** The United States of America (including its territories and possessions);

   **b.** Puerto Rico; and

   **c.** Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property or Covered Income.

**2.** After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   **a.** Someone insured by this insurance;

   **b.** A business firm:

     **(1)** Owned or controlled by you; or

     **(2)** That owns or controls you; or

   **c.** Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

COMMERCIAL PROPERTY
CP 10 30 09 17

# CAUSES OF LOSS - SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning.  Refer to Section **G.** Definitions.

## A. Covered Causes Of Loss

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of or compliance with any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion.  But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   (a) Airborne volcanic blast or airborne shock waves;

   (b) Ash, dust or particulate matter; or

   (c) Lava flow.

   With respect to coverage for Volcanic Action as set forth in **(5)(a)**, **(5)(b)** and **(5)(c)**, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5),** is caused by an act of nature or is otherwise caused.

 Copyright, Insurance Services Office, Inc., 2016

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

Copyright, Insurance Services Office, Inc., 2016

But if any of the above, in Paragraphs **(1)** through **(5),** results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**h.  "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungus", wet or dry rot or bacteria result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. (1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force.  But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion.  We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

 Copyright, Insurance Services Office, Inc., 2016

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

**(1)** Applies whether or not an act occurs during your normal hours of operation;

**(2)** Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.,** does not apply:

**(a)** To the extent that coverage is provided under the Additional Coverage, Collapse; or

**(b)** To collapse caused by one or more of the following:

**(i)** The "specified causes of loss";

**(ii)** Breakage of building glass;

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.,** does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

Copyright, Insurance Services Office, Inc., 2016

of part or all of any property on or off the described premises.

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.,** Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.** Ordinance Or Law;

**(b)** Paragraph **B.1.c.** Governmental Action;

**(c)** Paragraph **B.1.d.** Nuclear Hazard;

**(d)** Paragraph **B.1.e.** Utility Services; and

**(e)** Paragraph **B.1.f.** War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

    Copyright, Insurance Services Office, Inc., 2016

**5. Additional Exclusion**

The following provisions apply only to the specified property:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   **a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   **b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   **c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

   **(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

   **(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   **d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

   However, this limitation does not apply to:

   **(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

   **(2)** Business Income Coverage or Extra Expense Coverage.

   **e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   **f.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

   **g.** Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

   **(1)** Dampness or dryness of atmosphere or of soil supporting the vegetation;

   **(2)** Changes in or extremes of temperature;

   **(3)** Disease;

   **(4)** Frost or hail; or

   **(5)** Rain, snow, ice or sleet.

**2.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   **a.** Animals, and then only if they are killed or their destruction is made necessary.

   **b.** Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

   **(1)** Glass; or

   **(2)** Containers of property held for sale.

   **c.** Builders' machinery, tools and equipment owned by you  or entrusted to you, provided such property is Covered Property.

   However, this limitation does not apply:

   **(1)** If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

Copyright, Insurance Services Office, Inc., 2016

**(2)** To Business Income Coverage or to Extra Expense Coverage.

**3.** The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are (unless a higher limit is shown in the Declarations):

**a.** $2,500 for furs, fur garments and garments trimmed with fur.

**b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**c.** $2,500 for patterns, dies, molds and forms.

**d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

**4.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

**a.** Results in discharge of any substance from an automatic fire protection system; or

**b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage - Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

**1.** For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**2.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

**a.** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**b.** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**c.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

**d.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(1)** A cause of loss listed in **2.a. or 2.b.**;

**(2)** One or more of the "specified causes of loss";

**(3)** Breakage of building glass;

**(4)** Weight of people or personal property; or

**(5)** Weight of rain that collects on a roof.

**3.** This **Additional Coverage - Collapse** does **not** apply to:

**a.** A building or any part of a building that is in danger of falling down or caving in;

**b.** A part of a building that is standing, even if it has separated from another part of the building; or

**c.** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**4.** With respect to the following property:

**a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

Copyright, Insurance Services Office, Inc., 2016

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

**e.** Fences;

**f.** Piers, wharves and docks;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**i.** Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.,** we will pay for loss or damage to that property only if:

**(1)** Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

**(2)** The property is Covered Property under this Coverage Form.

**5.** If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**a.** The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.;**

**b.** The personal property which collapses is inside a building; and

**c.** The property which collapses is not of a kind listed in **4.,** regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**6.** This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**7.** This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

**8.** The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in **D.1.** through **D.7.**

**E.** **Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

**1.** The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

**a.** A "specified cause of loss" other than fire or lightning; or

**b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

**2.** We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

**a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

**b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

**c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

**3.** The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

Copyright, Insurance Services Office, Inc., 2016

**4.** The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**5.** The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss form or under the Additional Coverage, Collapse.

**6.** The following, **6.a.** or **6.b.,** applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

**a.** If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

**b.** If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**F. Additional Coverage Extensions**

**1. Property In Transit**

This Extension applies only to your personal property to which this form applies.

**a.** You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

**b.** Loss or damage must be caused by or result from one of the following causes of loss:

**(1)** Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

**(2)** Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

**(3)** Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

**c.** The most we will pay for loss or damage under this Extension is $5,000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**2. Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

Copyright, Insurance Services Office, Inc., 2016

3. **Glass**

   **a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

   **b.** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

This Coverage Extension, **F.3.** does not increase the Limit of Insurance.

## G. Definitions

   **1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

   **2.** "Specified causes of loss"  means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   **a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.  This cause of loss does not include:

     **(1)** The cost of filling sinkholes; or

     **(2)** Sinking or collapse of land into man-made underground cavities.

   **b.** Falling objects does not include loss or damage to:

     **(1)** Personal property in the open; or

     **(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   **c.** Water damage means:

     **(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

     **(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe caused by wear and tear, when the pipe is located off the described premises and is connected to or is part of a potable water supply system or sanitary sewer system operated by a public or private utility service provider pursuant to authority granted by the state or governmental subdivision where the described premises are located.

But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss", such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.

Copyright, Insurance Services Office, Inc., 2016

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ENDORSEMENT - VACANCY RESTRICTION AND FUNGUS EXCLUSION CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** The **Building and Personal Property Coverage Form** and **Condominium Commercial Unit-Owners Coverage Form** are revised as follows:

    **1.** Paragraph **6.b. Vacancy Provisions** of the **Building and Personal Property Coverage Form** and Paragraph **7.b.** in the **Condominium Commercial Unit-Owners Coverage Form** of Section **E., Loss Conditions** is replaced by the following:

    We will not pay for loss of or damage to any building that:

    **a.** Has been vacant for more than sixty consecutive days before that loss or damage occurs; or

    **b.** Was vacant at policy inception.

    This provision does not apply if the Vacancy Permit applies.

    **2.** The following is added to Section **E., Loss Conditions**:

    **Increase In Hazard**

    We will not pay for loss or damage occurring while the hazard is increased by any means within your control or knowledge, or is not usual to the occupancy.

**B.** The **Causes Of Loss - Basic Form**, **Causes Of Loss - Broad Form**, and **Causes Of Loss - Special Form** are revised as follows:

    **1.** Exclusion **B.1.h.**, **"Fungus", Wet Rot, Dry Rot, And Bacteria** is replaced by the following:

    **h.** **"Fungus", Wet Rot, Dry Rot, And Bacteria**

    Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot, or bacteria.

    **2.** **Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot, And Bacteria** is deleted.

**C.** The following provision is added to the **COMMON POLICY CONDITIONS**:

    **Premiums - Fully Earned:**

    If loss or damage by a Covered Cause of Loss occurs to Covered Property and the Limit of Insurance for that Covered Property is paid, then the entire premium for such Covered Property is earned and no premium refund will be due in the event of cancellation.

© 2016 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FEDERAL TERRORISM RISK INSURANCE ACT DISCLOSURE

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

The federal Terrorism Risk Insurance Act of 2002 as amended ("TRIA") establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in TRIA) caused by "Acts Of Terrorism" (as defined in TRIA).  "Act Of Terrorism" is defined in Section 102(1) of TRIA to mean any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for such Insured Losses is established by TRIA and is a percentage of the amount of such Insured Losses in excess of each Insurer's "Insurer Deductible" (as defined in TRIA), subject to the "Program Trigger" (as defined in TRIA).  Through 2020, that percentage is established by TRIA as follows:

85% with respect to such Insured Losses occurring in calendar year 2015.

84% with respect to such Insured Losses occurring in calendar year 2016.

83% with respect to such Insured Losses occurring in calendar year 2017.

82% with respect to such Insured Losses occurring in calendar year 2018.

81% with respect to such Insured Losses occurring in calendar year 2019.

80% with respect to such Insured Losses occurring in calendar year 2020.

In no event, however, will the Federal Government be required to pay any portion of the amount of such Insured Losses occurring in a calendar year that in the aggregate exceeds $100 billion, nor will any Insurer be required to pay any portion of such amount provided that such Insurer has met its Insurer Deductible.  Therefore, if such Insured Losses occurring in a calendar year exceed $100 billion in the aggregate, the amount of any payments by the Federal Government and any coverage provided by this policy for losses caused by Acts Of Terrorism may be reduced.

The charge for such Insured Losses under this Coverage Part is included in the Coverage Part premium. The charge for such Insured Losses that has been included for this Coverage Part is indicated below, and does not include any charge for the portion of such Insured Losses covered by the Federal Government under TRIA:

- 7% of your total Commercial Property Coverage Part premium if your primary location is in a Designated City (as listed below).

- 3% of your total Commercial Property Coverage Part premium if your primary location is not in a Designated City (as listed below).

© 2015 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Designated Cities are:**

| | | | |
|---|---|---|---|
| Albuquerque, NM | El Paso, TX | Miami, FL | San Diego, CA |
| Atlanta, GA | Fort Worth, TX | Milwaukee, WI | San Antonio, TX |
| Austin, TX | Fresno, CA | Minneapolis, MN | San Francisco, CA |
| Baltimore, MD | Honolulu, HI | Nashville-Davidson, TN | San Jose, CA |
| Boston, MA | Houston, TX | New Orleans, LA | Seattle, WA |
| Charlotte, NC | Indianapolis, IN | New York, NY | St. Louis, MO |
| Chicago, IL | Jacksonville, FL | Oakland, CA | Tucson, AZ |
| Cleveland, OH | Kansas City, MO | Oklahoma City, OK | Tulsa, OK |
| Colorado Springs, CO | Las Vegas, NV | Omaha, NE | Virginia Beach, VA |
| Columbus, OH | Long Beach, CA | Philadelphia, PA | Washington, DC |
| Dallas, TX | Los Angeles, CA | Phoenix, AZ | Wichita, KS |
| Denver, CO | Memphis, TN | Portland, OR | |
| Detroit, MI | Mesa, AZ | Sacramento, CA | |

© 2015 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**CP T3 81 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MULTIPLE DEDUCTIBLE FORM
## (FIXED DOLLAR DEDUCTIBLES)

*This endorsement is **EFFECTIVE**:   09/01/2018          *and is part of Policy Number: WS355533

*issued to:Altaf Hudani

*Entry optional if shown in the Common Policy Declarations.  If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM

** For each deductible listed in the Schedule, enter the number corresponding to the Covered Cause(s) of Loss to which that deductible applies (or enter the description):

- **(1)**  All Covered Causes of Loss
- **(2)**  All Covered Causes of Loss **except** Windstorm or Hail
- **(3)**  All Covered Causes of Loss **except** Theft
- **(4)**  All Covered Causes of Loss **except** Windstorm or Hail and Theft
- **(5)**  Windstorm or Hail
- **(6)**  Theft
- **(7)**  Vandalism
- **(8)**  Other Peril: _____

Information required to complete the Schedule, if not shown in this endorsement, will be shown in the Declarations.

The following is added to the Deductible section:

**A.**  In the event that loss or damage occurs to Covered Property at more than one building location as a result of one occurrence, the largest applicable deductible for that Covered Cause of Loss, shown in the Schedule below or in the Declarations, will apply.

**B.**  The terms of this endorsement do not apply to any Windstorm or Hail Percentage Deductible provided elsewhere in this policy.

**C.**  This policy does not cover Earthquake or Flood unless such causes of loss are added to the policy as covered causes of loss.  If Earthquake and/or Flood are added to this policy as covered causes of loss, the terms of this endorsement do not apply to Earthquake or Flood and corresponding deductibles will be shown elsewhere in this policy and identified as such.

### SCHEDULE

The Deductibles applicable to any one occurrence are shown below:

| Prem. No. | Bldg. No. | Deductible | Covered Causes of Loss ** |
|-----------|-----------|------------|---------------------------|
| 001 | 001 | $    1,000 | All Covered Causes of Loss |
| 001 | 002 | $    1,000 | All Covered Causes of Loss |

© 2018 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

*This endorsement is **EFFECTIVE**    09/01/2018         *and is part of Policy Number:  WS355533

*issued to: Altaf Hudani

*Entry optional if shown in the Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**SCHEDULE**

| Premises Number | Building Number | Protective Safeguards Symbols Applicable |
|---|---|---|
| ALL | ALL | P-9 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Describe any "P-9":**

SMOKE DETECTORS

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.**   The following is added to the Commercial Property Conditions:

**Protective Safeguards**

1.   As a condition of this insurance, you are required to maintain the protective safeguards listed in the Schedule above in complete working order.

2.   Actively engage any automatic fire alarm or other automatic system listed in the Schedule and maintain it in the "on" position at all times.

3.   Notify us if you know of any suspension or impairment in any protective safeguard listed in the Schedule.

4.   The protective safeguards to which this endorsement applies are identified by the following symbols:

**"P-1" Automatic Sprinkler System**, including related supervisory services.

Automatic Sprinkler System means:

**a.** Any automatic fire protective or extinguishing system, including connected:

    **(1)** Sprinklers and discharge nozzles;

    **(2)** Ducts, pipes, valves and fittings;

    **(3)** Tanks, their component parts and supports; and

    **(4)** Pumps and private fire protection mains.

**b.** When supplied from an automatic fire protective system:

    **(1)** Non-automatic fire protective systems; and

    **(2)** Hydrants, standpipes and outlets.

**"P-2" Automatic Fire Alarm**, protecting the entire building, that is:

**a.** Connected to a central station; or

**b.** Reporting to a public or private fire alarm station.

**"P-3" Security Service**, with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**"P-5" Automatic Commercial Cooking Exhaust And Extinguishing System** installed on cooking appliances and having the following components:

**a.** Hood;

**b.** Grease removal device;

**c.** Duct system; and

**d.** Fire extinguishing equipment.

**"P-9"**, the protective system described in the Schedule.

**3.** This endorsement will remain in force unless the first Named Insured shown in the Declarations mails or delivers to us, in advance, a written request to remove this endorsement from the policy.

**B.** The following is added to the **Exclusions** section of:

Causes Of Loss - Basic Form
Causes Of Loss - Broad Form
Causes Of Loss - Special Form

We will not pay for loss or damage caused by or resulting from fire, explosion or vandalism if, prior to the fire, explosion or vandalism, you failed to comply with any condition set forth in Paragraph **A.**, **Protective Safeguards**.

If part of an Automatic Sprinkler System or Automatic Commercial Cooking Exhaust And Extinguishing System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

© 2016 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
S2971-CP (9/17)                                                                                                                                          Page 2 of 2

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# THEFT EXCLUSION

This endorsement modifies insurance provided under the following:

CAUSES OF LOSS - SPECIAL FORM

The following is added to the **EXCLUSIONS** Section:

We will not pay for loss or damage caused by or resulting from theft, and from acts of vandalism committed concurrently or in conjunction with theft.

But we will pay for:

**1.** Loss or damage that occurs due to looting at the time and place of a riot or civil commotion; or

**2.** Building damage caused by the breaking in or exiting of burglars.

And if theft results in a Covered Causes of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

© 2015 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

S2983-CP (11/15)

**COMMERCIAL PROPERTY
CP 02 99 06 07**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CANCELLATION CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

The following is added to the **Cancellation** Common Policy Condition:

If any one of the following conditions exists at any building that is Covered Property in this policy, we may cancel this Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least five days before the effective date of cancellation.

**A.** The building has been vacant or unoccupied 60 or more consecutive days. This dos not apply to:

   **1.** Seasonal unoccupancy;

   **2.** Buildings in the course of construction, renovation or addition; or

   **3.** Buildings to which the Vacancy Permit endorsement applies.

   Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

**B.** After damage by a covered cause of loss, permanent repairs to the building:

   **1.** Have not started; and

   **2.** Have not been contracted for,

   within 30 days of initial payment of loss.

**C.** The building has:

   **1.** An outstanding order to vacate;

   **2.** An outstanding demolition order;

   **3.** Been declared unsafe by governmental authority.

**D.** Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

**E.** Failure to:

   **1.** Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

   **2.** Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

Copyright, ISO Properties, Inc., 2007

COMMERCIAL PROPERTY
CP 12 70 09 96

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# JOINT OR DISPUTED LOSS AGREEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** This endorsement is intended to facilitate payment of insurance proceeds when:

  **1.** Both a boiler and machinery policy and this commercial property policy are in effect;

  **2.** Damage occurs to Covered Property that is insured by the boiler and machinery policy and this commercial property policy; and

  **3.** There is disagreement between the insurers as to whether there is coverage or as to the amount of the loss to be paid, if any, by each insurer under its own policies.

**B.** This endorsement does not apply if:

  **1.** Both the boiler and machinery insurer(s) and we do not admit to any liability; and

  **2.** Neither the boiler and machinery insurer(s) nor we contend that coverage applies under the other insurer's policy.

**C.** The provisions of this endorsement apply only if all of the following requirements are met:

  **1.** The boiler and machinery policy carried by the named insured, insuring the Covered Property, contains a similar provision at the time of the loss or damage, with substantially the same requirements, procedures and conditions as contained in this endorsement.

  **2.** The damage to the Covered Property was caused by a loss for which:

    **a.** Both the boiler and machinery insurer(s) and we admit to some liability for payment under the respective policies; or

    **b.** Either:

      **(1)** The boiler and machinery insurer(s) does not admit to any liability for payment, while we contend that:

        **(a)** All liability exists under the boiler and machinery policy; or

        **(b)** Some liability exists under both the boiler and machinery policy and this commercial property policy;

      **(2)** We do not admit to any liability for payment, while the boiler and machinery insurer(s) contends that:

        **(a)** All liability exists under this commercial property policy; or

        **(b)** Some liability exists under both the boiler and machinery policy and this commercial property policy; or

      **(3)** Both the boiler and machinery insurer(s) and we:

        **(a)** Do not admit to any liability for payment; and

        **(b)** Contend that some or all liability exists under the other insurer's policy; and

  **3.** The total amount of the loss is agreed to by you, the boiler and machinery insurer(s) and us.

**D.** If the requirements listed in Paragraph **C.** above are satisfied, we and the boiler and machinery insurer(s) will make payments to the extent, and in the manner, described as follows:

  **1.** We will pay, after your written request, the entire amount of loss that we have agreed as being covered, if any, by this commercial property policy and one-half (1/2) the amount of the loss that is in disagreement.

  **2.** The boiler and machinery insurer(s) will pay, after your written request, the entire amount of loss that they have agreed as being covered, if any, by the boiler and machinery policy and one-half (1/2) the amount of loss that is in disagreement.

  **3.** Payments by the insurers of the amounts that are in disagreement, as described in Paragraphs **1.** and **2.**, do not alter, waive or surrender any rights of any insurer against any other with regard to the portion of the loss for which each insurer is liable.

  **4.** The amount in disagreement to be paid by us under this endorsement shall not exceed the amount payable under the equivalent Loss Agreement(s) of the boiler and machinery policy.

Copyright, ISO Commercial Risk Services, Inc., 1996

5. The amount to be paid under this endorsement shall not exceed the amount we would have paid had no boiler and machinery policy been in effect at the time of loss. In no event will we pay more than the applicable Limit of Insurance shown in the Declarations.

6. Acceptance by you of sums paid under this endorsement does not alter, waive or surrender any other rights against us.

**E. Arbitration**

1. If the circumstances described in Paragraph **C.2.a.** exist and the boiler and machinery insurer(s) and we agree to submit our differences to arbitration, the boiler and machinery insurer(s) and we will determine the amount each will pay and will pay the insured within 90 days. Arbitration will then take place within 90 days after payment of the loss under the terms of this endorsement.

2. If any of the circumstances described in Paragraph **C.2.b.** exist, then the boiler and machinery insurer(s) and we agree to submit our differences to arbitration within 90 days after payment of the loss under the terms of this endorsement.

3. You agree to cooperate with any arbitration procedures. There will be three arbitrators: one will be appointed by us, and another will be appointed by the boiler and machinery insurer(s). The two arbitrators will select a third arbitrator. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. A decision agreed to by two of the three arbitrators will be binding on both parties. Judgment on any award can be entered in any court that has jurisdiction.

**F. Final Settlement Between Insurers**

The insurer(s) found responsible for the greater percentage of the ultimate loss must return the excess contribution to the other insurer(s). In addition, the insurer(s) found responsible for the greater portion of the loss must pay Liquidated Damages to the other insurer(s) on the amount of the excess contribution of the other insurer(s). Liquidated Damages are defined as interest from the date the insured invokes this Agreement to the date the insurer(s) that contributed the excess amount is reimbursed. The interest is calculated at 1.5 times the highest prime rate from the Money Rates column of the Wall Street Journal during the period of the Liquidated Damages. Arbitration expenses are not a part of the excess contribution for which liquidated damages are calculated. Arbitration expenses will be apportioned between insurers on the same basis that the ultimate loss is apportioned.

Copyright, ISO Commercial Risk Services, Inc., 1996

THESE ENDORSEMENTS CHANGE THE POLICY. PLEASE READ THEM CAREFULLY.

**THESE ENDORSEMENTS CHANGE THE POLICY. PLEASE READ THEM CAREFULLY.**

These endorsements modify insurance provided under the COMMERCIAL GENERAL LIABILITY COVERAGE PART.

# EXCLUSION - PUNITIVE OR EXEMPLARY DAMAGES

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Punitive Or Exemplary Damages**

Any claim for punitive or exemplary damages, fines, penalties or multiplied damages.

S43-CG (1/14)       © 2014 The Travelers Indemnity Company.  All rights reserved.

# EXCLUSION - VOLUNTARY LABOR

This insurance does not apply to "bodily injury" or "personal and advertising injury" to, or medical expense sustained by, any person loaned to or volunteering services to you arising out of or in the course of work performed on your behalf.

S49-CG  (10/04)

# AMENDMENT - DEPOSIT PREMIUM AND MINIMUM PREMIUM

Paragraph b. of Commercial General Liability Condition 5. Premium Audit is replaced by the following:

Premium shown in this Coverage Part as advance premium is both a deposit premium and a minimum premium for the full policy period.  At the close of each audit period, we will compute the earned premium for that period. If the earned premium is more than the advance premium, notice of the amount by which it exceeds the advance premium will be sent to the first Named Insured.  The due date for the audit and retrospective premiums is the date shown as the due date on the bill.  If the earned premium is less than the advance premium, the advance premium will apply as the minimum premium, with no return premium payable to you.

S56-CG (10/04)

# EXCLUSION - PROFESSIONAL SERVICES

**PROVISIONS**

**1.** The following exclusion is added to Paragraph **2.**, **Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE:**

**Professional Services**

"Bodily injury" or "property damage" arising out of the providing or failure to provide "professional services".

**2.** The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY:**

**Professional Services**

"Personal and advertising injury" arising out of the providing or failure to provide "professional services".

**3.** The following is added to the **DEFINITIONS** Section:

"Professional services" means only those services performed by an insured in the insured's professional capacity as a provider of the services identified under the Classification column in the Premium Section of the Declarations.

S311-CG (3/11)

© 2011 The Travelers Indemnity Company.  All rights reserved.

**THESE ENDORSEMENTS CHANGE THE POLICY. PLEASE READ THEM CAREFULLY.**

These endorsements modify insurance provided under the COMMERCIAL GENERAL LIABILITY COVERAGE PART.

# EXCLUSION - LIQUOR - ABSOLUTE

The following replaces Exclusion **c.**, **Liquor Liability**, in Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person, including causing or contributing to the intoxication of any person because alcoholic beverages were permitted to be brought on your premises for consumption on your premises;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

© 2014 The Travelers Indemnity Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

S354-CG  (2/14)

   © 2011 The Travelers Indemnity Company.  All rights reserved.

Exhibit B

Electronically FILED by Superior Court of California, County of Los Angeles on 08/28/2019 01:39 PM Sherri R. Carter, Executive Officer/Clerk of Court, by K. Vargas,Deputy Clerk

| | SUM-100 |
|---|---|

# SUMMONS
## *(CITATION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

ALTAF HUDANI, individually and in his capacity as the Trustee of the
HUDANI TRUST; JASMINE HUDANI, an individual; and DOES 1
through 50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

PATRICK BENJAMIN NASH, an individual; and RYAN PAUL
NASH, an individual

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es)* Stanley Mosk Courthouse<br>111 N Hill Street, Los Angeles, CA 90012 | CASE NUMBER:<br>*(Número del Caso):*<br>19STCV30804 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Zainah Alfi, Excelsis Law, P.C., 1000 Wilshire Blvd, Ste 600, Los Angeles, CA 90012; (213) 340-0300

| | | | |
|---|---|---|---|
| DATE: 08/28/2019 August, 28, 2019<br>*(Fecha)* | Sherri R. Carter Executive Officer / Clerk of Court | Clerk, by Kristina Vargas<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [X] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify)*:

3. [X] on behalf of *(specify)*: ALTAF HUDANI, Trustee, the HUDANI TRUST

under: [ ] CCP 416.10 (corporation)     [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation)     [ ] CCP 416.70 (conservatee)
[ ] CCP 416.40 (association or partnership)     [ ] CCP 416.90 (authorized person)
[X] other *(specify)*: Trust
4. [ ] by personal delivery on *(date)*:

**Page 1 of 1**

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courtinfo.ca.gov* |

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Michael Stern

Electronically FILED by Superior Court of California, County of Los Angeles on 08/28/2019 04:41 PM Sherri R. Carter, Executive Officer/Clerk of Court, by K. Vargas,Deputy Clerk

1    **EXCELSIS LAW, P.C.**
   ZAINAH ALFI (SBN 304164)
2    C. GENEVIEVE JENKINS (SBN 271128)
   1000 Wilshire Blvd., Suite 600
3    Los Angeles, California 90017
   Telephone: (213) 340-0300
4    Facsimile: (213) 340-0200
   zalfi@excelsislaw.com
5
   Attorneys for Plaintiffs,
6    PATRICK BENJAMIN NASH,
   and RYAN PAUL NASH
7

8

9                SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                     FOR THE COUNTY OF LOS ANGELES

11

12   PATRICK BENJAMIN NASH, an       Case No.   19STCV30804
   individual; and RYAN PAUL NASH, an
13   individual,

14          Plaintiffs,              **COMPLAINT FOR DAMAGES**

15          vs.                      1. **NEGLIGENT MAINTENANCE OF PREMISES;**
                                  2. **NEGLIGENT INFLICTION OF EMOTIONAL**
16   ALTAF HUDANI, individually and in his      **DISTRESS;**
   capacity as the Trustee of the HUDANI    3. **TORTIOUS BREACH OF WARRANTY OF**
17   TRUST; JASMINE HUDANI, an individual;      **HABITABILITY;**
   and DOES 1 through 50, inclusive,      4. **BREACH OF IMPLIED COVENANT OF QUIET**
18                                   **ENJOYMENT;**
            Defendants.             5. **RETALIATION – CIV. CODE § 1942.5;**
19                                  6. **VIOLATION OF CIV. CODE § 1940.2;**
                                  7. **COLLECTION OF RENT ON UNTENANTABLE**
20                                   **DWELLING – CIV. CODE § 1942.4;**
                                  8. **FAILURE TO TIMELY RETURN SECURITY**
21                                   **DEPOSIT – CIV. CODE § 1950.2;**
                                  9. **NUISANCE; AND**
22                                  10. **INTENTIONAL INFLICTION OF EMOTIONAL**
                                   **DISTRESS.**
23

24

25                                  **[DEMAND FOR JURY TRIAL]**

26

27

28

Plaintiffs Patrick Benjamin Nash and Ryan Paul Nash ("Plaintiffs") hereby bring this Complaint for Damages against Defendant Altaf Hudani in his individual capacity and in his capacity as Trustee of the Hudani Trust, Defendant Jasmine Hudani, and DOES 1 through 50, inclusive, and allege as follows on their knowledge or on information and belief as to all other matters:

I.

**PARTIES**

1.     Plaintiff Patrick Benjamin Nash is an individual who, at all times relevant to this Complaint, resided in Los Angeles County at 228 Atlantic Avenue, Long Beach, CA 90802 (the "Property"), pursuant to a written lease.

2.     Plaintiff Ryan Paul Nash is an individual who, at all times relevant to this Complaint, resided in Los Angeles County at the Property, pursuant to a written lease.

3.     Defendant Altaf Hudani is an individual who, at all times relevant to this Complaint, resided in Los Angeles County, and is an owner of the Property, located in Los Angeles County.

4.     Defendant Altaf Hudani also serves as trustee of the Hudani Trust, who at all relevant times relevant to this Complaint, was an owner of the Property.

5.     Defendant Jasmine Hudani is an individual who, at all times relevant to this Complaint, resided in Los Angeles County, and served as the real estate agent for the owner and the manager of the Property.

6.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of said defendants when the same has been ascertained.  Each of the fictitiously named defendants is responsible in some manner for the acts complained of herein.  Unless otherwise stated, all references to named defendants shall include DOE defendants as well.

II.

**JURISDICTION AND VENUE**

7.     Jurisdiction and venue are proper in this Court because all of the claims alleged herein

- 2 -

COMPLAINT FOR DAMAGES

arose in Los Angeles County and all of the Defendants are doing or did business or reside in Los Angeles County, and/or their principal place of business is in Los Angeles County, in each case, at the times relevant herein.

8.    The amount in controversy in this matter exceeds the sum of $25,000.00, exclusive of interest and costs.

## III.

## FACTUAL ALLEGATIONS

9.    Plaintiffs were tenants of the front unit of a split home, located at 228 Atlantic Avenue, Long Beach, CA 90802 (hereinafter, the "Property"). The Property consists of two (2) bedrooms and one (1) bathroom and is approximately five hundred and forty (540) square feet.

10.    The rear unit, located at 228 ½ Atlantic Avenue, Long Beach, CA 90802, has a separate parking area and entrance, and does not share any common area with the Property. The rear unit is occupied by one of Defendant Altaf Hudani's employees, along with her partner and minor child.

11.    The front of the Property faces the rear entrance of Defendant Altaf Hudani's dental practice, which at all relevant times described herein was not open for business, and which, for most of Plaintiffs' tenancy, was under construction.

12.    Plaintiffs occupied the Property from September 1, 2018 through March 22, 2019.

13.    Plaintiffs paid one thousand and eight hundred dollars ($1,800.00) per month in rent pursuant to a written lease agreement entered into by Plaintiffs and Defendant Altaf Hudani.

14.    Upon execution of the lease agreement, Plaintiffs paid six thousand and three hundred and fifty dollars ($6,350.00) of which three thousand and six hundred dollars ($3,600.00) was for the first and last months' rent, two thousand dollars ($2,000.00) was for a security deposit to Defendant Altaf Hudani, and seven hundred and fifty dollars ($750.00) was a broker fee.

15.    Defendant Altaf Hudani failed to account for or return the security deposit to Plaintiffs after Plaintiffs vacated the Property as required by law.

16.    Plaintiffs' real estate agent, Esther Chun, assisted Plaintiffs in finding the Property and worked with Defendant Altaf Hudani's daughter, Defendant Jasmine Hudani, to secure the Property for

- 3 -
COMPLAINT FOR DAMAGES

1    Plaintiffs.  Defendant Jasmine Hudani served as her father's real estate agent as well as manager of the

2    Property.

3         17.    Plaintiffs, who moved from out of state without first seeing the Property in person, relied

4    on Defendants' representations regarding the condition of the Property.

5    **Defendants' Breach of the Warranty of Habitability**

6         18.    The Defendants negligently and/or willfully failed to maintain the Property for the

7    duration of Plaintiffs' tenancy, repeatedly ignoring Plaintiffs' many requests to repair the defective

8    conditions at the Property.

9         19.    On or about September 10, 2018, Plaintiffs and Defendant Jasmine Hudani conducted a

10   walk-through of the Property.  At that time, Plaintiffs noted to Defendant Jasmine Hudani that there were

11   several issues that needed to be resolved.  These issues included: broken windows in bedroom two, a

12   broken bathroom door, dead insects and cockroaches, broken microwave handle, several lights in need

13   of replacement, and missing and broken smoke detectors throughout the house.  Defendant Jasmine Huda

14   informed Plaintiffs that Defendants would resolve all of these issues soon, and provide Plaintiffs with

15   another set of keys.

16        20.    At the walk-through, Defendant Jasmine Hudani represented to tenants that they could

17   park two cars in the front yard area of the Property, despite the lease designating it one (1) parking spot.

18   This representation was of importance to Plaintiffs as they planned to purchase a second car.

19        21.    On or about September 12, 2018, Plaintiffs discovered that there was no hot water and no

20   functional heat at the Property.  Plaintiffs called the gas company, but they refused to turn on the gas

21   because Defendants had a delinquent balance on the account.

22        22.    Plaintiffs called Defendant Altaf Hudani to inform him that there was a past-due balance

23   on the account and as a result, there was no gas at the Property.  They also inquired when the repairs

24   identified in the walkthrough would be performed.

25        23.    Defendant Altaf Hudani paid the past due balance but did not arrange for any repairs to

26   be made to the Property.

27

28
- 4 -
COMPLAINT FOR DAMAGES

24.     On or about September 14, 2018, the gas company returned to the Property and turned on the gas.  The gas company's representative informed Plaintiffs that the heater thermostat was broken. Plaintiffs informed Defendant Altaf Hudani of the broken thermostat.

25.     For the duration of Plaintiffs' tenancy, Defendants failed to repair the broken thermostat; thus, there was no functioning heater at the Property.

26.     On or about September 16, 2018, someone threw trash into the front yard of the Property and around Plaintiffs' vehicle.  Plaintiffs contacted the Long Beach Police Department and filed a police report.

27.     Plaintiffs informed Defendant Altaf Hudani of what had transpired.   On or about September 16, 2018, Defendant Altaf Hudani visited the property and informed the Plaintiffs that he would provide them with the log-in information for the video cameras so that they could utilize them. For the duration of their tenancy, despite Plaintiffs' multiple requests and multiple incidents at the Property, Defendant Altaf Hudani never provided Plaintiffs the information to access the security cameras.

28.     During Defendant Altaf Hudani's visit, Plaintiffs walked through the Property with him to point out all of the outstanding repairs including, but not limited to:

     a.   No heat in the unit,

     b.   Broken thermostat on the heater,

     c.   Broken windows that did not open,

     d.   Front door that did not close securely,

     e.   Broken kitchen and bathroom cabinets,

     f.   Broken dial on the dryer requiring a wrench to operate it,

     g.   Plumbing issues with the tub, and

     h.   Broken front gate.

29.     Defendant Altaf Hudani informed Plaintiffs that he would schedule a time to have all the repairs made.  Defendant Altaf Hudani also walked Plaintiffs over to his dental practice in the adjacent

1   building and notified them that construction would be beginning at the dental practice in the upcoming

2   weeks.

3       30.     At no time prior to signing the lease were Plaintiffs advised that Defendant Altaf Hudani

4   would be undertaking a large-scale construction project within several feet of their home.

5       31.     While inside the dental practice, Plaintiffs noted that there was a sleeping bag in the

6   building.  Defendant Altaf Hudani informed Plaintiffs that one of the construction workers who was

7   working on the site often slept there.

8       32.     Because Plaintiffs had already signed the lease agreement and moved in, they felt that

9   they had no choice but to accept the situation that Defendant presented to them.

10      33.     On or about October 26, 2018, Plaintiffs reached out to Defendant Altaf Hudani via text

11  message to inquire when the repairs would be made, as no one had yet come to the Property to make the

12  needed repairs.  Plaintiffs were particularly concerned that the smoke detectors and carbon monoxide

13  detectors had not been installed or repaired.  Plaintiffs did not receive a response.

14      34.     On or about November 2, 2018, a neighbor aggressively banged on the side of the

15  Property using a mop to complain to Plaintiffs of the extremely loud noises created by the air

16  conditioning unit, installed by Defendant Altaf Hudani prior to the inception of Plaintiffs' tenancy.

17      35.     Plaintiffs informed Defendant Altaf Hudani of the issue and notified him that they had a

18  new air conditioning unit that they were willing to have installed.  Defendant Altaf Hudani purchased

19  the air conditioning unit from Plaintiffs and informed Plaintiffs that he would arrange for someone to

20  install it.

21      36.     Defendant Altaf Hudani also informed Plaintiffs that someone would reach out to them

22  to make the repairs, but rather than providing the legally provided notice, or any notice at all, Defendants'

23  agents arrived at the Property unannounced shortly thereafter on two separate occasions, once to repair

24  the garbage disposal and the other time to install the air conditioning unit.

25      37.     After several months spending significant amounts time trying to arrange for Defendants

26  to make the rest of the repairs at the Property, Plaintiffs realized that their efforts were futile and that

27  their landlord was not going to respond to their requests for repairs.  Plaintiffs had, many times, called

28

- 6 -

1   both Hudani Defendants, had sent text messages to both Hudani Defendants, and had asked their real

2   estate agent Ms. Chun to reach out to Defendant Jasmine Hudani in an attempt to convince her to make

3   repairs at the Property.  None of these attempts were fruitful.

4         38.    On or about January 8, 2019, Plaintiff Patrick Nash filed a complaint with the City of

5   Long Beach Department of Development Services about the condition of the Property.  The complaint

6   detailed that there was still no heat at the Property, the front door security lock was broken, the tub plug

7   did not work, the kitchen and bathroom cabinets were broken, the dryer was not functional without the

8   use of a wrench, and that Defendants were storing construction materials and debris throughout the

9   exterior the Property.

10         39.    Around the same time, Plaintiffs began to suspect that there was a moisture problem at

11   the Property.  Every time they were inside of the Property, the air felt heavy and wet.  Further, both

12   Plaintiffs had been feeling weak and ill since moving into the Property.

13         40.    Plaintiffs had discovered that many of their belongings, including antique family

14   heirlooms, furniture, clothing, and other property began to grow mold and were damaged by the mold

15   and moisture at the property.  Plaintiffs discovered water intrusion on a wall behind one of their

16   bookshelves.  As a result, the back of the bookshelf had severe mold growing on it.

17         41.    Plaintiffs believed that water was entering the walls from the roof and water was leaking

18   in from the old windows.  Defendants were aware of the problem as Defendant Altaf Hudani told

19   Plaintiffs that it was time to replace the old windows; he did not, however, change them or re-seal them

20   for the duration of Plaintiffs' tenancy.

21         42.    On or about January 28, 2019, Plaintiffs hired a mold company, Huggs Quality

22   Inspection, to conduct a mold inspection.  The mold report confirmed their suspicions and found mold

23   in the Property, specifically in the living / dining area.  There was also visible mold growing in the

24   second bedroom.

25         43.    On February 3, 2019, Plaintiffs informed Defendant Altaf Hudani that they had hired a

26   mold inspection company and that the company had found mold in the Property.  Defendant Altaf Hudani

27   did not make any arrangements to address the mold at the Property.

28

- 7 -

COMPLAINT FOR DAMAGES

44.     On or about January 29, 2019, as a result of the complaint filed by Plaintiffs and after conducting an inspection, the City of Long Beach issued a Citation Warning Notice to Defendant Altaf Hudani for the bad conditions of the property.   The Citation listed conditions in need of repair by Defendant Altaf Hudani and stated that they were to be complete on or before February 13, 2019.   The Citation noted the following:

      a.   Deteriorated bathtub faucet,

      b.   Deteriorated and ill-fitting bathroom door,

      c.   Inoperative room heater,

      d.   Unsanitary, deteriorated kitchen cabinets,

      e.   Inoperable window sashes prohibiting the windows from staying open,

      f.   Deteriorated or missing window sashes,

      g.   Poor painting of the windows prohibiting them from opening,

      h.   Missing window screens,

      i.   Poorly fitted exterior door, lacking weather strip, and

      j.   Unapproved type of deadbolt lock on the exterior gate.

45.     On or about February 3, 2019, Plaintiffs wrote a letter to Defendant Altaf Hudani again informing him of the persistent bad conditions and informing him that due to a breach of the warranty of habitability, they would be providing him with official notice to vacate and terminating their lease as soon as possible.   Defendant Altaf Hudani did not reply to or acknowledge the letter.

46.     Plaintiffs felt as if they had no choice but to terminate their lease as no repairs had been made to date other than the repair of the smoke detectors, garbage disposal and air conditioning, and the condition of the Property, as well as their health, as detailed below, continued to deteriorate.

47.     On or about February 13, 2019, Plaintiffs received a 24-Hour Notice to Enter the Property to make repairs.

48.     On or about February 14, 2019, Plaintiffs viewed footage on their doorbell camera of a man coming to the Property and ringing the doorbell.   The man left without entering the property.

- 8 -

COMPLAINT FOR DAMAGES

1    49.    On or about February 15, 2019, Plaintiffs received a Three (3) Day Notice to Perform or

2    Quit for failing to allow entry to the Property.

3    50.    At no time did Plaintiffs deny Defendants or any of their agents entry into the Property.

4    51.    At no time did Plaintiffs change the locks or restrict access to the Property.

5    52.    At all times during Plaintiffs' tenancy, Defendants were in possession of a key to the

6    Property.

7    53.    On or about February 23, 2019, Plaintiffs received a 24-Hour Notice to Enter the Property

8    for three days: February 25, 2019, February 26, 2019, and February 27, 2019.

9    54.    One of Defendants' agents visited the property on February 25, 2019 to measure the

10   windows, conduct a walk through, and inspect the property.  No work was performed at the Property.

11   No entries were made on February 26, 2019 or February 27, 2019.

12   55.    On or about March 7, 2019, the City of Long Beach formalized the Citation Notice that

13   was issued because no repairs or corrections had been made at the Property.  It also added a new violation

14   for mold at the Property.  The Citation Warning Notice was placed into effect for one year starting on

15   March 7, 2019.

16   56.    On or about March 11, 2019, Defendant Altaf Hudani's agents arrived at the Property to

17   scrape paint off the windows in order to allow for them to open.  Paint scrapings were left all over the

18   Property. The sashes on the windows were not repaired and the windows were damaged by the scraping.

19   Plaintiffs had arranged all their belongings in the middle of the room to accommodate the work that they

20   expected would be done.  They returned to find their items strewn about the interior of the Property and

21   broken personal belongings.

22   57.    On March 14, 2019, the City of Long Beach issued an Administrative Citation, providing

23   Defendant Altaf Hudani until April 15, 2019 to repair or remediate the following:

24       a.    Visible mold in the Property,

25       b.    Deteriorated bathtub faucet,

26       c.    Deteriorated an ill-fitting bathroom door,

27       d.    Inoperative room heater,

28

- 9 -

COMPLAINT FOR DAMAGES

  e. Unsanitary, deteriorated kitchen cabinets,

  f. Inoperable window sashes prohibiting the windows from staying open,

  g. Deteriorated or missing window sashes,

  h. Poor painting of the windows prohibiting them from opening,

  i. Missing window screens,

  j. Poorly fitted exterior door, lacking weather strip, and

  k. Unapproved type of deadbolt lock on the exterior gate.

58. The issues listed above were not repaired or remediated during Plaintiffs' tenancy, and Plaintiffs continued to live in a home that was left in disrepair.

59. Defendants failed to perform their obligations under the Lease Agreement and as mandated by state and local law for landlords, property owners and/or managers of residential rental property.

**Impact of the Property's Condition on Plaintiffs' Health**

60. Upon moving into the Property, Plaintiffs noticed that the air smelled wet and musty. Within a few days, Plaintiffs began to feel ill. They were unable to identify the source of their symptoms in the first few weeks, but ultimately, a few months after living at the Property, Plaintiffs discovered that the Property itself was making them ill.

61. Plaintiffs experienced a significant or complete reduction in their symptoms when they left the property for any overnight trips.

62. For the duration of their tenancy, both Plaintiffs experienced a persistent cough, excess mucus and nasal discharge, respiratory problems, extreme fatigue, and headaches.

63. Plaintiffs constantly felt weak and tired for the duration of their tenancy at the Property. Both often struggled with fatigue and headaches and were not performing as well as they normally did when they exercised.

64. When Plaintiffs began to cough up dark-colored phlegm, they grew concerned and scheduled appointments with their primary care physician, Dr. Jay Kim.

COMPLAINT FOR DAMAGES

1    65.    On or about January 23, 2019, Plaintiffs visited Dr. Kim who prescribed them antibiotics

2    to alleviate their coughs and to assist with any infection that they may have developed as a result of their

3    exposure to any mold or fungus.  Plaintiffs felt temporary relief, but as soon as the course of antibiotics

4    was complete, their symptoms returned.

5    66.    Plaintiffs' symptoms have disappeared completely after vacating the property.

6    67.    Plaintiffs' three (3) dogs were also adversely impacted by the exposure to mold at the

7    Property.  Within weeks of moving into the Property, two (2) of Plaintiffs' dogs perished.  The dogs

8    were otherwise in good health prior to moving into the Property.

9    68.    Both dogs had been coughing and sneezing since living at the Property.  Neither dog had

10    experienced these symptoms previously.

11    69.    Plaintiffs' third dog sneezed and coughed continuously for the duration of their tenancy

12    at the Property.  Upon vacating the Property, the dog's symptoms have subsided.

13    70.    Plaintiffs have suffered tremendously, both physically and emotionally, as a result of their

14    exposure to the unchecked water intrusion and resulting moisture and mold at the Property.

15    **On-Going Dispute Regarding the Property's Front Yard**

16    71.    Before Plaintiffs moved to the Property, Defendant Jasmine Hudani verbally represented

17    to them that the paved front yard, otherwise referred to as "one (1) parking spot" in Plaintiffs' lease and

18    Defendants' later correspondence, could easily accommodate two cars.

19    72.    Plaintiffs only owned one car at the time, but intended to purchase a second to

20    accommodate their new life in Los Angeles, and the need to drive.

21    73.    From the inception of Plaintiffs' tenancy at the Property, the Hudani Defendants harassed

22    Plaintiffs about their parking in the front yard of the Property, asked them to move their cars as early as

23    7:00am so that construction workers could use the front yard as a staging area and storage space for

24    construction materials. Later, Defendants attempted to evict Plaintiffs because they were parking both

25    of their cars on the Property.

26    74.    On many occasions, Plaintiffs were asked to find alternate parking for both cars in order

27    to accommodate construction workers and construction materials.  Because there was no other option,

28    - 11 -
COMPLAINT FOR DAMAGES

Plaintiffs were forced to park on the street when they were asked to move their cars. Most of the street parking in the area, however, is limited to two (2) hour parking. Plaintiffs' cars were ticketed on at least (3) occasions due to Defendants' demands that they move the cars from the Property.

75.    Plaintiffs asked the Defendants to reimburse them for the cost of the parking tickets or find alternate parking for them. Despite these requests, Defendants neither reimbursed Plaintiffs nor found them alternate parking.

76.    When Plaintiffs were able to park their vehicles in the Property's front yard, the vehicles would be coated with debris, cement dust, or other construction materials as a result of the construction work taking place in the dental practice and in the Property's front yard. Plaintiffs notified Defendants of this issue on several occasions, and Defendants responded that they would advise the construction workers to be more careful; Plaintiffs' cars, however, continued to get covered in construction debris throughout their tenancy at the Property.

77.    On or about January 4, 2019, Plaintiffs received a letter from attorney Richard Sontag on behalf of Defendant Altaf Hudani. The letter informed Plaintiffs that they were in "default of the lease" as a result of parking two cars in the "one parking spot" in their front yard. The letter claimed that Defendants and the construction workers were not able to access the back entrance of the dental practice due to the way that the cars were parked.

78.    At no time prior to signing their lease were Plaintiffs informed that there would be construction in the adjacent building.

79.    At no time did Plaintiffs give permission to the Defendants or their agents to use a portion of the Property that Plaintiffs had leased in order to access the Defendants' dental practice.

80.    At no time were Plaintiffs' cars blocking any door or entryway to the dental practice or impeding ingress and/or egress from the doors.

81.    At no time were Plaintiffs' cars obstructing the front gate from closing completely.

82.    At no time were Plaintiffs' two (2) cars outside of the parking area designated by Defendants as the one (1) parking spot.

- 12 -

COMPLAINT FOR DAMAGES

83.     Plaintiffs reminded the Defendants multiple times of Defendant Jasmine Hudani's oral representation that two cars could easily fit within the front yard.  Defendants, however, refused to allow Plaintiffs to park two cars on the Property because it impeded Defendants' ability to conduct construction work in the front yard.  At all relevant times, this construction work unlawfully impeded on Plaintiffs' ability to enjoy the front yard and amounted to trespass.

84.     On or about January 10, 2019, Plaintiffs received a Three (3) Day Notice to Perform Covenants or Quit claiming that they were in breach of their lease by parking two cars in the driveway. Plaintiffs informed Defendant Altaf Hudani that both cars were within the parking spot and within the paved portion of the front yard.  Because they did not want to risk eviction, however, Plaintiffs began parking one of their cars on the street.

85.     On or about January 19, 2019, Defendants' agent, who was conducting construction work in the dental practice, hit and damaged one of Plaintiffs' cars with a ladder while it was parked on the Property.  The car was the only one parked on the Property at the time.  Plaintiffs suspected that the car was hit intentionally and filed a report with the Long Beach Police Department.  Plaintiffs also informed Defendants of the damage, asked for the video footage from the surveillance cameras, and asked that the contractors not be permitted to walk through the front of the Property and damage their cars.

86.     Defendant Altaf Hudani reacted defensively and told Plaintiffs that they should not be parking their car in the front and in a manner that interfered with the construction at the dental practice. He reiterated that he wanted to use the front yard of the Property for construction workers to access the dental practice and for the storage of construction materials.

87.     On or about January 25, 2019, Plaintiffs received another Three (3) Day Notice to Perform Covenants or Quit for disturbing other occupants and neighbors by parking their cars in the front yard.  The Notice claimed that the cars were impeding the construction workers' access to the dental practice's rear door and were a nuisance.

88.     At no time did Plaintiff's cars block the rear access to the dental office.  At all relevant times, the rear door, which opened inwards towards the dental office, was accessible.

- 13 -
COMPLAINT FOR DAMAGES

89.     Plaintiffs had stopped parking a second car in the front yard after receiving the first Three (3) Day Notice on or about January 10, 2019.

90.     The tenants residing in the back portion of the home had a separate parking area where they parked their oversized pickup truck.  The truck often protruded beyond the gate and into the alley. This meant that the gate, which was meant to secure the back portion of the premises was left open and exposed the Property to trespassers.  Further, the truck often blocked a portion of the back alley and was the source of many complaints from neighbors.  Defendant Altaf Hudani never cited the back tenants for having a vehicle that protruded beyond the space designated.

91.     On several occasions throughout Plaintiffs' tenancy, Plaintiffs asked Defendants and their agents working at the dental practice to make sure that the gate remained closed so that Plaintiffs' dog had a secure area to play and so that the Property was secured.  This was particularly important, as the front door lock, identified as broken at the inception of the tenancy, was never repaired.

92.     In addition to often failing to secure the gate, there were multiple occasions during Plaintiffs' tenancy when Plaintiffs encountered the Defendants' agents' dogs sitting the Property's front yard.  On other occasions, Plaintiffs found large puddles of dog urine throughout the front yard.

93.     When Plaintiffs notified Defendant Jasmine Hudani, she replied that Plaintiffs should not be concerned as the contractor's dogs were very friendly.  Plaintiffs, however, were entitled to exclusive possession and control of the front yard, and were concerned that there was another dog on their Property. Plaintiffs were forced to keep their dog inside the Property to avoid any risk of a hostile interaction with the other animals on the Property.

94.     For the duration of their tenancy at the Property, Plaintiffs were unable to have exclusive possession and control of the exterior of the Property, which they were entitled to pursuant to their lease terms.  Instead, Defendants, their agents, and their agents' animals regularly trespassed.

95.     At no relevant time did Defendants, or any of them, compensate Plaintiffs for the effective deprivation of a parking space, which amounted to a reduction in services.

//

- 14 -
COMPLAINT FOR DAMAGES

**Termination of Plaintiffs' Tenancy**

96.    Exasperated by Defendants' refusal to address substandard conditions at the Property addressed and Defendants' attempts to evict them, Plaintiffs verbally notified the Hudani Defendants in November 2018 that they would be terminating their lease as soon as possible due to the Defendants' breaches of the lease agreement.  The Hudani Defendants agreed to allow Plaintiffs to terminate their lease and repeatedly inquired when Plaintiffs would be moving out.

97.    Defendants were not, however, content to allow Plaintiffs to find a new apartment and give notice.  Instead, following Plaintiffs' complaints to the City of Long Beach regarding the uninhabitable conditions of the Property, Defendants retaliated against Plaintiffs through the use of bogus Three (3) Day Notices regarding the parking dispute and failure to allow Defendants to enter and a letter from their attorney intended to intimidate Plaintiffs and have them vacate the Property.

98.    Ultimately, Plaintiff Patrick Nash texted Defendant Altaf Hudani to inform him that Plaintiffs would be vacating the Property on March 23, 2019.  He informed Defendant Altaf Hudani that Plaintiffs would be sending formal written notice.  The parties communicated further regarding other dates on which Plaintiffs may be able to vacate the Property, but did not reach clear agreement to any date before March 23, 2019.

99.    Prior to Plaintiffs completely removing their items, Defendants locked the premises and did not allow Plaintiffs to remove their remaining personal items.

100.    Plaintiffs were unable to gain access to the Property, and the personal property inside the unit remains in the possession and control of Defendants.  These items include some of Plaintiffs' clothing, Plaintiffs' bed and their bedding, a dining table, and other miscellaneous items.

101.    After Plaintiffs vacated the Property, Defendants had twenty-one (21) days to return Plaintiffs' security deposit, pursuant to California law.

102.    To date, Defendants have not returned Plaintiffs' security deposit, nor have they provided Plaintiffs with an accounting of the security deposit.  More than twenty-one (21) days have passed since Plaintiffs' vacated the Property.

- 15 -
COMPLAINT FOR DAMAGES

103.    Plaintiffs' rent increased from one thousand and eight hundred dollars ($1,800.00) per month to three thousand and two hundred dollars ($3,200.00) per month as a result of their need to find immediate housing due to Defendants' threats of imminent eviction and the poor conditions at the property.  Moreover, Plaintiffs' expenses for gas have increased because the home they found to move into is further from downtown Long Beach.

104.    As described herein, Defendants Altaf Hudani and Jasmine Hudani engaged in malicious, fraudulent, and oppressive conduct that justifies an award of punitive damages.

105.    In committing the foregoing acts as set forth above, Defendants Altaf Hudani and Jasmine Hudani willfully disregarded Plaintiffs' rights to be free from, *inter alia*, unlawful retaliation, harassment, breach of the covenant of quiet enjoyment, and breach of the warranty of habitability.

106.    In committing the foregoing acts as set forth above, Defendants Altaf Hudani and Jasmine Hudani acted despicably and subjected Plaintiffs to cruel and unjust hardship in conscious disregard for their rights under California law.  By way of example, the Managing Agents subjected Plaintiffs to extreme uninhabitable conditions, delayed necessary repairs in order to harm Plaintiffs, exposed Plaintiffs to dangerous mold that impacted their health and damaged their personal property, utilized the Property as a staging area for construction and storage for materials, and maliciously held over Plaintiffs' security deposit.  This is evidenced by the fact that Plaintiffs repeatedly voiced their concerns to Defendants and in response, Defendants failed to undertake the repairs and added to the bad conditions of the premises by using the Property as a storage area for construction materials.  The Managing Agents' conduct demonstrates a callous indifference for the law and Plaintiffs' rights.

107.    In committing the foregoing acts as set forth above, Defendants Altaf Hudani and Jasmine Hudani intended to cause emotional injury to Plaintiffs.  Specifically, the Defendants did not comply with applicable law, and forced Plaintiffs to deal with extreme habitability problems, prohibited Plaintiffs from retrieving their items left at the Property, and held over Plaintiffs' security deposit without reason and without the legally required accounting, with the intent to cause them severe emotional distress or, at least, without regard for the consequences on Plaintiffs' emotional well-being.

# IV.

## FIRST CAUSE OF ACTION

### Negligent Maintenance of Premises

### (By Plaintiffs Against All Defendants, and Does 1 through 50)

108.    Plaintiffs re-allege and incorporate by reference each of the allegations of the Complaint contained in the preceding paragraphs, as if fully set forth herein.

109.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

110.    As lessors of a building for the occupation of human beings, Defendants and/or their agents, owe a duty to Plaintiffs under Civil Code section 1941 to put the Property in a condition fit for human occupation, and to repair all subsequent dilapidations that render it untenantable.

111.    Defendants, and each of them, have breached this duty by negligently failing to put the Property in a condition fit for human occupancy, and by failing to repair all subsequent dilapidations thereof.

112.    Because of the untenantable conditions they endured daily, Plaintiffs have suffered severe emotional distress including, but not limited to, feelings of anxiety, fearfulness, frustration, depression, worry, discomfort, helplessness, disgust and shame.

113.    Defendants' negligence was a substantial factor in causing Plaintiffs' serious emotional distress, which was a foreseeable, direct, and proximate result of Defendants' failure to keep the Property fit for occupancy.  The Defendants, and each of them, are liable to compensate Plaintiffs for these injuries.

114.    As a direct and proximate cause of the untenantable conditions they endured daily, Plaintiffs suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

115.    As a direct and proximate result of Defendants' negligent maintenance of the premises, the value of Plaintiffs' leasehold was diminished.  Plaintiffs were also forced to find alternative housing

- 17 -

COMPLAINT FOR DAMAGES

on short notice and were only able to secure a property with a higher monthly rent further from the city center. Consequently, Plaintiffs have been damaged in an amount to be proven at trial, but which amount is within the jurisdictional limits of this Court.

116. Defendants' breach of their duties has been willful, malicious, and oppressive, amounting to despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to entitle Plaintiffs to an award of punitive and exemplary damages. Plaintiffs are entitled to punitive and exemplary damages against Defendants, and Does 1 through 50, in an amount sufficient to punish them and deter them and others from engaging in similar conduct, as determined at trial.

### V.

### SECOND CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

### (By Plaintiffs against All Defendants, and Does 1 through 50)

117. Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

118. As lessors of a building intended for the occupation of human beings, Defendants and/or their agents owe a duty to Plaintiffs under Civil Code section 1941 to put the Property in a condition fit for human occupation, and to repair all subsequent dilapidations which render it untenantable.

119. Defendants have breached these duties by, *inter alia*, failing to keep the Property in a condition fit for human occupancy, and by failing to repair all dilapidated conditions (and by creating conditions that added to the dilapidation).

120. As landlords and/or owners and/or managers of a residential rental property, Defendants and their agents owe a duty to Plaintiffs to preserve Plaintiffs' right to quiet enjoyment of the Property.

121. Defendants have breached these duties by, *inter alia*, negligently failing to maintain the Property, negligently failing to repair the leaks in the walls, negligently failing to abate the mold in the Property, negligently creating unsafe conditions by using the Property to store construction materials and debris, and negligently failing to understand and follow the applicable law.

122.    Because of Defendants' negligent breach of such duties, Plaintiffs have suffered serious emotional distress including, but not limited to, feelings of anxiety, fearfulness, frustration, depression, worry, discomfort, disgust and shame.

123.    Defendants' negligence was a substantial factor in causing Plaintiffs' serious emotional distress, which was a foreseeable, direct, and proximate result of Defendants' negligently failing to maintain the Property, negligently failing to abate the mold in the Property, negligently creating unsafe conditions by using the Property to store construction materials and debris, and negligently failing to understand and follow the applicable law.

124.    As a direct and proximate result of Defendants' acts, Plaintiffs have been damaged in an amount that will be shown according to proof, but which does not exceed the jurisdictional limits of this Court.

## VI.

## THIRD CAUSE OF ACTION

### Tortious Breach of Warranty of Habitability

### (By Plaintiffs against All Defendants, and Does 1 through 50)

125.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

126.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

127.    By virtue of the landlord-tenant relationship, Defendants owed Plaintiffs the duty to comply with building, fire, health and safety codes, ordinances, regulations and other laws and to maintain the premises in a habitable condition.

128.    Defendants breached this duty and the implied warranty of habitability by failing to correct the substandard conditions complained of herein, and by creating new substandard conditions vis-à-vis their construction activities.

129.    Defendants knew, or reasonably should have known, that Plaintiffs would suffer damages as a result of this breach.

- 19 -

130.    Plaintiffs have been damaged by Defendants' conduct in an amount equal to rents due and paid by Plaintiffs during the time period Plaintiffs resided at the Property or in an amount to be proven at trial.

131.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer substantial damages, including illness, physical injury, mental stress, emotional distress, discomfort, annoyance, anxiety, fear for safety, loss in the value of his or her leasehold, increased cost of Plaintiffs' new lease, property damage and loss, loss of money, and lost income, in an amount to be determined at trial.

132.    Defendants' conduct in tortiously breaching the implied warranty of habitability has been fraudulent, grossly negligent, malicious, and oppressive, thereby entitling each Plaintiff to punitive damages in an amount to be determined at trial.

## VII.

## FOURTH CAUSE OF ACTION

### Breach of Implied Covenant of Quiet Enjoyment

### (By Plaintiffs against All Defendants, and Does 1 through 50)

133.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

134.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

135.    Implied in the rental agreement between Defendants and Plaintiffs was a covenant that the Defendants would not interfere with Plaintiffs' quiet enjoyment of the premises during the term of their tenancy.

136.    Defendants have a duty to abide by the implied covenant of quiet enjoyment. Defendants breached this duty and the implied covenant by their conduct as described above, including, but not limited to, failing to repair unsafe, unsanitary, and uninhabitable conditions at the premises and failing to maintain the premises in habitable condition, repeatedly requesting that Plaintiffs move their cars at all hours of the day, using Plaintiffs' yard as an extended active construction zone and storage for

- 20 -

construction materials, entering Plaintiffs' home without notice/consent, by harassing Plaintiffs in the Property, and by repeatedly serving Plaintiffs with bogus Three-Day Notices in an attempt to intimidate them.

137. Defendants knew, or reasonably should have known, that Plaintiffs would suffer damage as a result of this breach.

138. As a direct and proximate result of Defendants' breach of the covenant of quiet enjoyment, the value of Plaintiffs' leasehold was diminished. Consequently, Plaintiffs have been damaged in an amount equal to the rental payments due and paid during their leasehold, or in an amount to be proven at trial.

139. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer substantial damages, including illness, physical injury, mental stress, emotional distress, discomfort, annoyance, anxiety, fear for safety, loss in the value of their leasehold, property damage, loss of money, lost income, and other injuries, in an amount to be determined at trial, but which amount is within the jurisdictional requirements of this Court.

140. Defendants' conduct has been fraudulent, grossly negligent, malicious, and oppressive, thereby entitling Plaintiffs to punitive damages in an amount to be determined at trial.

## VIII.

### **FIFTH CAUSE OF ACTION**

### **Retaliation – Civil Code § 1942.5**

### **(By Plaintiffs against All Defendants, and Does 1 through 50)**

141. Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

142. At all relevant times, as described herein, Defendants were the owners and landlords with authority to manage and control the Property. Plaintiffs were in landlord-tenant relationships with Defendants pursuant to a written rental agreement. Plaintiffs held leasehold interests in, and at all relevant times while Defendants have owned and/or managed it, were tenants at, the Property.

143. At no time during their tenancy were Plaintiffs in default as to the payment of their rent.

144.    Defendants, and each of them, violated Civil Code section 1942.5(a) by retaliating against Plaintiffs within 180 days of various events including, but not limited to: Plaintiffs' complaints to City of Long Beach Department of Development Services.

145.    Defendants, and each of them, retaliated against Plaintiffs by failing to repair dilapidations at Property, continuing to store construction material at the Property, attempting to unlawfully recover possession of the Property, and serving Plaintiffs with bogus Three-Day Notices to make them fear eviction.

146.    As a direct result of Defendants' retaliatory acts, Plaintiffs suffered and continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, loss in the value of their leaseholds, and property damage, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.  Defendants, and each of them, are liable to compensate Plaintiffs for these injuries under Civil Code section 1942.5(h).

147.    Defendants' acts were also malicious, oppressive, and fraudulent; as a result, under Section 1942.5(h)(2), Defendants, and each of them, are liable to each Plaintiff in the amount of $2,000 for each retaliatory act.

148.    Under Section 1942.5(i), Plaintiffs are entitled to attorneys' fees incurred in bringing this action.

## IX.

### SIXTH CAUSE OF ACTION

**Violation of Civil Code § 1940.2**

**(By Plaintiffs against All Defendants, and Does 1 through 50)**

149.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

150.    Section 1940.2 of the Civil Code makes it unlawful for a landlord to, with the purpose of influencing a tenant to vacate a dwelling: engage in conduct that violates Penal Code sections 484(a) or 518; to use, threaten to use, force, willful threats, or menacing conduct constituting a course of conduct that interferes with the tenant's quiet enjoyment of the premises in violation of Civil Code § 1927 that

- 22 -
COMPLAINT FOR DAMAGES

would create an apprehension of harm in a reasonable person; commit a signification or intentional violation of Civil Code § 1954; or to threaten to disclose information related to a tenants' immigration or citizenship status.

151.   Defendants used, or threatened to use, force, willful threats, and/or menacing conduct that interfered with the Plaintiffs' quiet enjoyment of the Property, in violation of Civil Code section 1927. Defendants' actions would create an apprehension of harm in a reasonable person.

152.   In significant and intentional violation of Civil Code section 1954, Defendants, *inter alia*, Defendants' agent damaged Plaintiff's vehicle, entered Plaintiffs' home without permission, caused construction workers to enter Plaintiffs' home without Plaintiffs' permission, during and outside of regular business hours, without notice and without Plaintiffs' permission, and harassed Plaintiffs.

153.   Defendants acted for the purpose of influencing Plaintiffs to vacate the Property.

154.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer substantial damages, including illness, physical injury, mental stress, emotional distress, discomfort, annoyance, anxiety, fear for safety, loss in the value of his or her leasehold, property damage, loss of money, and lost income, all to Plaintiffs' damage in an amount to be determined at trial.

155.   Pursuant to Civil Code section 1940.2(b), Defendants are liable to Plaintiffs in an amount not to exceed $2,000.00 for each violation of Civil Code section 1940.2.

156.   Defendants' conduct in tortiously breaching Civil Code section 1940.2 has been fraudulent, grossly negligent, malicious, and oppressive, thereby entitling each Plaintiff to punitive damages in an amount to be determined at trial.

## X.

## SEVENTH CAUSE OF ACTION

### Collection of Rent on Untenantable Dwelling—Civil Code section 1942.4

### (By Plaintiffs against All Defendants, and Does 1 through 50)

157.   Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

158.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

159.    Civil Code section 1942.4 prohibits a landlord from demanding and collecting rent if: the dwelling substantially lacks any of the standard characteristics necessary for habitation in a dwelling delineated in Civil Code section 1941.1 or Health and Safety Code section 17920.3; a public officer or employee responsible for the enforcement of any housing law has notified the landlord or their agent in writing of the obligation to repair the substandard conditions; the conditions have not been abated 35 days after the date of the service of the notice from the public employee; and the conditions were not caused by an act or omission of the tenant.

160.    The Property substantially lacked, and at all times relevant to this action, substantially lacked, the following standard characteristics, without limitation, necessary for habitation in a dwelling as delineated in Civil Code section 1941.1: effective waterproofing and weather protection of roof, floor and exterior walls; heating facilities maintained in good working order; and building kept in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, rodents and vermin.

161.    The Property substantially lacked, and at all times relevant to this action, substantially lacked, the standard characteristics necessary for habitation in a dwelling as delineated in Health and Safety Code section 17920.3.  Specifically, the Property had, or had for significant periods of time, *inter alia*, inadequate sanitation (*i.e.*, lack of adequate heating, dampness of habitable rooms, visible mold growth, as determined by a health officer or a code enforcement officer; general dilapidation or improper maintenance); nuisance; materials of construction, not maintained in good and safe condition; an accumulation of garbage and debris constituting a health and safety hazard; and inadequate exit facilities.

162.    Inspectors from the City of Long Beach Office of Development Services, who are public employees responsible for enforcing housing and health laws in Long Beach, inspected the Property on multiple occasions.  Each time they notified the Defendants in writing of the substandard conditions at the Property and of the Defendants' duty to correct the substandard conditions at the Unit.

- 24 -

163.    The substandard conditions existed and were not abated 35 days beyond the date of the City's Citation issued on January 29, 2019.  Defendants do not have good cause for the delay in correcting the cited violations.

164.    The substandard conditions were not caused by any act or omission of Plaintiffs. Defendants, therefore, are in violation of Civil Code section 1942.4.

165.    As a direct and proximate result of Defendants' conduct and the conditions outlined above, Plaintiffs have suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, loss in the value of the leasehold, property damage, and other economic damage in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

166.    Additionally, Plaintiffs have been damaged by Defendants' conduct in an amount equal to rents due and paid by Plaintiffs during the period of Plaintiffs' occupancy of the Property, or in an amount to be proven at trial.

167.    Plaintiffs are entitled to actual damages sustained and to special damages of not less than $100.00, and not more than $5,000.00.

168.    Code of Civil Procedure section 1942.4 provides for an award of reasonable attorneys' fees and costs incurred by the prevailing party in an action brought under this section.  Plaintiffs have employed and will continue to employ attorneys for the initiation and prosecution of this action. Plaintiffs have incurred and will continue to incur attorneys' fees and costs herein.  Plaintiffs are entitled to reasonable attorneys' fees and costs.

## XI.

## EIGHTH CAUSE OF ACTION

### Failure to Timely Return Security Deposit – Breach of Civil Code § 1950.5

### (By Plaintiffs against All Defendants, and Does 1 through 50)

169.    Plaintiffs re-allege and incorporate by reference each of the allegations of the Complaint contained in the preceding paragraphs, as if fully set forth herein.

170.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

171.    Upon signing of the Lease Agreement, Plaintiffs paid two thousand dollars ($2,000.00) to the Defendants as a security deposit.

172.    On or about March 22, 2019, Defendants regained possession of the Property before Plaintiffs could complete moving out. Plaintiffs had paid their rent in full through the end of March 2019.

173.    At all times relevant to this Complaint, Plaintiffs were tenants of the Property subject to a fixed-term written lease agreement.

174.    Due to the egregious breaches of the lease, Plaintiffs intended to vacate the Property prior to the culmination of their fixed-term lease agreement. Defendants agreed with Plaintiffs' decision to vacate the Property before the term expired.

175.    Civil Code 1950.5(g) provides, in relevant part, "No later than 21 calendar days after the tenant has vacated the premises … the landlord shall furnish the tenant, by personal delivery or by first-class mail, postage prepaid, a copy of an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security, and shall return any remaining portion of the security to the tenant."

176.    Twenty-one days from the date that Defendants regained possession of the Property was April 12, 2019. Plaintiffs have not received their security deposit or an accounting of their security deposit.

177.    At all relevant times, Defendants were aware of their legal obligation to return Plaintiffs' security deposit and failed to do so. Such failure was in bad faith.

178.    The bad faith retention of any portion of a security deposit, in violation of Section 1950.5, may subject the Defendants to statutory damages of up to twice the amount of the security, in addition to actual damages.

179.    Defendants' failure to timely return Plaintiffs' security deposit was in bad faith and in violation of Civil Code 1950.5.

180.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered economic damage in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.  Civil Code § 1950.5(l).

181.    Plaintiffs also seek statutory damages in the amount of twice the security deposit, pursuant to Section 1950.5(l).

**XII.**

**NINTH CAUSE OF ACTION**

**Nuisance**

**(By Plaintiffs against All Defendants, and Does 1 through 50)**

182.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

183.    At all relevant times, as described herein, Defendants were the owners and landlords with authority to manage and control the Property.  Plaintiffs were in landlord-tenant relationships with Defendants pursuant to a written rental agreement.  Plaintiffs held leasehold interests in, and at all relevant times while Defendants have owned and/or managed it, were tenants at, the Property.

184.    The conditions at the Property, as created by Defendants and as described above, constitute a nuisance within, but not limited to, the meaning of Civil Code sections 3479 *et seq*., in that these defective conditions were injurious to the health and safety of Plaintiffs, and substantially interfered with Plaintiffs' comfortable enjoyment of the Property.  Additionally, the Defendants' harassment of Plaintiffs and the on-going construction activities adjacent to and within the leased Property substantially interfered with Plaintiffs' comfortable enjoyment of the premises.

185.    Despite being required by law to abate the nuisance, Defendants failed to correct conditions rendering the Property a nuisance.  Defendants knew, or reasonably should have known, that Plaintiffs would be injured as a result of this failure to abate the nuisance.

186.    As a direct and proximate result of Defendants' failure to abate the nuisance, the value of Plaintiffs' leasehold was diminished.  Consequently, Plaintiffs have been damaged in an amount equal to the rental payments due and paid during Plaintiffs' leasehold, or in an amount to be proven at trial.

COMPLAINT FOR DAMAGES

187.    As a direct and proximate result of Defendants' failure to abate the nuisance, Plaintiffs have suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, discomfort, annoyance, anxiety, fear, loss in the value of their leasehold, and property damage, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

188.    Defendants' failure to abate the nuisance has been despicable, malicious, willful, knowing, cruel, unjust and oppressive, and shows extreme indifference to Plaintiffs' rights, health, and safety, thereby entitling Plaintiffs to punitive damages in an amount to be proven at trial.

## XIII.

### TENTH CAUSE OF ACTION

**Intentional Infliction of Emotional Distress**

**(By Plaintiffs against All Defendants, and Does 1-50)**

189.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

190.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

191.    The conduct of Defendants and/or their agents and employees was outrageous in the extreme. As landlords and/or managers of the Property, Defendants and/or their agents and employees were in a position of authority which they consistently abused, by, *inter alia*: failing to respond to Plaintiffs' repeated attempts to have the defective conditions at the Property repaired; allowing dangerous and unhealthy nuisance conditions to persist; creating additional dangerous and unhealthy nuisance conditions at the Property; and damaging Plaintiffs' personal property.

192.    Defendants did these things with actual knowledge that their actions were against the law. Even after Plaintiffs complained to Defendants multiple times about the defective conditions, Defendants made no effort to repair them. Defendants compounded the problem by using the Property to store construction materials and waste. These conditions were injurious to Plaintiffs' health and well-being. Defendants and their agents abused their positions as owners and managers of a the Property by

- 28 -
COMPLAINT FOR DAMAGES

leaving the Property in uninhabitable condition, leaving Plaintiffs without a functional heater for the entirety of the Fall and Winter seasons, constantly asking Plaintiffs to move their cars without reimbursing them for alternative parking, and harassing and intimidating Plaintiffs, all while demanding and collecting rent.

193.    Defendants at all relevant times knew that Plaintiffs were particularly vulnerable as they had just moved to Los Angeles from another state.  Because Plaintiffs had just moved across the country, Plaintiffs had limited options and limited support.  On multiple occasions dating back to November 2018, the Defendants inquired when they would be receiving Plaintiffs' Notice to Vacate.  When Plaintiffs remained at the Property, Defendants engaged in a pattern of harassment and pretextual attempts to evict them in an attempt to have them vacate the Property as soon as possible.  Subsequent to their failed eviction attempts, Defendants ultimately took matters into their own hands, and took advantage of Plaintiffs by locking the Property and prohibiting from collecting their personal items that remained inside.  Defendants knew, or reasonably should have known, that their conduct would result in Plaintiffs' severe and extreme emotional distress.

194.    Defendants and their agents knew of the applicable California law well and yet failed to maintain the Property in a habitable state as required by that law.  They knew, further, that the Plaintiffs were being exposed to mold in the unit and that *none* of the necessary repairs at the Property had been performed, including but not limited to, stopping the water intrusion, remediating the mold resulting from that water intrusion, fixing the front door lock to secure the Property, fixing the gate lock to secure the Property, repairing the heater so that it was functional, reinstalling the bathroom door, and other miscellaneous repairs.  As a direct and proximate result of Defendants' conduct, and that of their agents and employees, Plaintiffs have suffered and continue to suffer severe emotional distress, including extreme anguish, fearfulness, horror, anxiety, worry, sleeplessness, humiliation and shame, resulting in damages in an amount to be determined at trial, but which amount is within the jurisdictional requirements of this Court.

195.    Defendants' intentional infliction of emotional distress has been despicable, malicious, willful, knowing, cruel, unjust and oppressive, thereby entitling Plaintiffs to punitive damages in an amount to be determined at trial.

# XIV.

## **PRAYER FOR RELIEF**

For All Causes of Action:

    1.    For general damages, including emotional distress damages, according to proof on each cause of action for which such damages are available.

    2.    For special damages, according to proof on each cause of action for which such damages are available.

    3.    For compensatory damages, including emotional distress damages, according to proof on each cause of action for which such damages are available.

    4.    For punitive damages, according to proof on each cause of action for which such damages are available.

    5.    For declaratory and injunctive relief, as appropriate.

    6.    For prejudgment interest and post-judgment interest according to law.

    7.    For reasonable attorneys' fees incurred in this action pursuant to Civil Code sections 1942.4 and 1942.5.

    8.    For costs of suit incurred in this action.

    9.    For such other and further relief that the Court deems proper and just.

For the Fifth Cause of Action:

    10.    A penalty of $2,000 per retaliatory act, pursuant to Civil Code section 1942.5.

For the Sixth Cause of Action:

    11.    A penalty of $2,000 per violation, pursuant to Civil Code section 1940.2.

For the Seventh Cause of Action:

    12.    For special damages of not less than $100 and not more than $5,000, pursuant to Civil Code section 1942.4.

//

COMPLAINT FOR DAMAGES

1    For the Eighth Cause of Action:

2        13.    For statutory damages of up to twice the amount of the Plaintiffs' security deposit,

3    pursuant to Civil Code section 1950.5(l).

4

5        Dated: August 28, 2019                    EXCELSIS LAW, P.C.

6

7                                                 By: _____
                                                      ZAINAH ALFI
8                                                     C. GENEVIEVE JENKINS

9                                                 Attorneys for Plaintiffs PATRICK BENJAMIN
                                                  NASH, and RYAN PAUL NASH

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    - 31 -

1

**DEMAND FOR JURY TRIAL**

2

Plaintiffs Patrick Benjamin Nash and Ryan Paul Nash hereby demand a trial by jury on all causes

3

of action alleged herein in the Complaint.

4

5

Dated: August 28, 2019

EXCELSIS LAW, P.C.

6

By: _____

7

ZAINAH ALFI
C. GENEVIEVE JENKINS

8

Attorneys for Plaintiffs PATRICK BENJAMIN
NASH, and RYAN PAUL NASH

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

Exhibit C



**EXCELSIS LAW**

A PROFESSIONAL CORPORATION

Zainah Alfi

1000 Wilshire Blvd., Suite 600
Los Angeles, CA 90017

Main Phone: (213) 340-0300
Direct Line: (213) 340-0400
Fax: (213) 340-0200

zalfi@excelsislaw.com
www.excelsislaw.com

**CONFIDENTIAL SETTLEMENT COMMUNICATION
PURSUANT TO CAL. EVID. CODE § 1152(a) & FED. R. EVID. 408(a)**

June 6, 2019

Altaf Hudani
15052 Springdale Ste, Ste E
Huntington Beach, CA 92649
altafhudani@hotmail.com

Jasmine Hudani
2239 Hawthorne Blvd
Torrance, CA 90505
Jasmine.hudani729@gmail.com

Richard Sontag, Esq.
16520 Bake Pkwy, Ste 280
Irvine, CA 92618

*(Sent via FedEx and by email to Dr. Hudani and Ms. Hudani only)*

**RE: Ryan Nash and Patrick Nash (228 Atlantic Avenue, Long Beach, CA 90802)**

Dear Dr. Hudani and Ms. Hudani:

Our firm has been retained by Mr. Ryan Nash and Mr. Patrick Nash (hereinafter the "Tenants"). The Tenants previously occupied the home located at 228 Atlantic Avenue, Long Beach, CA 90802 (hereinafter the "Property") pursuant to a written lease, and have retained us in connection with matters related to their tenancy – specifically, to bring a lawsuit against the Hudani Trust, its Trustees, and manager, Jasmine Hudani for negligent maintenance of premises, negligent infliction of emotional distress, tortious breach of the warranty of habitability, breach of the implied covenant of quiet enjoyment, retaliation in violation of Civil Code 1942.5, violation of Civil Code 1940.2, forcible entry in violation of Civil Code 1159, trespass, constructive eviction in violation of Civil Code 789.3, collection of rent on an untenantable dwelling in violation of Civil Code 1942.4, failure to timely return security deposit in violation of Civil Code 1950.5, nuisance, and intentional infliction of emotional distress. A copy of the draft Complaint is attached as **Exhibit A** hereto.

It is our understanding that you have not returned the Tenants' security deposit in violation of the rental agreement and California law.  To the extent that the deposit was not returned because you did not have a forwarding address, please send it to my office **no later than June 21, 2019**. If you elect not to send the deposit or an accounting of the deposit, we will continue to pursue the Tenants' claims that you have violated Civil Code § 1950.5.

Although we consider you to have been in breach of the rental agreement which underlies the tenancy at issue, we are writing to extend an olive branch, and to do our part in recognizing the intent of the parties at the time of entering into the rental agreement to first attempt mediation of any issues related to the rental of the Property.  *See* Rental Agreement, attached as **Exhibit B** hereto, at ¶ 35.  Should you agree to early mediation, we are willing produce documentation showing the strength of the Tenants' claims.

If you/your client are amenable to private mediation, to show our commitment to a good faith process, we are willing to pay half the costs of a mutually agreeable mediator.  To the extent your client is interested, we suggest mediating with the Honorable Enrique Romero (Ret.), Honorable Richard Stone (Ret.), or Henry Bongiovi but are open to your suggestions.  ***Please let us know at your earliest convenience, but <u>no later than June 21, 2019</u>, whether you and/or your client agree to mediate and, if so, your thoughts about the suggested mediators.  If we do not hear from you by then, we will assume that you and/or your client are not interested in exploring opportunities for early compromise and proceed with filing the Complaint.***

\*    \*    \*

Thank you for your prompt attention this matter – we look forward to working with you toward a positive outcome.

Sincerely,

**Zainah Alfi**
Counsel, Excelsis Law. P.C.

Enclosure: Complaint; Rental Agreement



**EXHIBIT A**

1   **EXCELSIS LAW, P.C.**
    ZAINAH ALFI (SBN 304164)
2   C. GENEVIEVE JENKINS (SBN 271128)
    1000 Wilshire Blvd., Suite 600
3   Los Angeles, California 90017
    Telephone: (213) 340-0300
4   Facsimile: (213) 340-0200
    zalfi@excelsislaw.com
5
    Attorneys for Plaintiffs,
6   PATRICK BENJAMIN NASH,
    and RYAN PAUL NASH
7

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      FOR THE COUNTY OF LOS ANGELES

10

11
    PATRICK BENJAMIN NASH, an           Case No.
12  individual; and RYAN PAUL NASH, an
    individual,
13                                       **COMPLAINT FOR DAMAGES**
              Plaintiffs,
14                                       1.  **NEGLIGENT MAINTENANCE OF PREMISES;**
              vs.                        2.  **NEGLIGENT INFLICTION OF EMOTIONAL**
15                                           **DISTRESS;**
    ALTAF HUDANI, individually and in his  3.  **TORTIOUS BREACH OF WARRANTY OF**
16  capacity as the Trustee of the HUDANI      **HABITABILITY;**
    TRUST; JASMINE HUDANI, an individual;  4.  **BREACH OF IMPLIED COVENANT OF QUIET**
17  and DOES 1 through 50, inclusive,        **ENJOYMENT;**
                                         5.  **RETALIATION – CIV. CODE § 1942.5;**
18            Defendants.                 6.  **VIOLATION OF CIV. CODE § 1940.2;**
                                         7.  **FORCIBLE ENTRY – CIV. CODE § 11159;**
19                                       8.  **TRESPASS;**
                                         9.  **CONSTRUCTION EVICTION – CIV. CODE §**
20                                           **789.3;**
                                         10. **COLLECTION OF RENT ON UNTENANTABLE**
21                                           **DWELLING – CIV. CODE § 1942.4;**
                                         11. **FAILURE TO TIMELY RETURN SECURITY**
22                                           **DEPOSIT – CIV. CIDE § 1950.2;**
                                         12. **NUISANCE; AND**
23                                       13. **INTENTIONAL INFLICTION OF EMOTIONAL**
                                             **DISTRESS.**
24

25

26

27                                       **[DEMAND FOR JURY TRIAL]**

28

─────────────────────────────────────────────
                    COMPLAINT FOR DAMAGES

Plaintiffs Patrick Benjamin Nash and Ryan Paul Nash ("Plaintiffs") hereby bring this Complaint for Damages against Defendant Altaf Hudani in his individual capacity and in his capacity as Trustee of the Hudani Trust, Defendant Jasmine Hudani, and DOES 1 through 50, inclusive, and allege as follows on their knowledge or on information and belief as to all other matters:

## I.

## PARTIES

1.      Plaintiff Patrick Benjamin Nash is an individual who, at all times relevant to this Complaint, resided in Los Angeles County at 228 Atlantic Avenue, Long Beach, CA 90802 (the "Property"), pursuant to a written lease.

2.      Plaintiff Ryan Paul Nash is an individual who, at all times relevant to this Complaint, resided in Los Angeles County at the Property, pursuant to a written lease.

3.      Defendant Altaf Hudani is an individual who, at all times relevant to this Complaint, resided in Los Angeles County, and is an owner of the Property, located in Los Angeles County.

4.      Defendant Altaf Hudani also serves as trustee of the Hudani Trust, who at all relevant times relevant to this Complaint, was an owner of the Property.

5.      Defendant Jasmine Hudani is an individual who, at all times relevant to this Complaint, resided in Los Angeles County, and served as the real estate agent for the owner and the manager of the Property.

6.      Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of said defendants when the same has been ascertained.  Each of the fictitiously named defendants is responsible in some manner for the acts complained of herein.  Unless otherwise stated, all references to named defendants shall include DOE defendants as well.

## II.

## JURISDICTION AND VENUE

7.      Jurisdiction and venue are proper in this Court because all of the claims alleged herein

- 1 -
COMPLAINT FOR DAMAGES

arose in Los Angeles County and all of the Defendants are doing or did business or reside in Los Angeles County, and/or their principal place of business is in Los Angeles County, in each case, at the times relevant herein.

8.    The amount in controversy in this matter exceeds the sum of $25,000.00, exclusive of interest and costs.

**III.**

**FACTUAL ALLEGATIONS**

9.    Plaintiffs were tenants of the front unit of a split home, located at 228 Atlantic Avenue, Long Beach, CA 90802 (hereinafter, the "Property"). The Property consists of two (2) bedrooms and one (1) bathroom and is approximately five hundred and forty (540) square feet.

10.    The rear unit, located at 228 ½ Atlantic Avenue, Long Beach, CA 90802, has a separate parking area and entrance, and does not share any common area with the Property. The rear unit is occupied by one of Defendant Altaf Hudani's employees, along with her partner and minor child.

11.    The front of the Property faces the rear entrance of Defendant Altaf Hudani's dental practice, which at all relevant times described herein was not open for business, and which, for most of Plaintiffs' tenancy, was under construction.

12.    Plaintiffs occupied the Property from September 1, 2018 through March 22, 2019, when the Defendants locked them out.

13.    Plaintiffs paid one thousand and eight hundred dollars ($1,800.00) per month in rent pursuant to a written lease agreement entered into by Plaintiffs and Defendant Altaf Hudani.

14.    Upon execution of the lease agreement, Plaintiffs paid six thousand and three hundred and fifty dollars ($6,350.00) of which three thousand and six hundred dollars ($3,600.00) was for the first and last months' rent, two thousand dollars ($2,000.00) was for a security deposit to Defendant Altaf Hudani, and seven hundred and fifty dollars ($750.00) was a broker fee.

15.    Defendant Altaf Hudani failed to account for or return the security deposit to Plaintiffs after Plaintiffs vacated the Property as required by law.

16.    Plaintiffs' real estate agent, Esther Chun, assisted Plaintiffs in finding the Property and

- 2 -
COMPLAINT FOR DAMAGES

worked with Defendant Altaf Hudani's daughter, Defendant Jasmine Hudani, to secure the Property for Plaintiffs. Defendant Jasmine Hudani served as her father's real estate agent as well as manager of the Property.

17.    Plaintiffs, who moved from out of state without first seeing the Property in person, relied on Defendants' representations regarding the condition of the Property.

**Defendants' Breach of the Warranty of Habitability**

18.    The Defendants negligently and/or willfully failed to maintain the Property for the duration of Plaintiffs' tenancy, repeatedly ignoring Plaintiffs' many requests to repair the defective conditions at the Property.

19.    On or about September 10, 2018, Plaintiffs and Defendant Jasmine Hudani conducted a walk-through of the Property. At that time, Plaintiffs noted to Defendant Jasmine Hudani that there were several issues that needed to be resolved. These issues included: broken windows in bedroom two, a broken bathroom door, dead insects and cockroaches, broken microwave handle, several lights in need of replacement, and missing and broken smoke detectors throughout the house. Defendant Jasmine Huda informed Plaintiffs that Defendants would resolve all of these issues soon, and provide Plaintiffs with another set of keys.

20.    At the walk-through, Defendant Jasmine Hudani represented to tenants that they could park two cars in the front yard area of the Property, despite the lease designating it one (1) parking spot. This representation was of importance to Plaintiffs as they planned to purchase a second car.

21.    On or about September 12, 2018, Plaintiffs discovered that there was no hot water and no functional heat at the Property. Plaintiffs called the gas company, but they refused to turn on the gas because Defendants had a delinquent balance on the account.

22.    Plaintiffs called Defendant Altaf Hudani to inform him that there was a past-due balance on the account and as a result, there was no gas at the Property. They also inquired when the repairs identified in the walkthrough would be performed.

23.    Defendant Altaf Hudani paid the past due balance but did not arrange for any repairs to be made to the Property.

COMPLAINT FOR DAMAGES

24.     On or about September 14, 2018, the gas company returned to the Property and turned on the gas.  The gas company's representative informed Plaintiffs that the heater thermostat was broken. Plaintiffs informed Defendant Altaf Hudani of the broken thermostat.

25.     For the duration of Plaintiffs' tenancy, Defendants failed to repair the broken thermostat; thus, there was no functioning heater at the Property.

26.     On or about September 16, 2018, someone threw trash into the front yard of the Property and around Plaintiffs' vehicle.  Plaintiffs contacted the Long Beach Police Department and filed a police report.

27.     Plaintiffs informed Defendant Altaf Hudani of what had transpired.   On or about September 16, 2018, Defendant Altaf Hudani visited the property and informed the Plaintiffs that he would provide them with the log-in information for the video cameras so that they could utilize them. For the duration of their tenancy, despite Plaintiffs' multiple requests and multiple incidents at the Property, Defendant Altaf Hudani never provided Plaintiffs the information to access the security cameras.

28.     During Defendant Altaf Hudani's visit, Plaintiffs walked through the Property with him to point out all of the outstanding repairs including, but not limited to:

      a.   No heat in the unit,

      b.   Broken thermostat on the heater,

      c.   Broken windows that did not open,

      d.   Front door that did not close securely,

      e.   Broken kitchen and bathroom cabinets,

      f.   Broken dial on the dryer requiring a wrench to operate it,

      g.   Plumbing issues with the tub, and

      h.   Broken front gate.

29.     Defendant Altaf Hudani informed Plaintiffs that he would schedule a time to have all the repairs made.  Defendant Altaf Hudani also walked Plaintiffs over to his dental practice in the adjacent

building and notified them that construction would be beginning at the dental practice in the upcoming weeks.

30.      At no time prior to signing the lease were Plaintiffs advised that Defendant Altaf Hudani would be undertaking a large-scale construction project within several feet of their home.

31.      While inside the dental practice, Plaintiffs noted that there was a sleeping bag in the building.  Defendant Altaf Hudani informed Plaintiffs that one of the construction workers who was working on the site often slept there.

32.      Because Plaintiffs had already signed the lease agreement and moved in, they felt that they had no choice but to accept the situation that Defendant presented to them.

33.      On or about October 26, 2018, Plaintiffs reached out to Defendant Altaf Hudani via text message to inquire when the repairs would be made, as no one had yet come to the Property to make the needed repairs.  Plaintiffs were particularly concerned that the smoke detectors and carbon monoxide detectors had not been installed or repaired.  Plaintiffs did not receive a response.

34.      On or about November 2, 2018, a neighbor aggressively banged on the side of the Property using a mop to complain to Plaintiffs of the extremely loud noises created by the air conditioning unit, installed by Defendant Altaf Hudani prior to the inception of Plaintiffs' tenancy.

35.      Plaintiffs informed Defendant Altaf Hudani of the issue and notified him that they had a new air conditioning unit that they were willing to have installed.  Defendant Altaf Hudani purchased the air conditioning unit from Plaintiffs and informed Plaintiffs that he would arrange for someone to install it.

36.      Defendant Altaf Hudani also informed Plaintiffs that someone would reach out to them to make the repairs, but rather than providing the legally provided notice, or any notice at all, Defendants' agents arrived at the Property unannounced shortly thereafter on two separate occasions, once to repair the garbage disposal and the other time to install the air conditioning unit.

37.      After several months spending significant amounts time trying to arrange for Defendants to make the rest of the repairs at the Property, Plaintiffs realized that their efforts were futile and that their landlord was not going to respond to their requests for repairs.  Plaintiffs had, many times, called

COMPLAINT FOR DAMAGES

both Hudani Defendants, had sent text messages to both Hudani Defendants, and had asked their real estate agent Ms. Chun to reach out to Defendant Jasmine Hudani in an attempt to convince her to make repairs at the Property.  None of these attempts were fruitful.

38.    On or about January 8, 2019, Plaintiff Patrick Nash filed a complaint with the City of Long Beach Department of Development Services about the condition of the Property.  The complaint detailed that there was still no heat at the Property, the front door security lock was broken, the tub plug did not work, the kitchen and bathroom cabinets were broken, the dryer was not functional without the use of a wrench, and that Defendants were storing construction materials and debris throughout the exterior the Property.

39.    Around the same time, Plaintiffs began to suspect that there was a moisture problem at the Property.  Every time they were inside of the Property, the air felt heavy and wet.  Further, both Plaintiffs had been feeling weak and ill since moving into the Property.

40.    Plaintiffs had discovered that many of their belongings, including antique family heirlooms, furniture, clothing, and other property began to grow mold and were damaged by the mold and moisture at the property.  Plaintiffs discovered water intrusion on a wall behind one of their bookshelves.  As a result, the back of the bookshelf had severe mold growing on it.

41.    Plaintiffs believed that water was entering the walls from the roof and water was leaking in from the old windows.  Defendants were aware of the problem as Defendant Altaf Hudani told Plaintiffs that it was time to replace the old windows; he did not, however, change them or re-seal them for the duration of Plaintiffs' tenancy.

42.    On or about January 28, 2019, Plaintiffs hired a mold company, Huggs Quality Inspection, to conduct a mold inspection.  The mold report confirmed their suspicions and found mold in the Property, specifically in the living / dining area.  There was also visible mold growing in the second bedroom.

43.    On February 3, 2019, Plaintiffs informed Defendant Altaf Hudani that they had hired a mold inspection company and that the company had found mold in the Property.  Defendant Altaf Hudani did not make any arrangements to address the mold at the Property.

- 6 -
COMPLAINT FOR DAMAGES

44.     On or about January 29, 2019, as a result of the complaint filed by Plaintiffs and after conducting an inspection, the City of Long Beach issued a Citation Warning Notice to Defendant Altaf Hudani for the bad conditions of the property.  The Citation listed conditions in need of repair by Defendant Altaf Hudani and stated that they were to be complete on or before February 13, 2019.  The Citation noted the following:

a.  Deteriorated bathtub faucet,

b.  Deteriorated and ill-fitting bathroom door,

c.  Inoperative room heater,

d.  Unsanitary, deteriorated kitchen cabinets,

e.  Inoperable window sashes prohibiting the windows from staying open,

f.  Deteriorated or missing window sashes,

g.  Poor painting of the windows prohibiting them from opening,

h.  Missing window screens,

i.  Poorly fitted exterior door, lacking weather strip, and

j.  Unapproved type of deadbolt lock on the exterior gate.

45.     On or about February 3, 2019, Plaintiffs wrote a letter to Defendant Altaf Hudani again informing him of the persistent bad conditions and informing him that due to a breach of the warranty of habitability, they would be providing him with official notice to vacate and terminating their lease as soon as possible.  Defendant Altaf Hudani did not reply to or acknowledge the letter.

46.     Plaintiffs felt as if they had no choice but to terminate their lease as no repairs had been made to date other than the repair of the smoke detectors, garbage disposal and air conditioning, and the condition of the Property, as well as their health, as detailed below, continued to deteriorate.

47.     On or about February 13, 2019, Plaintiffs received a 24-Hour Notice to Enter the Property to make repairs.

48.     On or about February 14, 2019, Plaintiffs viewed footage on their doorbell camera of a man coming to the Property and ringing the doorbell.  The man left without entering the property.

49.     On or about February 15, 2019, Plaintiffs received a Three (3) Day Notice to Perform or Quit for failing to allow entry to the Property.

50.     At no time did Plaintiffs deny Defendants or any of their agents entry into the Property.

51.     At no time did Plaintiffs change the locks or restrict access to the Property.

52.     At all times during Plaintiffs' tenancy, Defendants were in possession of a key to the Property.

53.     On or about February 23, 2019, Plaintiffs received a 24-Hour Notice to Enter the Property for three days: February 25, 2019, February 26, 2019, and February 27, 2019.

54.     One of Defendants' agents visited the property on February 25, 2019 to measure the windows, conduct a walk through, and inspect the property.  No work was performed at the Property.  No entries were made on February 26, 2019 or February 27, 2019.

55.     On or about March 7, 2019, the City of Long Beach formalized the Citation Notice that was issued because no repairs or corrections had been made at the Property.  It also added a new violation for mold at the Property.  The Citation Warning Notice was placed into effect for one year starting on March 7, 2019.

56.     On or about March 11, 2019, Defendant Altaf Hudani's agents arrived at the Property to scrape paint off the windows in order to allow for them to open.  Paint scrapings were left all over the Property. The sashes on the windows were not repaired and the windows were damaged by the scraping. Plaintiffs had arranged all their belongings in the middle of the room to accommodate the work that they expected would be done.  They returned to find their items strewn about the interior of the Property and broken personal belongings.

57.     On March 14, 2019, the City of Long Beach issued an Administrative Citation, providing Defendant Altaf Hudani until April 15, 2019 to repair or remediate the following:

      a.     Visible mold in the Property,

      b.     Deteriorated bathtub faucet,

      c.     Deteriorated an ill-fitting bathroom door,

      d.     Inoperative room heater,

COMPLAINT FOR DAMAGES

e.  Unsanitary, deteriorated kitchen cabinets,

f.  Inoperable window sashes prohibiting the windows from staying open,

g.  Deteriorated or missing window sashes,

h.  Poor painting of the windows prohibiting them from opening,

i.  Missing window screens,

j.  Poorly fitted exterior door, lacking weather strip, and

k.  Unapproved type of deadbolt lock on the exterior gate.

58.  The issues listed above were not repaired or remediated during Plaintiffs' tenancy, and Plaintiffs continued to live in a home that was left in disrepair.

59.  Defendants failed to perform their obligations under the Lease Agreement and as mandated by state and local law for landlords, property owners and/or managers of residential rental property.

**Impact of the Property's Condition on Plaintiffs' Health**

60.  Upon moving into the Property, Plaintiffs noticed that the air smelled wet and musty. Within a few days, Plaintiffs began to feel ill. They were unable to identify the source of their symptoms in the first few weeks, but ultimately, a few months after living at the Property, Plaintiffs discovered that the Property itself was making them ill.

61.  Plaintiffs experienced a significant or complete reduction in their symptoms when they left the property for any overnight trips.

62.  For the duration of their tenancy, both Plaintiffs experienced a persistent cough, excess mucus and nasal discharge, respiratory problems, extreme fatigue, and headaches.

63.  Plaintiffs constantly felt weak and tired for the duration of their tenancy at the Property. Both often struggled with fatigue and headaches and were not performing as well as they normally did when they exercised.

64.  When Plaintiffs began to cough up dark-colored phlegm, they grew concerned and scheduled appointments with their primary care physician, Dr. Jay Kim.

COMPLAINT FOR DAMAGES

65.     On or about January 23, 2019, Plaintiffs visited Dr. Kim who prescribed them antibiotics to alleviate their coughs and to assist with any infection that they may have developed as a result of their exposure to any mold or fungus.  Plaintiffs felt temporary relief, but as soon as the course of antibiotics was complete, their symptoms returned.

66.     Plaintiffs' symptoms have disappeared completely after vacating the property.

67.     Plaintiffs' three (3) dogs were also adversely impacted by the exposure to mold at the Property.  Within weeks of moving into the Property, two (2) of Plaintiffs' dogs perished.  The dogs were otherwise in good health prior to moving into the Property.

68.     Both dogs had been coughing and sneezing since living at the Property.  Neither dog had experienced these symptoms previously.

69.     Plaintiffs' third dog sneezed and coughed continuously for the duration of their tenancy at the Property.  Upon vacating the Property, the dog's symptoms have subsided.

70.     Plaintiffs have suffered tremendously, both physically and emotionally, as a result of their exposure to the unchecked water intrusion and resulting moisture and mold at the Property.

**On-Going Dispute Regarding the Property's Front Yard**

71.     Before Plaintiffs moved to the Property, Defendant Jasmine Hudani verbally represented to them that the paved front yard, otherwise referred to as "one (1) parking spot" in Plaintiffs' lease and Defendants' later correspondence, could easily accommodate two cars.

72.     Plaintiffs only owned one car at the time, but intended to purchase a second to accommodate their new life in Los Angeles, and the need to drive.

73.     From the inception of Plaintiffs' tenancy at the Property, the Hudani Defendants harassed Plaintiffs about their parking in the front yard of the Property, asked them to move their cars as early as 7:00am so that construction workers could use the front yard as a staging area and storage space for construction materials. Later, Defendants attempted to evict Plaintiffs because they were parking both of their cars on the Property.

74.     On many occasions, Plaintiffs were asked to find alternate parking for both cars in order to accommodate construction workers and construction materials.  Because there was no other option,

Plaintiffs were forced to park on the street when they were asked to move their cars.  Most of the street parking in the area, however, is limited to two (2) hour parking.  Plaintiffs' cars were ticketed on at least (3) occasions due to Defendants' demands that they move the cars from the Property.

75.    Plaintiffs asked the Defendants to reimburse them for the cost of the parking tickets or find alternate parking for them.  Despite these requests, Defendants neither reimbursed Plaintiffs nor found them alternate parking.

76.    When Plaintiffs were able to park their vehicles in the Property's front yard, the vehicles would be coated with debris, cement dust, or other construction materials as a result of the construction work taking place in the dental practice and in the Property's front yard.  Plaintiffs notified Defendants of this issue on several occasions, and Defendants responded that they would advise the construction workers to be more careful; Plaintiffs' cars, however, continued to get covered in construction debris throughout their tenancy at the Property.

77.    On or about January 4, 2019, Plaintiffs received a letter from attorney Richard Sontag on behalf of Defendant Altaf Hudani.  The letter informed Plaintiffs that they were in "default of the lease" as a result of parking two cars in the "one parking spot" in their front yard.  The letter claimed that Defendants and the construction workers were not able to access the back entrance of the dental practice due to the way that the cars were parked.

78.    At no time prior to signing their lease were Plaintiffs informed that there would be construction in the adjacent building.

79.    At no time did Plaintiffs give permission to the Defendants or their agents to use a portion of the Property that Plaintiffs had leased in order to access the Defendants' dental practice.

80.    At no time were Plaintiffs' cars blocking any door or entryway to the dental practice or impeding ingress and/or egress from the doors.

81.    At no time were Plaintiffs' cars obstructing the front gate from closing completely.

82.    At no time were Plaintiffs' two (2) cars outside of the parking area designated by Defendants as the one (1) parking spot.

83.     Plaintiffs reminded the Defendants multiple times of Defendant Jasmine Hudani's oral representation that two cars could easily fit within the front yard.  Defendants, however, refused to allow Plaintiffs to park two cars on the Property because it impeded Defendants' ability to conduct construction work in the front yard.  At all relevant times, this construction work unlawfully impeded on Plaintiffs' ability to enjoy the front yard and amounted to trespass.

84.     On or about January 10, 2019, Plaintiffs received a Three (3) Day Notice to Perform Covenants or Quit claiming that they were in breach of their lease by parking two cars in the driveway. Plaintiffs informed Defendant Altaf Hudani that both cars were within the parking spot and within the paved portion of the front yard.  Because they did not want to risk eviction, however, Plaintiffs began parking one of their cars on the street.

85.     On or about January 19, 2019, Defendants' agent, who was conducting construction work in the dental practice, hit and damaged one of Plaintiffs' cars with a ladder while it was parked on the Property.  The car was the only one parked on the Property at the time.  Plaintiffs suspected that the car was hit intentionally and filed a report with the Long Beach Police Department.  Plaintiffs also informed Defendants of the damage, asked for the video footage from the surveillance cameras, and asked that the contractors not be permitted to walk through the front of the Property and damage their cars.

86.     Defendant Altaf Hudani reacted defensively and told Plaintiffs that they should not be parking their car in the front and in a manner that interfered with the construction at the dental practice. He reiterated that he wanted to use the front yard of the Property for construction workers to access the dental practice and for the storage of construction materials.

87.     On or about January 25, 2019, Plaintiffs received another Three (3) Day Notice to Perform Covenants or Quit for disturbing other occupants and neighbors by parking their cars in the front yard.  The Notice claimed that the cars were impeding the construction workers' access to the dental practice's rear door and were a nuisance.

88.     At no time did Plaintiff's cars block the rear access to the dental office.  At all relevant times, the rear door, which opened inwards towards the dental office, was accessible.

- 12 -
**COMPLAINT FOR DAMAGES**

89.     Plaintiffs had stopped parking a second car in the front yard after receiving the first Three (3) Day Notice on or about January 10, 2019.

90.     The tenants residing in the back portion of the home had a separate parking area where they parked their oversized pickup truck.  The truck often protruded beyond the gate and into the alley.  This meant that the gate, which was meant to secure the back portion of the premises was left open and exposed the Property to trespassers.  Further, the truck often blocked a portion of the back alley and was the source of many complaints from neighbors.  Defendant Altaf Hudani never cited the back tenants for having a vehicle that protruded beyond the space designated.

91.     On several occasions throughout Plaintiffs' tenancy, Plaintiffs asked Defendants and their agents working at the dental practice to make sure that the gate remained closed so that Plaintiffs' dog had a secure area to play and so that the Property was secured.  This was particularly important, as the front door lock, identified as broken at the inception of the tenancy, was never repaired.

92.     In addition to often failing to secure the gate, there were multiple occasions during Plaintiffs' tenancy when Plaintiffs encountered the Defendants' agents' dogs sitting the Property's front yard.  On other occasions, Plaintiffs found large puddles of dog urine throughout the front yard.

93.     When Plaintiffs notified Defendant Jasmine Hudani, she replied that Plaintiffs should not be concerned as the contractor's dogs were very friendly.  Plaintiffs, however, were entitled to exclusive possession and control of the front yard, and were concerned that there was another dog on their Property.  Plaintiffs were forced to keep their dog inside the Property to avoid any risk of a hostile interaction with the other animals on the Property.

94.     For the duration of their tenancy at the Property, Plaintiffs were unable to have exclusive possession and control of the exterior of the Property, which they were entitled to pursuant to their lease terms.  Instead, Defendants, their agents, and their agents' animals regularly trespassed.

95.     At no relevant time did Defendants, or any of them, compensate Plaintiffs for the effective deprivation of a parking space, which amounted to a reduction in services.

//

COMPLAINT FOR DAMAGES

**Illegal Lockout and Termination of Plaintiffs' Tenancy**

96.     Exasperated by Defendants' refusal to address substandard conditions at the Property addressed and Defendants' attempts to evict them, Plaintiffs verbally notified the Hudani Defendants in November 2018 that they would be terminating their lease as soon as possible due to the Defendants' breaches of the lease agreement.  The Hudani Defendants agreed to allow Plaintiffs to terminate their lease and repeatedly inquired when Plaintiffs would be moving out.

97.     Defendants were not, however, content to allow Plaintiffs to find a new apartment and give notice.  Instead, following Plaintiffs' complaints to the City of Long Beach regarding the uninhabitable conditions of the Property, Defendants retaliated against Plaintiffs through the use of bogus Three (3) Day Notices regarding the parking dispute and failure to allow Defendants to enter and a letter from their attorney intended to intimidate Plaintiffs and have them vacate the Property.

98.     Ultimately, Plaintiff Patrick Nash texted Defendant Altaf Hudani to inform him that Plaintiffs would be vacating the Property on March 23, 2019.  He informed Defendant Altaf Hudani that Plaintiffs would be sending formal written notice.  The parties communicated further regarding other dates on which Plaintiffs may be able to vacate the Property, but did not reach clear agreement to any date before March 23.

99.     On or about March 12, 2019, Plaintiffs arrived at the Property to find that Defendant Altaf Hudani had placed a bike lock on the exterior gate, prohibiting access to the Property.

100.     On March 22, 2019, when Plaintiffs returned home to the Property, they found that Defendant Altaf Hudani had changed all the locks at the Property.  Plaintiffs were unable to get inside.

101.     Plaintiffs were forced to call two locksmiths.  The first locksmith refused to come to the Property without police presence, and ultimately, never arrived at the Property.  Another locksmith was able to go to the Property, but also requested police presence as he opened the doors.  Plaintiffs were able to access the interior of the unit and remove some of their belongings.

102.     The following day, on or about March 23, 2019, what they believed to be the last day of their tenancy, Plaintiffs returned to the Property to remove the rest of their personal property.  Plaintiffs

COMPLAINT FOR DAMAGES

1  discovered that the locks had been changed again.  Padlocks were also installed on the gate, the home's

2  doors, and one of the doors was welded shut.

3      103.    Plaintiffs were unable to gain access to the Property, and the personal property inside the

4  unit remains in the possession and control of Defendants.  These items include some of Plaintiffs'

5  clothing, Plaintiffs' bed and their bedding, a dining table, and other miscellaneous items.

6      104.    After Plaintiffs vacated the Property, Defendants had twenty-one (21) days to return

7  Plaintiffs' security deposit, pursuant to California law.

8      105.    To date, Defendants have not returned Plaintiffs' security deposit, nor have they provided

9  Plaintiffs with an accounting of the security deposit.  More than twenty-one (21) days have passed since

10  Plaintiffs' vacated the Property.

11      106.    Plaintiffs' rent increased from one thousand and eight hundred dollars ($1,800.00) per

12  month to three thousand and two hundred dollars ($3,200.00) per month as a result of their need to find

13  immediate housing due to Defendants' threats of imminent eviction and the poor conditions at the

14  property.  Moreover, Plaintiffs' expenses for gas have increased because the home they found to move

15  into is further from downtown Long Beach.

16      107.    As described herein, Defendants Altaf Hudani and Jasmine Hudani engaged in malicious,

17  fraudulent, and oppressive conduct that justifies an award of punitive damages.

18      108.    In committing the foregoing acts as set forth above, Defendants Altaf Hudani and Jasmine

19  Hudani willfully disregarded Plaintiffs' rights to be free from, *inter alia*, unlawful retaliation,

20  constructive eviction, harassment, retaliation, breach of the covenant of quiet enjoyment, and breach of

21  the warranty of habitability.

22      109.    In committing the foregoing acts as set forth above, Defendants Altaf Hudani and Jasmine

23  Hudani acted despicably and subjected Plaintiffs to cruel and unjust hardship in conscious disregard for

24  their rights under California law.  By way of example, the Managing Agents subjected Plaintiffs to

25  extreme uninhabitable conditions, delayed necessary repairs in order to harm Plaintiffs, exposed

26  Plaintiffs to dangerous mold that impacted their health and damaged their personal property, utilized the

27  Property as a staging area for construction and storage for materials, engaged in unlawful self-help and

28

COMPLAINT FOR DAMAGES

locked Plaintiffs out of the Property, and maliciously held over Plaintiffs' security deposit. This is evidenced by the fact that Plaintiffs repeatedly voiced their concerns to Defendants and in response, Defendants failed to undertake the repairs and added to the bad conditions of the premises by using the Property as a storage area for construction materials. The Managing Agents' conduct demonstrates a callous indifference for the law and Plaintiffs' rights.

110.    In committing the foregoing acts as set forth above, Defendants Altaf Hudani and Jasmine Hudani intended to cause emotional injury to Plaintiffs. Specifically, the Defendants did not comply with applicable law, and forced Plaintiffs to deal with extreme habitability problems, locked Plaintiffs out of the Property, and held over Plaintiffs' security deposit without reason and without the legally required accounting, with the intent to cause them severe emotional distress or, at least, without regard for the consequences on Plaintiffs' emotional well-being.

**IV.**

**FIRST CAUSE OF ACTION**

**Negligent Maintenance of Premises**

**(By Plaintiffs Against All Defendants, and Does 1 through 50)**

111.    Plaintiffs re-allege and incorporate by reference each of the allegations of the Complaint contained in the preceding paragraphs, as if fully set forth herein.

112.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

113.    As lessors of a building for the occupation of human beings, Defendants and/or their agents, owe a duty to Plaintiffs under Civil Code section 1941 to put the Property in a condition fit for human occupation, and to repair all subsequent dilapidations that render it untenantable.

114.    Defendants, and each of them, have breached this duty by negligently failing to put the Property in a condition fit for human occupancy, and by failing to repair all subsequent dilapidations thereof.

COMPLAINT FOR DAMAGES

115.     Because of the untenantable conditions they endured daily, Plaintiffs have suffered severe emotional distress including, but not limited to, feelings of anxiety, fearfulness, frustration, depression, worry, discomfort, helplessness, disgust and shame.

116.     Defendants' negligence was a substantial factor in causing Plaintiffs' serious emotional distress, which was a foreseeable, direct, and proximate result of Defendants' failure to keep the Property fit for occupancy.  The Defendants, and each of them, are liable to compensate Plaintiffs for these injuries.

117.     As a direct and proximate cause of the untenantable conditions they endured daily, Plaintiffs suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

118.     As a direct and proximate result of Defendants' negligent maintenance of the premises, the value of Plaintiffs' leasehold was diminished.  Plaintiffs were also forced to find alternative housing on short notice and were only able to secure a property with a higher monthly rent further from the city center.  Consequently, Plaintiffs have been damaged in an amount to be proven at trial, but which amount is within the jurisdictional limits of this Court.

119.     Defendants' breach of their duties has been willful, malicious, and oppressive, amounting to despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to entitle Plaintiffs to an award of punitive and exemplary damages. Plaintiffs are entitled to punitive and exemplary damages against Defendants, and Does 1 through 50, in an amount sufficient to punish them and deter them and others from engaging in similar conduct, as determined at trial.

//

# V.

## SECOND CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

### (By Plaintiffs against All Defendants, and Does 1 through 50)

120.     Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

121.     As lessors of a building intended for the occupation of human beings, Defendants and/or their agents owe a duty to Plaintiffs under Civil Code section 1941 to put the Property in a condition fit for human occupation, and to repair all subsequent dilapidations which render it untenantable.

122.     Defendants have breached these duties by, *inter alia*, failing to keep the Property in a condition fit for human occupancy, and by failing to repair all dilapidated conditions (and by creating conditions that added to the dilapidation).

123.     As landlords and/or owners and/or managers of a residential rental property, Defendants and their agents owe a duty to Plaintiffs to preserve Plaintiffs' right to quiet enjoyment of the Property.

124.     Defendants have breached these duties by, *inter alia*, negligently failing to maintain the Property, negligently failing to abate the mold in the Property, negligently creating unsafe conditions by using the Property to store construction materials and debris, unlawfully recovering possession of the Property, and negligently failing to understand and follow the applicable law.

125.     Because of Defendants' negligent breach of such duties, Plaintiffs have suffered serious emotional distress including, but not limited to, feelings of anxiety, fearfulness, frustration, depression, worry, discomfort, disgust and shame.

126.     Defendants' negligence was a substantial factor in causing Plaintiffs' serious emotional distress, which was a foreseeable, direct, and proximate result of Defendants' negligently failing to maintain the Property, negligently failing to abate the mold in the Property, negligently creating unsafe conditions by using the Property to store construction materials and debris, and negligently failing to understand and follow the applicable law.

- 18 -

COMPLAINT FOR DAMAGES

127.    As a direct and proximate result of Defendants' acts, Plaintiffs have been damaged in
an amount that will be shown according to proof, but which does not exceed the jurisdictional limits of
this Court.

## VI.

## <u>THIRD CAUSE OF ACTION</u>

### Tortious Breach of Warranty of Habitability

### (By Plaintiffs against All Defendants, and Does 1 through 50)

128.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this
paragraph, all the allegations of this Complaint.

129.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship
with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as
specified herein.

130.    By virtue of the landlord-tenant relationship, Defendants owed Plaintiffs the duty to
comply with building, fire, health and safety codes, ordinances, regulations and other laws and to
maintain the premises in a habitable condition.

131.    Defendants breached this duty and the implied warranty of habitability by failing to
correct the substandard conditions complained of herein, and by creating new substandard conditions
vis-à-vis their construction activities.

132.    Defendants knew, or reasonably should have known, that Plaintiffs would suffer
damages as a result of this breach.

133.    Plaintiffs have been damaged by Defendants' conduct in an amount equal to rents due
and paid by Plaintiffs during the time period Plaintiffs resided at the Property or in an amount to be
proven at trial.

134.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and
will continue to suffer substantial damages, including illness, physical injury, mental stress, emotional
distress, discomfort, annoyance, anxiety, fear for safety, loss in the value of his or her leasehold,
increased cost of Plaintiffs' new lease, property damage and loss, loss of money, and lost income, in
an amount to be determined at trial.

COMPLAINT FOR DAMAGES

135.    Defendants' conduct in tortiously breaching the implied warranty of habitability has been fraudulent, grossly negligent, malicious, and oppressive, thereby entitling each Plaintiff to punitive damages in an amount to be determined at trial.

**VII.**

**FOURTH CAUSE OF ACTION**

**Breach of Implied Covenant of Quiet Enjoyment**

**(By Plaintiffs against All Defendants, and Does 1 through 50)**

136.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

137.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

138.    Implied in the rental agreement between Defendants and Plaintiffs was a covenant that the Defendants would not interfere with Plaintiffs' quiet enjoyment of the premises during the term of their tenancy.

139.    Defendants have a duty to abide by the implied covenant of quiet enjoyment. Defendants breached this duty and the implied covenant by their conduct as described above, including, but not limited to, failing to repair unsafe, unsanitary, and uninhabitable conditions at the premises and failing to maintain the premises in habitable condition, repeatedly requesting that Plaintiffs move their cars at all hours of the day, using Plaintiffs' yard as an extended active construction zone and storage for construction materials, entering Plaintiffs' home without notice/consent, by harassing Plaintiffs in the Property, by repeatedly serving Plaintiffs with bogus Three-Day Notices in an attempt to intimidate them, and by unlawfully recovering possession of the Property.

140.    Defendants knew, or reasonably should have known, that Plaintiffs would suffer damage as a result of this breach.

141.    As a direct and proximate result of Defendants' breach of the covenant of quiet enjoyment, the value of Plaintiffs' leasehold was diminished.  Consequently, Plaintiffs have been

COMPLAINT FOR DAMAGES

damaged in an amount equal to the rental payments due and paid during their leasehold, or in an amount to be proven at trial.

142.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer substantial damages, including illness, physical injury, mental stress, emotional distress, discomfort, annoyance, anxiety, fear for safety, loss in the value of their leasehold, property damage, loss of money, lost income, and other injuries, in an amount to be determined at trial, but which amount is within the jurisdictional requirements of this Court.

143.    Defendants' conduct has been fraudulent, grossly negligent, malicious, and oppressive, thereby entitling Plaintiffs to punitive damages in an amount to be determined at trial.

### VIII.

### **FIFTH CAUSE OF ACTION**

**Retaliation – Civil Code § 1942.5**

**(By Plaintiffs against All Defendants, and Does 1 through 50)**

144.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

145.    At all relevant times, as described herein, Defendants were the owners and landlords with authority to manage and control the Property.  Plaintiffs were in landlord-tenant relationships with Defendants pursuant to a written rental agreement.  Plaintiffs held leasehold interests in, and at all relevant times while Defendants have owned and/or managed it, were tenants at, the Property.

146.    At no time during their tenancy were Plaintiffs in default as to the payment of their rent.

147.    Defendants, and each of them, violated Civil Code section 1942.5(a) by retaliating against Plaintiffs within 180 days of various events including, but not limited to: Plaintiffs' complaints to City of Long Beach Department of Development Services.

148.    Defendants, and each of them, retaliated against Plaintiffs by failing to repair dilapidations at Property, continuing to store construction material at the Property, attempting to unlawfully recover possession of the Property, serving Plaintiffs with bogus Three-Day Notices to make them fear eviction, and constructively evicting the Plaintiffs.

COMPLAINT FOR DAMAGES

149.    As a direct result of Defendants' retaliatory acts, Plaintiffs suffered and continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, loss in the value of their leaseholds, and property damage, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.  Defendants, and each of them, are liable to compensate Plaintiffs for these injuries under Civil Code section 1942.5(h).

150.    Defendants' acts were also malicious, oppressive, and fraudulent; as a result, under Section 1942.5(h)(2), Defendants, and each of them, are liable to each Plaintiff in the amount of $2,000 for each retaliatory act.

151.    Under Section 1942.5(i), Plaintiffs are entitled to attorneys' fees incurred in bringing this action.

## IX.

### SIXTH CAUSE OF ACTION

**Violation of Civil Code § 1940.2**

**(By Plaintiffs against All Defendants, and Does 1 through 50)**

152.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

153.    Section 1940.2 of the Civil Code makes it unlawful for a landlord to, with the purpose of influencing a tenant to vacate a dwelling: engage in conduct that violates Penal Code sections 484(a) or 518; to use, threaten to use, force, willful threats, or menacing conduct constituting a course of conduct that interferes with the tenant's quiet enjoyment of the premises in violation of Civil Code § 1927 that would create an apprehension of harm in a reasonable person; commit a signification or intentional violation of Civil Code § 1954; or to threaten to disclose information related to a tenants' immigration or citizenship status.

154.    Defendants used, or threatened to use, force, willful threats, and/or menacing conduct that interfered with the Plaintiffs' quiet enjoyment of the Property, in violation of Civil Code section 1927.  Defendants' actions would create an apprehension of harm in a reasonable person.

COMPLAINT FOR DAMAGES

155.     In significant and intentional violation of Civil Code section 1954, Defendants, *inter alia*, entered Plaintiffs' home without permission, caused construction workers to enter Plaintiffs' home without Plaintiffs' permission, during and outside of regular business hours, without notice and without Plaintiffs' permission, and unlawfully recovered possession of the Property without notice to Plaintiffs.

156.     Defendants acted for the purpose of influencing Plaintiffs to vacate the Property.

157.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer substantial damages, including illness, physical injury, mental stress, emotional distress, discomfort, annoyance, anxiety, fear for safety, loss in the value of his or her leasehold, property damage, loss of money, and lost income, all to Plaintiffs' damage in an amount to be determined at trial.

158.     Pursuant to Civil Code section 1940.2(b), Defendants are liable to Plaintiffs in an amount not to exceed $2,000.00 for each violation of Civil Code section 1940.2.

159.     Defendants' conduct in tortiously breaching Civil Code section 1940.2 has been fraudulent, grossly negligent, malicious, and oppressive, thereby entitling each Plaintiff to punitive damages in an amount to be determined at trial.

## X.

## **SEVENTH CAUSE OF ACTION**

### **Forcible Entry – Code of Civil Procedure § 1159**

### **(By Plaintiffs Against All Defendants, and Does 1 through 50)**

160.     Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

161.     During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

162.     By entering Plaintiffs' home without notice to Plaintiffs and without Plaintiffs' permission, and thereafter changing the locks on the Property before Plaintiffs had moved out, Defendants, and each of them, violated Code of Civil Procedure section 1159.

COMPLAINT FOR DAMAGES

163.    Defendants engaged in forcible entry upon Property on no fewer than three occasions: on March 12, 2019, March 22, 2019, and March 23, 2019.

164.    As a direct and proximate cause of Defendants' forcible entries, Plaintiffs were improperly forced out of their home, although they were the lawful tenants and parties in possession of the Property and had paid rent through the end of March.

165.    Plaintiffs suffered and continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, loss in the value of the leasehold, and property damage, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.  Defendants, and each of them, are liable to compensate Plaintiffs for these damages.

166.    Defendants' tortious acts were willful, malicious, and oppressive, amounting to despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to entitle Plaintiffs to an award of punitive and exemplary damages.  Plaintiffs are entitled to punitive and exemplary damages, in an amount to be determined at trial, against Defendants, and each of them, in an amount sufficient to punish them and deter them and others from engaging in similar conduct.

## XI.

## EIGHTH CAUSE OF ACTION

### Trespass

### (By Plaintiffs against All Defendants, and Does 1 through 50)

167.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

168.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

169.    Defendants, and each of them, and/or their respective agents, servants, employees, and authorized representatives, without consent or notice, entered Plaintiffs' home on various occasions to

COMPLAINT FOR DAMAGES

change the locks at the Property in order to unlawfully reclaim possession of the Property and prohibit Plaintiffs from accessing the Property.

170.    Defendants, and each of them, and/or their respective agents, servants, employees, and authorized representatives, without consent or notice, entered the front yard of the Property, damaged Plaintiffs' vehicles, obstructed Plaintiffs' ability to enter their home, and used the premises for construction work without notice or permission to do so.

171.    As a direct and proximate cause of Defendants' trespass, Plaintiffs suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, and property damage, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.  The Defendants, and each of them, are liable to compensate Plaintiffs for these damages.

## XII.

## NINTH CAUSE OF ACTION

### Constructive Eviction– Civil Code § 789.3

### (By Plaintiffs against All Defendants, and Does 1 through 100)

172.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

173.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

174.    Defendants, and each of them, owed a duty to Plaintiffs not, with intent to terminate the Plaintiffs' occupancy, to prevent them from gaining reasonable access to the Property by changing the locks or using a bootlock or by any other similar method or device.

175.    Defendants, and each of them, willfully breached their duties by preventing Plaintiffs from gaining reasonable access to the Property by changing the locks to the exterior gate and/or the home's doors on at least three separate dates: March 12, 2019, March 23, 2019, and March 25, 2019. Defendants, and each of them, committed these breaches with intent to terminate Plaintiffs' occupancy.

COMPLAINT FOR DAMAGES

176.    As a direct result of Defendants' actions, Plaintiffs were unable to derive the full benefits from their tenancies.  Plaintiffs also suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, loss in the value of the leasehold, and property damage, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

177.    Defendants, and each of them, are liable to compensate Plaintiffs' damages resulting from the mental, physical, and property injuries described above.

178.    Pursuant to Civil Code section 789.3(c)(2), Defendants, and each of them, are liable to compensate each Plaintiff in an amount not to exceed one hundred dollars ($100) for each day or part thereof that Defendants remain in violation of Civil Code section 789.3.

179.    The Court should treat as a distinct cause of action for which Plaintiffs are entitled to a separate award of damages, in the amount of not less than $250 per Plaintiff for each instance in which Defendants, with the intent to terminate Plaintiffs' occupancy, changed the locks at the Property to prevent Plaintiffs from gaining reasonable access to the Property.

180.    Pursuant to Civil Code section 789.3(d), Plaintiffs are also entitled to recover reasonable attorneys' fees incurred in bringing and litigating this matter and costs of the suit herein.

181.    In engaging in the conduct alleged above, Defendants, and their respective agents, servants, employees, and authorized representatives, acted with malice, fraud, and oppression, and/or in conscious disregard of Plaintiffs' health, rights, and well-being, and intended to subject Plaintiffs to unjust hardship, thereby warranting an assessment of punitive damages pursuant to Code of Civil Procedure section 3294(a), in an amount sufficient to punish these Defendants and deter others from engaging in similar conduct.

# XIII.

## TENTH CAUSE OF ACTION

### Collection of Rent on Untenantable Dwelling—Civil Code section 1942.4

### (By Plaintiffs against All Defendants, and Does 1 through 50)

182.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

183.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

184.    Civil Code section 1942.4 prohibits a landlord from demanding and collecting rent if: the dwelling substantially lacks any of the standard characteristics necessary for habitation in a dwelling delineated in Civil Code section 1941.1 or Health and Safety Code section 17920.3; a public officer or employee responsible for the enforcement of any housing law has notified the landlord or their agent in writing of the obligation to repair the substandard conditions; the conditions have not been abated 35 days after the date of the service of the notice from the public employee; and the conditions were not caused by an act or omission of the tenant.

185.    The Property substantially lacked, and at all times relevant to this action, substantially lacked, the following standard characteristics, without limitation, necessary for habitation in a dwelling as delineated in Civil Code section 1941.1: effective waterproofing and weather protection of roof, floor and exterior walls; heating facilities maintained in good working order; and building kept in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, rodents and vermin.

186.    The Property substantially lacked, and at all times relevant to this action, substantially lacked, the standard characteristics necessary for habitation in a dwelling as delineated in Health and Safety Code section 17920.3.  Specifically, the Property had, or had for significant periods of time, *inter alia*, inadequate sanitation (*i.e.*, lack of adequate heating, dampness of habitable rooms, visible mold growth, as determined by a health officer or a code enforcement officer; general dilapidation or improper maintenance); nuisance; materials of construction, not maintained in good and safe

condition; an accumulation of garbage and debris constituting a health and safety hazard; and inadequate exit facilities.

187.    Inspectors from the City of Long Beach Office of Development Services, who are public employees responsible for enforcing housing and health laws in Long Beach, inspected the Property on multiple occasions.  Each time they notified the Defendants in writing of the substandard conditions at the Property and of the Defendants' duty to correct the substandard conditions at the Unit.

188.    The substandard conditions existed and were not abated 35 days beyond the date of the City's Citation issued on January 29, 2019.  Defendants do not have good cause for the delay in correcting the cited violations.

189.    The substandard conditions were not caused by any act or omission of Plaintiffs. Defendants, therefore, are in violation of Civil Code section 1942.4.

190.    As a direct and proximate result of Defendants' conduct and the conditions outlined above, Plaintiffs have suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, loss in the value of the leasehold, property damage, and other economic damage in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

191.    Additionally, Plaintiffs have been damaged by Defendants' conduct in an amount equal to rents due and paid by Plaintiffs during the period of Plaintiffs' occupancy of the Property, or in an amount to be proven at trial.

192.    Plaintiffs are entitled to actual damages sustained and to special damages of not less than $100.00, and not more than $5,000.00.

193.    Code of Civil Procedure section 1942.4 provides for an award of reasonable attorneys' fees and costs incurred by the prevailing party in an action brought under this section.  Plaintiffs have employed and will continue to employ attorneys for the initiation and prosecution of this action. Plaintiffs have incurred and will continue to incur attorneys' fees and costs herein.  Plaintiffs are entitled to reasonable attorneys' fees and costs.

COMPLAINT FOR DAMAGES

# XIV.

## ELEVENTH CAUSE OF ACTION

**Failure to Timely Return Security Deposit – Breach of Civil Code § 1950.5**

**(By Plaintiffs against All Defendants, and Does 1 through 50)**

194.    Plaintiffs re-allege and incorporate by reference each of the allegations of the Complaint contained in the preceding paragraphs, as if fully set forth herein.

195.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

196.    Upon signing of the Lease Agreement, Plaintiffs paid two thousand dollars ($2,000.00) to the Defendants as a security deposit.

197.    On or about March 22, 2019, Plaintiffs were forcibly locked out before they could complete moving out.  Plaintiffs had paid their rent in full through the end of March 2019.

198.    At all times relevant to this Complaint, Plaintiffs were tenants of the Property subject to a fixed-term written lease agreement.

199.    Due to the egregious breaches of the lease, Plaintiffs intended to vacate the Property prior to the culmination of their fixed-term lease agreement.  Defendants agreed with Plaintiffs' decision to vacate the Property before the term expired.

200.    Civil Code 1950.5(g) provides, in relevant part, "No later than 21 calendar days after the tenant has vacated the premises … the landlord shall furnish the tenant, by personal delivery or by first-class mail, postage prepaid, a copy of an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security, and shall return any remaining portion of the security to the tenant."

201.    Twenty-one days from the date that Plaintiffs were locked out of the Property was April 12, 2019.  Plaintiffs have not received their security deposit or an accounting of their security deposit.

202.    At all relevant times, Defendants were aware of their legal obligation to return Plaintiffs' security deposit and failed to do so.  Such failure was in bad faith.

- 29 -

203.    The bad faith retention of any portion of a security deposit, in violation of Section 1950.5, may subject the Defendants to statutory damages of up to twice the amount of the security, in addition to actual damages.

204.    Defendants' failure to timely return Plaintiffs' security deposit was in bad faith and in violation of Civil Code 1950.5.

205.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered economic damage in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.  Civil Code § 1950.5(l).

206.    Plaintiffs also seek statutory damages in the amount of twice the security deposit, pursuant to Section 1950.5(l).

### XV.

### TWELFTH CAUSE OF ACTION

### Nuisance

### (By Plaintiffs against All Defendants, and Does 1 through 50)

207.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

208.    At all relevant times, as described herein, Defendants were the owners and landlords with authority to manage and control the Property.  Plaintiffs were in landlord-tenant relationships with Defendants pursuant to a written rental agreement.  Plaintiffs held leasehold interests in, and at all relevant times while Defendants have owned and/or managed it, were tenants at, the Property.

209.    The conditions at the Property, as created by Defendants and as described above, constitute a nuisance within, but not limited to, the meaning of Civil Code sections 3479 *et seq*., in that these defective conditions were injurious to the health and safety of Plaintiffs, and substantially interfered with Plaintiffs' comfortable enjoyment of the Property.  Additionally, the Defendants' harassment of Plaintiffs and the on-going construction activities adjacent to and within the leased Property substantially interfered with Plaintiffs' comfortable enjoyment of the premises.

210.     Despite being required by law to abate the nuisance, Defendants failed to correct conditions rendering the Property a nuisance.  Defendants knew, or reasonably should have known, that Plaintiffs would be injured as a result of this failure to abate the nuisance.

211.     As a direct and proximate result of Defendants' failure to abate the nuisance, the value of Plaintiffs' leasehold was diminished.  Consequently, Plaintiffs have been damaged in an amount equal to the rental payments due and paid during Plaintiffs' leasehold, or in an amount to be proven at trial.

212.     As a direct and proximate result of Defendants' failure to abate the nuisance, Plaintiffs have suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, discomfort, annoyance, anxiety, fear, loss in the value of their leasehold, and property damage, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

213.     Defendants' failure to abate the nuisance has been despicable, malicious, willful, knowing, cruel, unjust and oppressive, and shows extreme indifference to Plaintiffs' rights, health, and safety, thereby entitling Plaintiffs to punitive damages in an amount to be proven at trial.

## XVI.

## THIRTEENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (By Plaintiffs against All Defendants, and Does 1-50)

214.     Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

215.     During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendants, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein.

216.     The conduct of Defendants and/or their agents and employees was outrageous in the extreme.  As landlords and/or managers of the Property, Defendants and/or their agents and employees were in a position of authority which they consistently abused, by, *inter alia*: failing to respond to Plaintiffs' repeated attempts to have the defective conditions at the Property repaired; allowing

COMPLAINT FOR DAMAGES

dangerous and unhealthy nuisance conditions to persist; creating additional dangerous and unhealthy nuisance conditions at the Property; damaging Plaintiffs' personal property; and unlawfully recovering possession of the Property.

217.    Defendants did these things with actual knowledge that their actions were against the law.  Even after Plaintiffs complained to Defendants multiple times about the defective conditions, Defendants made no effort to repair them.  Defendants compounded the problem by using the Property to store construction materials and waste.  These conditions were injurious to Plaintiffs' health and well-being.  Defendants and their agents abused their positions as owners and managers of a the Property by leaving the Property in uninhabitable condition, leaving Plaintiffs without a functional heater for the entirety of the Fall and Winter seasons, constantly asking Plaintiffs to move their cars without reimbursing them for alternative parking, harassing and intimidating Plaintiffs, and ultimately unlawfully recovering possession of the Property by locking Plaintiffs out on three separate occasions, all while demanding and collecting rent.

218.    Defendants at all relevant times knew that Plaintiffs were particularly vulnerable as they had just moved to Los Angeles from another state .  Because Plaintiffs had just moved across the country, Plaintiffs had limited options and limited support.  On multiple occasions dating back to November 2018, the Defendants inquired when they would be receiving Plaintiffs' Notice to Vacate.  When Plaintiffs remained at the Property, Defendants engaged in a pattern of harassment and pretextual attempts to evict them in an attempt to have them vacate the Property as soon as possible.  Subsequent to their failed eviction attempts, Defendants ultimately took matters into their own hands, locking Plaintiffs out of the Property on three separate occasions, depriving them of their personal belongings that remained inside.  Defendants knew, or reasonably should have known, that their conduct would result in Plaintiffs' severe and extreme emotional distress.

219.    Defendants and their agents knew of the applicable California law well and yet failed to maintain the Property in a habitable state as required by that law.  They knew, further, that the Plaintiffs were being exposed to mold in the unit and that *none* of the necessary repairs at the Property had been performed, including but not limited to, stopping the water intrusion, remediating the mold resulting from that water intrusion, fixing the front door lock to secure the Property, fixing the gate

COMPLAINT FOR DAMAGES

lock to secure the Property, repairing the heater so that it was functional, reinstalling the bathroom door, and other miscellaneous repairs.  As a direct and proximate result of Defendants' conduct, and that of their agents and employees, Plaintiffs have suffered and continue to suffer severe emotional distress, including extreme anguish, fearfulness, horror, anxiety, worry, sleeplessness, humiliation and shame, resulting in damages in an amount to be determined at trial, but which amount is within the jurisdictional requirements of this Court.

220.    Defendants' intentional infliction of emotional distress has been despicable, malicious, willful, knowing, cruel, unjust and oppressive, thereby entitling Plaintiffs to punitive damages in an amount to be determined at trial.

## XVII.

## PRAYER FOR RELIEF

For All Causes of Action:

1.    For general damages, including emotional distress damages, according to proof on each cause of action for which such damages are available.

2.    For special damages, according to proof on each cause of action for which such damages are available.

3.    For compensatory damages, including emotional distress damages, according to proof on each cause of action for which such damages are available.

4.    For punitive damages, according to proof on each cause of action for which such damages are available.

5.    For declaratory and injunctive relief, as appropriate.

6.    For prejudgment interest and post-judgment interest according to law.

7.    For reasonable attorneys' fees incurred in this action pursuant to Civil Code sections 789.3, 1942.4 and 1942.5.

8.    For costs of suit incurred in this action.

9.    For such other and further relief that the Court deems proper and just.

//

COMPLAINT FOR DAMAGES

For the Fifth Cause of Action:

   10.    A penalty of $2,000 per retaliatory act, pursuant to Civil Code section 1942.5.

For the Sixth Cause of Action:

   11.    A penalty of $2,000 per violation, pursuant to Civil Code section 1940.2.

For the Ninth Cause of Action:

   12.    For each day, or part thereof, Defendants have been in violation of Civil Code section 789.3, a penalty not to exceed $100, in an amount no less than $250 per cause of action (where subsequent or repeated violations, which are not committed contemporaneously with the initial violation shall be treated as separate causes of action, and subject to a separate award of damages).

For the Tenth Cause of Action:

   13.    For special damages of not less than $100 and not more than $5,000, pursuant to Civil Code section 1942.4.

For the Eleventh Cause of Action:

   14.    For statutory damages of up to twice the amount of the Plaintiffs' security deposit, pursuant to Civil Code section 1950.5(l).

Dated:  June ____, 2019            EXCELSIS LAW, P.C.

                                   By: _____
                                        ZAINAH ALFI

                                   Attorneys for Plaintiffs PATRICK BENJAMIN NASH, and RYAN PAUL NASH

COMPLAINT FOR DAMAGES

## **DEMAND FOR JURY TRIAL**

     Plaintiffs Patrick Benjamin Nash and Ryan Paul Nash hereby demand a trial by jury on all causes of action alleged herein in the Complaint.


Dated:  June ____, 2019          EXCELSIS LAW, P.C.


By: _____
     ZAINAH ALFI

Attorneys for Plaintiffs PATRICK BENJAMIN NASH, and RYAN PAUL NASH

- 1 -

DEMAND FOR JURY TRIAL

**EXHIBIT B**

DocuSign Envelope ID: EBAF7051-552C-4894-AA6A-4437F54B2EA1

**CALIFORNIA ASSOCIATION OF REALTORS®**

# RESIDENTIAL LEASE OR
# MONTH-TO-MONTH RENTAL AGREEMENT
### (C.A.R. Form LR, Revised 6/18)

Date  _09/01/2018_  , _____ _Altaf Hudani_ _____ ("Landlord") and
_Patrick Benjamin Nash, Ryan Paul Nash_ _____ ("Tenant") agree as follows ("Agreement"):

1. **PROPERTY:**
   A. Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as: _228 Atlantic Avenue, Long Beach, CA  90802_ ("Premises").
   B. The Premises are for the sole use as a personal residence by the following named person(s) only: _Patrick Benjamin Nash, Ryan Paul Nash_
   C. The following personal property, maintained pursuant to paragraph 11, is included: _____
      _____ or ☐ (if checked) the personal property on the attached addendum is included.
   D. The Premises may be subject to a local rent control ordinance

2. **TERM:** The term begins on (date) _September 1, 2018_ ("Commencement Date"). If Tenant has not paid all amounts then due; (i) Tenant has no right to possession or keys to the premises and; (ii) this Agreement is voidable at the option of Landlord, 2 calendar days after giving Tenant a Notice to Pay (C.A.R. Form PPN). Notice may be delivered to Tenant (i) in person; (ii) by mail to Tenant's last known address; or (iii) by email, if provided in Tenant's application or previously used by Tenant to communicate with Landlord or agent for Owner. If Landlord elects to void the lease, Landlord shall refund to Tenant all rent and security deposit paid.
   **(Check A or B):**
   ☐ **A.**  **Month-to-Month:** This Agreement continues from the commencement date as a month-to-month tenancy. Tenant may terminate the tenancy by giving written notice at least 30 days prior to the intended termination date. Tenant shall be responsible for paying rent through the termination date even if moving out early. Landlord may terminate the tenancy by giving written notice as provided by law. Such notices may be given on any date.
   ☒ **B.**  **Lease:** This Agreement shall terminate on (date) _August 31, 2019_ at _6:00_ ☐ AM/ ☒ PM. Tenant shall vacate the Premises upon termination of the Agreement, unless: **(i)** Landlord and Tenant have extended this Agreement in writing or signed a new agreement; **(ii)** mandated by local rent control law; or **(iii)** Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month tenancy shall be created which either party may terminate as specified in paragraph 2A. Rent shall be at a rate agreed to by Landlord and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full force and effect.

3. **RENT:** "Rent" shall mean all monetary obligations of Tenant to Landlord under the terms of the Agreement, except security deposit.
   A. Tenant agrees to pay _$1,800.00_ per month for the term of the Agreement.
   B. Rent is payable in advance on the **1st (or ☒ _3rd_ ) day** of each calendar month, and is delinquent on the next day.
   C. If Commencement Date falls on any day other than the day Rent is payable under paragraph 3B, and Tenant has paid one full month's Rent in advance of Commencement Date, Rent for the second calendar month shall be prorated and Tenant shall pay 1/30th of the monthly rent per day for each day remaining in the prorated second month.
   D. PAYMENT: **(1)** Rent shall be paid by ☒ personal check, ☒ money order, ☒ cashier's check, made payable to _Altaf Hudani_
      _____ , ☒ wire/electronic transfer, or ☐ other _____ .
      **(2)** Rent shall be delivered  to (name) _Altaf Hudani_
      (whose phone number is) _(310)999-1039_ at (address) _15052 Springdale St. Suite E, Huntington Beach, CA, 92649_
      _____ , (or at any other location subsequently specified by Landlord in writing to Tenant) (and ☐ if checked, rent may be paid personally, between the hours of _____ and _____ on the following days _____ ).
      **(3)** If any payment is returned for non-sufficient funds ("NSF") or because tenant stops payment, then after that: (i) Landlord may, in writing, require Tenant to pay Rent in cash for three months and (ii) all future Rent shall be paid by ☒ money order, or ☒ cashier's check.
   E. Rent payments received by Landlord shall be applied to the earliest amount(s) due or past due.

4. **SECURITY DEPOSIT:**
   A. Tenant agrees to pay $_2,000.00_ as a security deposit. Security deposit will be ☒ transferred to and held by the Owner of the Premises, or ☐ held in Owner's Broker's trust account.
   B. All or any portion of the security deposit may be used, as reasonably necessary, to: **(i)** cure Tenant's default in payment of Rent (which includes Late Charges, NSF fees or other sums due); **(ii)** repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest, invitee or licensee of Tenant; **(iii)** clean Premises, if necessary, upon termination of the tenancy; and **(iv)** replace or return personal property or appurtenances. **SECURITY DEPOSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT.** If all or any portion of the security deposit is used during the tenancy, Tenant agrees to reinstate the total security deposit within five days after written notice is delivered to Tenant. Within 21 days after Tenant vacates the Premises, Landlord shall: **(1)** furnish Tenant an itemized statement indicating the amount of any security deposit received and the basis for its disposition and supporting documentation as required by California Civil Code § 1950.5(g); and **(2)** return any remaining portion of the security deposit to Tenant.
   C. Security deposit will not be returned until all Tenants have vacated the Premises and all keys returned. Any security deposit returned by check shall be made out to all Tenants named on this Agreement, or as subsequently modified.
   D. No interest will be paid on security deposit unless required by local law.
   E. If the security deposit is held by Owner, Tenant agrees not to hold Broker responsible for its return. If the security deposit is held in Owner's Broker's trust account, **and** Broker's authority is terminated before expiration of this Agreement, **and** security deposit is released to someone other than Tenant, **then** Broker shall notify Tenant, in writing, where and to whom security deposit has been released. Once Tenant has been provided such notice, Tenant agrees not to hold Broker responsible for the security deposit.

Tenant's Initials X(_____) X(_____)                         Landlord's Initials X(_____) (_____)

© 2018, California Association of REALTORS®, Inc.
**LR REVISED 6/18 (PAGE 1 OF 8)**
**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 1 OF 8)**

DocuSign Envelope ID: EBAF7051-552C-4894-AA6A-4437F54B2EA1

Premises: **228 Atlantic Avenue, Long Beach, CA  90802**                                     Date: **09/01/2018**

**5. MOVE-IN COSTS RECEIVED/DUE:** Move-in funds shall be paid by ☐ personal check, ☐ money order, or ☐ cashier's check, ☒ wire/ electronic transfer.

| Category | Total Due | Payment Received | Balance Due | Date Due | Payable To |
|---|---|---|---|---|---|
| Rent from _09/01/2018_ | | | | | |
| to _09/30/2018_ (date) | $1,800.00 | | $1,800.00 | 09/01/2018 | **Altaf Hudani** |
| *Security Deposit | $2,000.00 | | $2,000.00 | 09/01/2018 | **Altaf Hudani** |
| Other Last Months Rent | $1,800.00 | | $1,800.00 | 09/01/2018 | **Altaf Hudani** |
| Other **Broker Fee** | $750.00 | | $750.00 | 09/01/2018 | **Altaf Hudani** |
| Total | $6,350.00 | | $6,350.00 | 09/01/2018 | |

*The maximum amount of security deposit, however designated, cannot exceed two months' Rent for an unfurnished premises, or three months' Rent for a furnished premises.

**6. LATE CHARGE; RETURNED CHECKS:**
   A. Tenant acknowledges either late payment of Rent or issuance of a returned check may cause Landlord to incur costs and expenses, the exact amounts of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Landlord. If any installment of Rent due from Tenant is not received by Landlord within **5 (or** _____ ) calendar days after the date due, or if a check is returned, Tenant shall pay to Landlord, respectively, an additional sum of $_____ or **10.000** % of the Rent due as a Late Charge and $25.00 as a NSF fee for the first returned check and $35.00 as a NSF fee for each additional returned check, either or both of which shall be deemed additional Rent.
   B. Landlord and Tenant agree that these charges represent a fair and reasonable estimate of the costs Landlord may incur by reason of Tenant's late or NSF payment. Any Late Charge or NSF fee due shall be paid with the current installment of Rent. Landlord's acceptance of any Late Charge or NSF fee shall not constitute a waiver as to any default of Tenant. Landlord's right to collect a Late Charge or NSF fee shall neither be deemed an extension of the date Rent is due under paragraph 3 nor prevent Landlord from exercising any other rights and remedies under this Agreement and as provided by law.

**7. PARKING: (Check A or B)**
   ☒ A. Parking is permitted as follows: **One Parking Spot in the Front of the Condo** _____
   
   The right to parking ☒ is ☐ is not included in the Rent charged pursuant to paragraph 3. If not included in the Rent, the parking rental fee shall be an additional $_____ per month. Parking space(s) are to be used only for parking properly registered and operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked on the Premises. Mechanical work, or storage of inoperable vehicles, or storage of any kind is not permitted in parking space(s) or elsewhere on the Premises except as specified in paragraph 8.
   OR☐ B. Parking is not permitted on the real property of which the Premises is a part.

**8. STORAGE: (Check A or B)**
   ☐ A. Storage is permitted as follows: _____
   The right to separate storage space ☐ is, ☐ is not, included in the Rent charged pursuant to paragraph 3. If not included in the Rent, storage space fee shall be an additional $_____ per month. Tenant shall store only personal property Tenant owns, and shall not store property claimed by another or in which another has any right, title or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances.
   OR☒ B. Except for Tenant's personal property, contained entirely within the Premises, storage is not permitted on the Premises.

**9. UTILITIES:** Tenant agrees to pay for all utilities and services, and the following charges: _____ except _____ , which shall be paid for by Landlord. If any utilities are not separately metered, Tenant shall pay Tenant's proportional share, as reasonably determined and directed by Landlord. If utilities are separately metered, Tenant shall place utilities in Tenant's name as of the Commencement Date. Landlord is only responsible for installing and maintaining one usable telephone jack and one telephone line to the Premises. Tenant shall pay any cost for conversion from existing utilities service provider.
   ☐ A. **Water Submeters:** Water use on the Premises is measured by a submeter and Tenant will be separately billed for water usage based on the submeter. See attached Water Submeter Addendum (C.A.R. Form WSM) for additional terms.
   ☒ B. **Gas Meter:** The Premises does not have a separate gas meter.
   ☒ C. **Electric Meter:** The Premises does not have a separate electrical meter.

**10. CONDITION OF PREMISES:** Tenant has examined Premises and, if any, all furniture, furnishings, appliances, landscaping and fixtures, including smoke alarm(s) and carbon monoxide detector(s).
   **(Check all that apply):**
   ☒ A. Tenant acknowledges these items are clean and in operable condition, with the following exceptions: _____
   
   ☐ B. Tenant's acknowledgment of the condition of these items is contained in an attached statement of condition (C.A.R. Form MIMO).
   ☒ C. (i) Landlord will Deliver to Tenant a statement of condition (C.A.R. Form MIMO) ☒ within **3 days** after execution of this Agreement; ☐ prior to the Commencement Date; ☐ within **3 days** after the Commencement Date.
   (ii) Tenant shall complete and return the MIMO to Landlord within **3 (or** _____ **) days** after Delivery. Tenant's failure to return the MIMO within that time shall conclusively be deemed Tenant's Acknowledgement of the condition as stated in the MIMO.

Tenant's Initials X(_____) X(_____)                Landlord's Initials X(_AH_) (_____)

**LR REVISED 6/18 (PAGE 2 OF 8)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com                228 Atlantic Ave

Premises: *228 Atlantic Avenue, Long Beach, CA  90802*                                    Date: *09/01/2018*

[X] **D.**  Tenant will provide Landlord a list of items that are damaged or not in operable condition within **3 (or** [ ] _____ **) days** after Commencement Date, not as a contingency of this Agreement but rather as an acknowledgement of the condition of the Premises.

[ ] **E.**  Other: _____ .

**11. MAINTENANCE USE AND REPORTING:**

A. Tenant shall properly use, operate and safeguard Premises, including if applicable, any landscaping, furniture, furnishings and appliances, and all mechanical, electrical, gas and plumbing fixtures, carbon monoxide detector(s) and smoke alarms, and keep them and the Premises clean, sanitary and well ventilated. Tenant shall be responsible for checking and maintaining all carbon monoxide detectors and any additional phone lines beyond the one line and jack that Landlord shall provide and maintain. Tenant shall replace any burned out or malfunctioning light bulbs. Tenant shall immediately notify Landlord, in writing, of any problem, malfunction or damage with any item including carbon monoxide detector(s) and smoke alarms on the property. Tenant shall be charged for all repairs or replacements caused by Tenant, pets, guests or licensees of Tenant, excluding ordinary wear and tear. Tenant shall be charged for all damage to Premises as a result of failure to report a problem in a timely manner. Tenant shall be charged for repair of drain blockages or stoppages, unless caused by defective plumbing parts or tree roots invading sewer lines.

B. [ ] Landlord [X] Tenant shall water the garden, landscaping, trees and shrubs, except: _____
_____ .

C. [ ] Landlord [X] Tenant shall maintain the garden, landscaping, trees and shrubs, except: _____
_____ .

D. [ ] Landlord [ ] Tenant shall maintain _____

E. Landlord and Tenant agree that State or local water use restrictions shall supersede any obligation of Landlord or Tenant to water or maintain any garden, landscaping, trees or shrubs pursuant to 11B, 11C, and 11D.

F. Tenant's failure to maintain any item for which Tenant is responsible shall give Landlord the right to hire someone to perform such maintenance and charge Tenant to cover the cost of such maintenance.

G. The following items of personal property are included in the Premises without warranty and Landlord will not maintain, repair or replace them: _____ .

H. Tenant understands that if Premises is located in a Common Interest Development, Landlord may not have authority or control over certain parts of the Premises such as roof, electrical, gas or plumbing features inside certain walls, and common areas such as shared parking structure or garage.

I. Tenant shall not use the premises to plant, grow, cultivate or sell marijuana.

**12. NEIGHBORHOOD CONDITIONS:** Tenant is advised to satisfy himself or herself as to neighborhood or area conditions, including, but not limited to, schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered sex offenders, fire protection, other governmental services, availability, adequacy and cost of any wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Tenant.

**13. PETS:** Unless otherwise provided in California Civil Code §54.2, or other law, no animal or pet shall be kept on or about the Premises without Landlord's prior written consent, [X] except as agreed to in the attached Pet Addendum (C.A.R. Form PET).

**14. SMOKING:**

A. (i) Tenant is responsible for all damage caused by smoking including, but not limited to stains, burns, odors and removal of debris; (ii) Tenant acknowledges that in order to remove odor caused by smoking, Landlord may need to replace carpet and drapes and paint the entire premises regardless of when these items were last cleaned, replaced or repainted. Such actions and other necessary steps will impact the return of any security deposit.

B. The Premises or common areas may be subject to a local non-smoking ordinance.

C. NO SMOKING of any substance is allowed on the Premises or common areas. If smoking does occur on the Premises or common areas, (i) Tenant is in material breach of this Agreement; (ii) Tenant, guests, and all others may be required to leave the Premises. [ ] Smoking of the following substances only is allowed: _____ .

**15. RULES/REGULATIONS:**

A. Tenant agrees to comply with all Landlord rules and regulations that are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests, invitees, and licensees of Tenant shall not, disturb, annoy, endanger or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, under federal, state, or local law including, but not limited to, using, manufacturing, selling, storing or transporting illicit drugs or other contraband, or violate any law or ordinance, or commit a waste or nuisance on or about the Premises.

B. **(If applicable, check one)**

[ ] **1.**  Landlord shall provide Tenant with a copy of the rules and regulations within _____ days or _____ .

OR [ ] **2.**  Tenant has been provided with, and acknowledges receipt of, a copy of the rules and regulations.

Tenant's Initials X(_____) X(_____)          Landlord's Initials X(_____) (_____)

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          228 Atlantic Ave

Premises: **228 Atlantic Avenue, Long Beach, CA  90802**                                  Date: **09/01/2018**

**16.** ☐ (If checked) **CONDOMINIUM; PLANNED UNIT DEVELOPMENT:**
  **A.** The Premises are a unit in a condominium, planned unit development, common interest subdivision or other development governed by a homeowners' association ("HOA"). The name of the HOA is _____. Tenant shall comply with all HOA covenants, conditions and restrictions, bylaws, rules and regulations and decisions ("HOA Rules"). Tenant shall reimburse Landlord for any fines or charges imposed by HOA or other authorities, due to any violation by Tenant, or the guests or licensees of Tenant or Landlord shall have the right to deduct such amounts from the security deposit.
  **B.** If applicable, Tenant is required to pay a fee to the HOA to gain access to certain areas within the development such as but not necessarily including or limited to the front gate, pool, and recreational facilities. If not specified in paragraph 5, Tenant is solely responsible for payment and satisfying any HOA requirements prior to or upon or after the Commencement Date.
  **C. (Check one)**
    ☐ **1.**  Landlord shall provide Tenant with a copy of the HOA Rules within _____ days
       or _____.
  OR ☐ **2.**  Tenant has been provided with, and acknowledges receipt of, a copy of the HOA Rules.
**17. ALTERATIONS; REPAIRS:** Unless otherwise specified by law or paragraph 25C, without Landlord's prior written consent, **(i)** Tenant shall not make any repairs, alterations or improvements in or about the Premises including: painting, wallpapering, adding or changing locks, installing antenna or satellite dish(es), placing signs, displays or exhibits, or using screws, fastening devices, large nails or adhesive materials; **(ii)** Landlord shall not be responsible for the costs of alterations or repairs made by Tenant; **(iii)** Tenant shall not deduct from Rent the costs of any repairs, alterations or improvements; and **(iv)** any deduction made by Tenant shall be considered unpaid Rent.
**18. KEYS; LOCKS:**
  **A.** Tenant acknowledges receipt of (or Tenant will receive ☐ prior to the Commencement Date, or ☒ **September 1st**                 ):
    ☒ **2** _____ key(s) to Premises,                                          _____ remote control device(s) for garage door/gate opener(s),
    _____ key(s) to mailbox,                                              **1 Keys for parking gate**                                          ,
    _____ key(s) to common area(s),                                                                                                          .
  **B.** Tenant acknowledges that locks to the Premises ☐ have, ☒ have not, been re-keyed.
  **C.** If Tenant re-keys existing locks or opening devices, Tenant shall immediately deliver copies of all keys to Landlord. Tenant shall pay all costs and charges related to loss of any keys or opening devices. Tenant may not remove locks, even if installed by Tenant.
**19. ENTRY:**
  **A.** Tenant shall make Premises available to Landlord or Landlord's representative for the purpose of entering to make necessary or agreed repairs (including, but not limited to, installing, repairing, testing, and maintaining smoke detectors and carbon monoxide devices, and bracing, anchoring or strapping water heaters, or repairing dilapidation relating to the presence of mold); providing decorations, alterations, or improvements, or supplying necessary or agreed services; or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, contractors and others (collectively "Interested Persons"). Tenant agrees that Landlord, Broker and Interested Persons may take photos of the Premises.
  **B.** Landlord and Tenant agree that 24-hour written notice shall be reasonable and sufficient notice, except as follows: (1) 48-hour written notice is required to conduct an inspection of the Premises prior to the Tenant moving out, unless the Tenant waives the right to such notice. (2) If Landlord has in writing informed Tenant that the Premises are for sale and that Tenant will be notified orally to show the premises (C.A.R. Form NSE), then, for the next 120 days following the delivery of the NSE, notice may be given orally to show the Premises to actual or prospective purchasers. (3) No written notice is required if Landlord and Tenant orally agree to an entry for agreed services or repairs if the date and time of entry are within one week of the oral agreement. (4) No notice is required: **(i)** to enter in case of an emergency; **(ii)** if the Tenant is present and consents at the time of entry; or **(iii)** if the Tenant has abandoned or surrendered the Premises.
  **C.** ☐ (If checked) Tenant authorizes the use of a keysafe/lockbox to allow entry into the Premises and agrees to sign a keysafe/lockbox addendum (C.A.R. Form KLA).
**20. PHOTOGRAPHS AND INTERNET ADVERTISING:**
  **A.** In order to effectively market the Premises for sale or rental it is often necessary to provide photographs, virtual tours and other media to Interested Persons. Tenant agrees that Broker may photograph or otherwise electronically capture images of the exterior and interior of the Premises ("Images") for static and/or virtual tours of the Premises by Interested Persons for use on Broker's website, the MLS, and other marketing materials and sites. Tenant acknowledges that once Images are placed on the Internet neither Broker nor Landlord has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet.
  **B.** Tenant acknowledges that prospective Interested Persons coming onto the Premises may take photographs, videos or other images of the Premises. Tenant understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Landlord has control over who views such Images nor what use viewers may make of the Images.
**21. SIGNS:** Tenant authorizes Landlord to place FOR SALE/LEASE signs on the Premises.
**22. ASSIGNMENT; SUBLETTING: A.** Tenant shall not sublet all or any part of Premises, or parking or storage spaces, or assign or transfer this Agreement or any interest in it, without Landlord's prior written consent. Unless such consent is obtained, any assignment, transfer or subletting of Premises or this Agreement or tenancy, by voluntary act of Tenant, operation of law or otherwise, shall, at the option of Landlord, terminate this Agreement. Any proposed assignee, transferee or sublessee shall submit to Landlord an application and credit information for Landlord's approval and, if approved, sign a separate written agreement with Landlord and Tenant. Landlord's consent to any one assignment, transfer or sublease, shall not be construed as consent to any subsequent assignment, transfer or sublease and does not release Tenant of Tenant's obligations under this Agreement. **B.** This prohibition also applies ( ☐ does not apply) to short term, vacation, and transient rentals such as, but not limited to, those arranged through AirBnB, VRBO, HomeAway or other short term rental services. **C.** Any violation of this prohibition is a non-curable, material breach of this Agreement.

Tenant's Initials X(_____) X(_____)                              Landlord's Initials X(_____) (_____)        *AH*
**LR REVISED 6/18 (PAGE 4 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 4 OF 8)**

**23. JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this Agreement, jointly with every other Tenant, and individually, whether or not in possession.

**24. POSSESSION:**

    **A. (1)** Tenant is not in possession of the Premises. If Landlord is unable to deliver possession of Premises on Commencement Date, such Date shall be extended to the date on which possession is made available to Tenant. If Landlord is unable to deliver possession within **5 (or ☐ _____ ) calendar days** after agreed Commencement Date, Tenant may terminate this Agreement by giving written notice to Landlord, and shall be refunded all Rent and security deposit paid.

    **or (2)** Possession is deemed terminated when Tenant has returned all keys to the Premises to Landlord.

    **B. ☐** Tenant is already in possession of the Premises.

**25. TENANT'S OBLIGATIONS UPON VACATING PREMISES:**

    **A.** Upon termination of this Agreement, Tenant shall: **(i)** give Landlord all copies of all keys and any opening devices to Premises, including any common areas; **(ii)** vacate and surrender Premises to Landlord, empty of all persons; and personal property belonging to Tenant **(iii)** vacate any/all parking and/or storage space; **(iv)** clean and deliver Premises, as specified in paragraph C below, to Landlord in the same condition as referenced in paragraph 10; **(v)** remove all debris; **(vi)** give written notice to Landlord of Tenant's forwarding address; and **(vii)** _____ .

    **B.** All alterations/improvements made by or caused to be made by Tenant, with or without Landlord's consent, become the property of Landlord upon termination. Landlord may charge Tenant for restoration of the Premises to the condition it was in prior to any alterations/improvements.

    **C. Right to Pre-Move-Out Inspection and Repairs: (i)** After giving or receiving notice of termination of a tenancy (C.A.R. Form NTT), or before the expiration of this Agreement, Tenant has the right to request that an inspection of the Premises take place prior to termination of the lease or rental (C.A.R. Form NRI). If Tenant requests such an inspection, Tenant shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Agreement. **(ii)** Any repairs or alterations made to the Premises as a result of this inspection (collectively, "Repairs") shall be made at Tenant's expense. Repairs may be performed by Tenant or through others, who have adequate insurance and licenses and are approved by Landlord. The work shall comply with applicable law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. **(iii)** Tenant shall: **(a)** obtain receipts for Repairs performed by others; **(b)** prepare a written statement indicating the Repairs performed by Tenant and the date of such Repairs; and **(c)** provide copies of receipts and statements to Landlord prior to termination. Paragraph 25C does not apply when the tenancy is terminated pursuant to California Code of Civil Procedure § 1161(2), (3), or (4).

**26. BREACH OF CONTRACT; EARLY TERMINATION:** In addition to any obligations established by paragraph 25, in the event of termination by Tenant prior to completion of the original term of the Agreement, Tenant shall also be responsible for lost Rent, rental commissions, advertising expenses and painting costs necessary to ready Premises for re-rental. Landlord may withhold any such amounts from Tenant's security deposit.

**27. TEMPORARY RELOCATION:** Subject to local law, Tenant agrees, upon demand of Landlord, to temporarily vacate Premises for a reasonable period, to allow for fumigation (or other methods) to control wood destroying pests or organisms, or other repairs to Premises. Tenant agrees to comply with all instructions and requirements necessary to prepare Premises to accommodate pest control, fumigation or other work, including bagging or storage of food and medicine, and removal of perishables and valuables. Tenant shall only be entitled to a credit of Rent equal to the per diem Rent for the period of time Tenant is required to vacate Premises.

**28. DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render Premises totally or partially uninhabitable, either Landlord or Tenant may terminate this Agreement by giving the other written notice. Rent shall be abated as of the date Premises become totally or partially uninhabitable. The abated amount shall be the current monthly Rent prorated on a 30-day period. If the Agreement is not terminated, Landlord shall promptly repair the damage, and Rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of Premises. If damage occurs as a result of an act of Tenant or Tenant's guests, only Landlord shall have the right of termination, and no reduction in Rent shall be made.

**29. INSURANCE: A.** Tenant's, guest's, invitees or licensee's personal property and vehicles are not insured by Landlord, manager or, if applicable, HOA, against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. **Tenant is advised to carry Tenant's own insurance (renter's insurance) to protect Tenant from any such loss or damage. B.** Tenant shall comply with any requirement imposed on Tenant by Landlord's insurer to avoid: **(i)** an increase in Landlord's insurance premium (or Tenant shall pay for the increase in premium); or **(ii)** loss of insurance. **C. ☒** Tenant shall obtain liability insurance, in an amount not less than $*100,000.00*_____, naming Landlord and, if applicable, Property Manager as additional insured for injury or damage to, or upon, the Premises during the term of this agreement or any extension. Tenant shall provide Landlord a copy of the insurance policy before commencement of this Agreement, and a rider prior to any renewal.

**30. WATERBEDS/PORTABLE WASHERS:** Tenant shall not use or have waterbeds on the Premises unless: **(i)** Tenant obtains a valid waterbed insurance policy; **(ii)** Tenant increases the security deposit in an amount equal to one-half of one month's Rent; and **(iii)** the bed conforms to the floor load capacity of Premises. Tenant shall not use on the Premises ☐ Portable Dishwasher ☐ Portable Washing Machine.

**31. WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same or any subsequent breach.

    Tenant's Initials X(_____) X(_____)           Landlord's Initials X(_____) (_____)

**LR REVISED 6/18 (PAGE 5 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 5 OF 8)**



Premises: *228 Atlantic Avenue, Long Beach, CA  90802*    Date: *09/01/2018*

**32** **NOTICE:** Notices are to be served at the following address, or at any other location subsequently designated:
Landlord: *15052 Springdale Street, Suite E,*    Tenant: *Patrick Benjamin Nash, Ryan Paul Nash*
*Huntington Beach, CA, 92649*    *228 Atlantic Avenue, Long Beach, CA, 90802*

**33.** **TENANT ESTOPPEL CERTIFICATE:** Tenant shall execute and return a tenant estoppel certificate delivered to Tenant by Landlord or Landlord's agent within **3 days** after its receipt (C.A.R. Form TEC). Failure to comply with this requirement shall be deemed Tenant's acknowledgment that the tenant estoppel certificate is true and correct, and may be relied upon by a lender or purchaser.

**34. REPRESENTATION**
**A. TENANT REPRESENTATION; OBLIGATIONS REGARDING OCCUPANTS; CREDIT:** Tenant warrants that all statements in Tenant's rental application are accurate. Landlord requires all occupants 18 years of age or older and all emancipated minors to complete a lease rental application. Tenant acknowledges this requirement and agrees to notify Landlord when any occupant of the Premises reaches the age of 18 or becomes an emancipated minor. Tenant authorizes Landlord and Broker(s) to obtain Tenant's credit report periodically during the tenancy in connection with the modification or enforcement of this Agreement. Landlord may cancel this Agreement: **(i)** before occupancy begins; upon disapproval of the credit report(s), or upon discovering that information in Tenant's application is false; **(ii)** After commencement date, upon disapproval of an updated credit report or upon discovering that information in Tenant's application is no longer true. A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency if Tenant fails to fulfill the terms of payment and other obligations under this Agreement.
**B. LANDLORD REPRESENTATIONS:** Landlord warrants that, unless otherwise specified in writing, Landlord is unaware of **(i)** any recorded Notices of Default affecting the Premise; **(ii)** any delinquent amounts due under any loan secured by the Premises; and **(iii)** any bankruptcy proceeding affecting the Premises.

**35. MEDIATION:**
**A.** Consistent with paragraphs B and C below, Landlord and Tenant agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action.
**B.** The following matters are excluded from mediation: **(i)** an unlawful detainer action; **(ii)** the filing or enforcement of a mechanic's lien; and **(iii)** any matter within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation provision.
**C.** Landlord and Tenant agree to mediate disputes or claims involving Listing Agent, Leasing Agent or property manager ("Broker"), provided Broker shall have agreed to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to such Broker. Any election by Broker to participate in mediation shall not result in Broker being deemed a party to this Agreement.

**36. ATTORNEY FEES:** In any action or proceeding arising out of this Agreement, the prevailing party between Landlord and Tenant shall be entitled to reasonable attorney fees and costs, collectively not to exceed $1,000 (or $_____), except as provided in paragraph 35A.

**37. C.A.R. FORM:** C.A.R. Form means the specific form referenced or another comparable form agreed to by the parties.

**38. STATUTORY DISCLOSURES:**
**A.** [X] **LEAD-BASED PAINT (If checked):** Premises were constructed prior to 1978. In accordance with federal law, Landlord gives and Tenant acknowledges receipt of the disclosures on the attached form (C.A.R. Form FLD) and a federally approved lead pamphlet.
**B. PERIODIC PEST CONTROL (CHECK IF EITHER APPLIES):**
**1.** [ ] Landlord has entered into a contract for periodic pest control treatment of the Premises and shall give Tenant a copy of the notice originally given to Landlord by the pest control company.
**2.** [ ] Premises is a house. Tenant is responsible for periodic pest control treatment.
**C.** [ ] **METHAMPHETAMINE CONTAMINATION:** Prior to signing this Agreement, Landlord has given Tenant a notice that a health official has issued an order prohibiting occupancy of the property because of methamphetamine contamination. A copy of the notice and order are attached.
**D. BED BUGS:** Landlord has no knowledge of any infestation in the Premises by bed bugs. See attached Bed Bug Disclosure (C.A.R. Form BBD) for further information. Tenant shall report suspected bed bug infestation to Landlord or, if applicable, property manager and cooperate with any inspection for and treatment of bed bugs. Landlord will notify tenants of any units infested by bed bugs.
**E. MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Landlord nor Brokers, if any, are required to check this website. If Tenant wants further information, Tenant should obtain information directly from this website.)
**F.** [ ] **RESIDENTIAL ENVIRONMENTAL HAZARDS BOOKLET:** Tenant acknowledges receipt of the residential environmental hazards booklet.
**G.** [ ] **MILITARY ORDNANCE DISCLOSURE:** (If applicable and known to Landlord) Premises are located within one mile of an area once used for military training, and may contain potentially explosive munitions.
**H. FLOOD HAZARD DISCLOSURE:** Flooding has the potential to cause significant damage to personal property owned by Tenant. See attached Tenant Flood Hazard Disclosure (C.A.R. Form TFHD) for additional information. *AH*

Tenant's Initials X(_____) X(_____)    Landlord's Initials X(_____) (_____)

**LR REVISED 6/18 (PAGE 6 OF 8)**
**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 6 OF 8)**

Premises: **228 Atlantic Avenue, Long Beach, CA  90802**                                        Date: **09/01/2018**

**39. TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing. This Agreement is subject to California landlord-tenant law and shall incorporate all changes required by amendment or successors to such law. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

**40. AGENCY:**
  **A.  CONFIRMATION:** The following agency relationship(s) are hereby confirmed for this transaction:
  Listing Agent: (Print firm name) _____ **Realty One Group United** _____
  is the agent of (check one): [X] the Landlord exclusively; or [ ] both the Landlord and Tenant.
  Leasing Agent: (Print firm name) _____ **Keller Williams Pacific Estates** _____
  (if not same as Listing Agent) is the agent of (check one): [X] the Tenant exclusively; or [ ] the Landlord exclusively; or [ ] both the Tenant and Landlord.
  **B.  DISCLOSURE:** [ ] (If checked): The term of this Agreement exceeds one year. A disclosure regarding real estate agency relationships (C.A.R. Form AD) has been provided to Landlord and Tenant, who each acknowledge its receipt.
**41.** [ ]  **TENANT COMPENSATION TO BROKER:** Upon execution of this Agreement, Tenant agrees to pay compensation to Broker as specified in a separate written agreement between Tenant and Broker.
**42. NOTICE OF RIGHT TO RECEIVE FOREIGN LANGUAGE TRANSLATION OF LEASE/RENTAL AGREEMENTS:** California Civil Code requires a landlord or property manager to provide a tenant with a foreign language translation copy of a lease or rental agreement if the agreement was negotiated primarily in Spanish, Chinese, Korean, Tagalog or Vietnamese. If applicable, every item of the lease/rental needs to be translated except for, among others, names, dollar amounts and dates written as numerals, and words with no generally accepted non-English translation.
**43. OWNER COMPENSATION TO BROKER:** Upon execution of this Agreement, Owner agrees to pay compensation to Broker as specified in a separate written agreement between Owner and Broker (C.A.R. Form LL or LCA).
**44. RECEIPT:** If specified in paragraph 5, Landlord or Broker, acknowledges receipt of move-in funds.
**45. OTHER TERMS AND CONDITIONS;** If checked, the following ATTACHED documents are incorporated in this Agreement:
  [ ] Keysafe/Lockbox Addendum (C.A.R. Form KLA); [X] Lead-Based Paint and Lead-Based Paint Hazards Disclosure (C.A.R. Form FLD);
  [X] Lease/Rental Mold and Ventilation Addendum (C.A.R. Form LRM); [ ] Landlord in Default Addendum (C.A.R. Form LID)
  [X] Bed Bug Disclosure (C.A.R. Form BBD); [X] Tenant Flood Hazard Disclosure (C.A.R. Form TFHD)
  Other: _____

**46. REPRESENTATIVE CAPACITY:** If one or more Parties is signing this Agreement in a representative capacity and not for him/herself as an individual then that Party shall so indicate in paragraph 49 or 50 and attach a Representative Capacity Signature Disclosure (C.A.R. Form RCSD). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Party acting in a representative capacity (i) represents that the entity for which that party is acting already exists and (ii) shall Deliver to the other Party and Escrow Holder, within 3 Days After Acceptance, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code §18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

---

Landlord and Tenant acknowledge and agree Brokers: **(a)** do not guarantee the condition of the Premises; **(b)** cannot verify representations made by others; **(c)** cannot provide legal or tax advice; **(d)** will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Landlord in this Agreement, Brokers: **(e)** do not decide what rental rate a Tenant should pay or Landlord should accept; and **(f)** do not decide upon the length or other terms of this Agreement. Landlord and Tenant agree that they will seek legal, tax, insurance and other desired assistance from appropriate professionals.

---

**47.** [ ]  **INTERPRETER/TRANSLATOR:** The terms of this Agreement have been interpreted for Tenant into the following language: _____ . Landlord and Tenant acknowledge receipt of the attached interpreter/translator agreement (C.A.R. Form ITA).

**48.** The Premises is being managed by Owner, (or, if checked):
  [ ] Listing firm in box below        [ ] Leasing firm in box below        [ ] Property Management firm immediately below

Real Estate Broker (Property Manager) _____ DRE Lic # _____

By (Agent) _____ DRE Lic # _____

Address _____ Telephone # _____

Tenant's Initials X(_____) X(_____)                    Landlord's Initials X(_____) (_____)

**LR REVISED 6/18 (PAGE 7 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 7 OF 8)**



Premises: *228 Atlantic Avenue, Long Beach, CA  90802*_____    Date: *09/01/2018*_____

**49. Tenant agrees to rent the Premises on the above terms and conditions.**
☐ One or more Tenants is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (For Tenant Representative) (C.A.R. Form RCSD-T) for additional terms.

Tenant *X*_____    Date _____

Print Name *Patrick Benjamin Nash*_____

Address _____ City _____ State _____ Zip _____

Telephone _____ Fax _____ E-mail _____

Tenant *X*_____    Date _____

Print Name *Ryan Paul Nash*_____

Address _____ City _____ State _____ Zip _____

Telephone _____ Fax _____ E-mail _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA)

☐ **GUARANTEE:** In consideration of the execution of this Agreement by and between Landlord and Tenant and for valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Guarantor") does hereby: **(i)** guarantee unconditionally to Landlord and Landlord's agents, successors and assigns, the prompt payment of Rent or other sums that become due pursuant to this Agreement, including any and all court costs and attorney fees included in enforcing the Agreement; **(ii)** consent to any changes, modifications or alterations of any term in this Agreement agreed to by Landlord and Tenant; and **(iii)** waive any right to require Landlord and/or Landlord's agents to proceed against Tenant for any default occurring under this Agreement before seeking to enforce this Guarantee.

Guarantor (Print Name) _____

Guarantor _____ Date _____

Address _____ City _____ State _____ Zip _____

Telephone _____ Fax _____ E-mail _____

**50. Landlord (owner or ☐ agent for owner) agrees to rent the Premises on the above terms and conditions.**
☐ One or more Landlords is signing this Agreement in a representative capacity and not for him/herself as an individual.  See attached Representative Capacity Signature Disclosure (For Landlord Representative) (C.A.R. Form RCSD-LL) for additional terms.

Landlord *X* ~~Altaf Hudani~~   Date *8/28/2018 3:20:39 PM PDT*   Landlord _____    Date _____
*133161G9F2E0446*
   *Altaf Hudani*

Address *15052 Springdale St, Huntington Beach, CA  92649*_____

Telephone *(310)999-1039*_____ Fax _____ E-mail *altafhudani@hotmail.com*_____

---

**REAL ESTATE BROKERS:**
**A.** Real estate brokers who are not also Landlord under this Agreement are not parties to the Agreement between Landlord and Tenant.
**B.** Agency relationships are confirmed in paragraph 40.
**C.** **COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker (Leasing Firm) and Cooperating Broker agrees to accept: **(i)** the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Property is offered for sale or lease or a reciprocal MLS; or **(ii)** ☐ (if checked) the amount specified in a separate written agreement between Listing Broker and Cooperating Broker.

Real Estate Broker (Leasing Firm) *Keller Williams Pacific Estates*_____ DRE Lic. # *01430290*_____

By (Agent) _____ *Esther J Chun* DRE Lic. # *01974491*_____ Date _____

Address *2883 E Spring St*_____ City *Long Beach*_____ State *CA*  Zip *90806-2467*

Telephone _____ Fax _____ E-mail *EstherJChun@kw.com*_____

Real Estate Broker (Listing Firm) *Realty One Group United*_____ DRE Lic. # *01828350*_____

By (Agent) _____ *Jasmine M Hudani* DRE Lic. # *02058953*_____ Date *8/28/2018 3:20:3*

Address *22939 Hawthorne Blvd*_____ City *Torrance*_____ State *CA*  Zip *90505-3680*

Telephone *(310)465-9231*_____ Fax _____ E-mail *jasminehudani729@gmail.com*_____

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
**REAL ESTATE BUSINESS SERVICES, INC.**
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**LR REVISED 6/18 (PAGE 8 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 8 OF 8)**

**CALIFORNIA ASSOCIATION OF REALTORS®**

## PET ADDENDUM
### (C.A.R. Form PET, 11/13)

The following terms and conditions are hereby incorporated in and made a part of the ☒ Residential Lease or Month-to-Month Rental Agreement, ☐ other _____ ,
dated **09/01/2018** , on property located at (Street Address) _____ **228 Atlantic Avenue**
(Unit/Apartment) _____ (City) **Long Beach** (State) **CA** (Zip Code) **90802** ("Premises"),
in which _____ **Patrick Benjamin Nash, Ryan Paul Nash** _____ is referred to as "Tenant"
and _____ **Altaf Hudani** _____ is referred to as "Landlord" (the term "Landlord" includes Owner and agent).

**PET ADDENDUM AND AGREEMENT:**
Notwithstanding any other term in the Agreement, Landlord herewith grants permission for Tenant to have the following pet(s) only on the Premises: **Alaskan Malamute, and two toy-sized Pomeranians** _____ ,
subject to the following terms and conditions:

1. Tenant is not allowed to have any other pets on the Premises other than those designated above, including any pets that are "just visiting."
2. Tenant represents to Landlord that the pet(s) is housebroken, has no vicious tendencies or history of threatening or causing harm to persons by biting, scratching, chewing or otherwise.
3. Tenant agrees that the pet(s) will be properly licensed and vaccinated pursuant to applicable laws and Tenant further agrees to provide proof of licensing and vaccination upon Landlord's or agent's request.
4. Tenant is responsible for compliance with all local laws and regulations relating to the pets.
5. Tenant agrees to clean up after their pet(s) and properly dispose of all waste.
6. Tenant agrees to keep Premises free from pet odor and stain.
7. Tenant agrees to take action to avoid pest infestations (fleas, etc.) in the Premises.
8. If the Premises is part of a residential complex, pets are not allowed in pool areas, clubhouses, business office, laundry rooms, business center or fitness centers. Pets may not be bathed or groomed in the laundry room sinks, pools, or pool area.
9. Permission to have a pet may be revoked at any time with three days notice for cause, or for month to month tenancies with thirty days notice without cause. Tenant's failure to remove the pet(s) after permission has been revoked shall be deemed a breach of the lease or rental agreement.
10. Tenant is responsible for and will be charged for any damage to the Premises caused by their pet(s), whether listed above or "just visiting." Damages include, but are not limited to, damages to floors, carpets, drapes, screens, landscaping, fencing, including odors due to the presence of pets.
11. Tenant agrees to indemnify and hold Landlord and Landlord's agents harmless from all liability, claims, demands, damages and costs for injuries to persons or property in connection with Tenant's pet(s).
12. ☒ Tenant agrees to carry renter's insurance which includes coverage for pet ownership. _____
13. _____

**By signing below, Tenant acknowledges that they have read, understand, accept, and have received a copy of this addendum.**

Tenant (Signature): X _____ Date: _____

(Print Name) **Patrick Benjamin Nash** _____ Date _____

Tenant (Signature): X _____ Date: _____

(Print Name) **Ryan Paul Nash** _____ *Altaf Hudani* _____ Date _____

Landlord (Signature): X ____ 13318160F2E0446 _____ Date: _____ 8/28/2018 3:20:3

(Print Name) **Altaf Hudani** _____ Date _____

© 2013, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**PET 11/13 (PAGE 1 OF 1)**

**PET ADDENDUM (PET PAGE 1 OF 1)**

Exhibit D

1  **EXCELSIS LAW, P.C.**
   ZAINAH ALFI (SBN 304164)
2  C. GENEVIEVE JENKINS (SBN 271128)
   1000 Wilshire Blvd., Suite 600
3  Los Angeles, California 90017
   Telephone: (213) 340-0300
4  Facsimile: (213) 340-0200
   zalfi@excelsislaw.com
5
   Attorneys for Plaintiffs,
6  PATRICK BENJAMIN NASH,
   and RYAN PAUL NASH
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF LOS ANGELES

10

11  PATRICK BENJAMIN NASH, an          Case No. 19STCV30804
    individual; and RYAN PAUL NASH, an
12  individual,                        [Assigned for All Purposes to the Hon. Michael L.
                                       Stern, Dept. 62]
13          Plaintiffs,
                                       **FIRST AMENDED COMPLAINT FOR**
14          vs.                        **DAMAGES**

15  ALTAF HUDANI, individually and in his
    capacity as the Trustee of the HUDANI   1. **NEGLIGENT MAINTENANCE OF PREMISES;**
16  TRUST; and DOES 1 through 50, inclusive,  2. **NEGLIGENT INFLICTION OF EMOTIONAL**
                                                 **DISTRESS;**
17          Defendants.                      3. **TORTIOUS BREACH OF WARRANTY OF**
                                                 **HABITABILITY;**
18                                          4. **BREACH OF IMPLIED COVENANT OF QUIET**
                                                 **ENJOYMENT;**
19                                          5. **RETALIATION – CIV. CODE § 1942.5;**
                                            6. **COLLECTION OF RENT ON UNTENANTABLE**
20                                             **DWELLING – CIV. CODE § 1942.4;**
21                                          7. **FAILURE TO TIMELY RETURN SECURITY**
                                               **DEPOSIT – CIV. CODE § 1950.2;**
22                                          8. **NUISANCE; AND**
                                            9. **INTENTIONAL INFLICTION OF EMOTIONAL**
23                                             **DISTRESS.**
24

25                                         **[DEMAND FOR JURY TRIAL]**
26

27

28

                    FIRST AMENDED COMPLAINT FOR DAMAGES

Plaintiffs Patrick Benjamin Nash and Ryan Paul Nash ("Plaintiffs") hereby bring this First Amended Complaint for Damages against Defendant in his individual capacity and in his capacity as Trustee of the Hudani Trust, and DOES 1 through 50, inclusive, and allege as follows on their knowledge or on information and belief as to all other matters:

## I.

## **PARTIES**

1.     Plaintiff Patrick Benjamin Nash is an individual who, at all times relevant to this Complaint, resided in Los Angeles County at 228 Atlantic Avenue, Long Beach, CA 90802 (the "Property"), pursuant to a written lease.

2.     Plaintiff Ryan Paul Nash is an individual who, at all times relevant to this Complaint, resided in Los Angeles County at the Property, pursuant to a written lease.

3.     Defendant is an individual who, at all times relevant to this Complaint, resided in Los Angeles County, and is an owner of the Property, located in Los Angeles County.

4.     Defendant also serves as trustee of the Hudani Trust, who at all relevant times relevant to this Complaint, was an owner of the Property.

5.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of said defendants when the same has been ascertained.  Each of the fictitiously named defendants is responsible in some manner for the acts complained of herein.  Unless otherwise stated, all references to named defendants shall include DOE defendants as well.

## II.

## **JURISDICTION AND VENUE**

6.     Jurisdiction and venue are proper in this Court because all of the claims alleged herein arose in Los Angeles County and Defendant is doing or did business or resides in Los Angeles County, and/or his principal place of business is in Los Angeles County, in each case, at the times relevant herein.

7.     The amount in controversy in this matter exceeds the sum of $25,000.00, exclusive of

- 2 -

1   interest and costs.

2                                          **III.**

3                               **FACTUAL ALLEGATIONS**

4        8.      Plaintiffs were tenants of the front unit of a split home, located at 228 Atlantic Avenue,

5   Long Beach, CA 90802 (hereinafter, the "Property"). The Property consists of two (2) bedrooms and

6   one (1) bathroom and is approximately five hundred and forty (540) square feet.

7        9.      The rear unit, located at 228 ½ Atlantic Avenue, Long Beach, CA 90802, has a separate

8   parking area and entrance, and does not share any common area with the Property. The rear unit is

9   occupied by one of Defendant's employees, along with her partner and minor child.

10       10.     The front of the Property faces the rear entrance of Defendant's dental practice, which at

11  all relevant times described herein was not open for business, and which, for most of Plaintiffs' tenancy,

12  was under construction.

13       11.     Plaintiffs occupied the Property from September 1, 2018 through March 22, 2019.

14       12.     Plaintiffs paid one thousand and eight hundred dollars ($1,800.00) per month in rent

15  pursuant to a written lease agreement entered into by Plaintiffs and Defendant.

16       13.     Upon execution of the lease agreement (attached hereto as Exhibit A), Plaintiffs paid six

17  thousand and three hundred and fifty dollars ($6,350.00) of which three thousand and six hundred dollars

18  ($3,600.00) was for the first and last months' rent, two thousand dollars ($2,000.00) was for a security

19  deposit to Defendant, and seven hundred and fifty dollars ($750.00) was a broker fee.

20       14.     Defendant failed to account for or return the security deposit to Plaintiffs after Plaintiffs

21  vacated the Property as required by law.

22       15.     Plaintiffs' real estate agent, Esther Chun, assisted Plaintiffs in finding the Property and

23  worked with Defendant's real estate agent, Jasmine Hudani, to secure the Property for Plaintiffs. Jasmine

24  Hudani served as Defendant's agent and assumed managerial duties at the Property.

25       16.     Plaintiffs, who moved from out of state without first seeing the Property in person, relied

26  on Defendant's representations regarding the condition of the Property.

27  //

28                                     - 3 -

**Defendant's Breach of the Warranty of Habitability**

17.     The Defendant negligently and/or willfully failed to maintain the Property for the duration of Plaintiffs' tenancy, repeatedly ignoring Plaintiffs' many requests to repair the defective conditions at the Property.

18.     On or about September 10, 2018, Plaintiffs and Defendant's agent, Jasmine Hudani ("Jasmine") conducted a walk-through of the Property.  At that time, Plaintiffs noted to Jasmine that there were several issues that needed to be resolved.  These issues included: broken windows in bedroom two, a broken bathroom door, dead insects and cockroaches, broken microwave handle, several lights in need of replacement, and missing and broken smoke detectors throughout the house.  Jasmine informed Plaintiffs that Defendant would resolve all of these issues soon, and provide Plaintiffs with another set of keys.

19.     At the walk-through, Jasmine represented to tenants that they could park two cars in the front yard area of the Property, despite the lease designating it one (1) parking spot.  This representation was of importance to Plaintiffs as they planned to purchase a second car.

20.     On or about September 12, 2018, Plaintiffs discovered that there was no hot water and no functional heat at the Property.  Plaintiffs called the gas company, but they refused to turn on the gas because Defendant had a delinquent balance on the account.

21.     Plaintiffs called Defendant to inform him that there was a past-due balance on the account and as a result, there was no gas at the Property.  They also inquired when the repairs identified in the walkthrough would be performed.

22.     Defendant paid the past due balance but did not arrange for any repairs to be made to the Property.

23.     On or about September 14, 2018, the gas company returned to the Property and turned on the gas.  The gas company's representative informed Plaintiffs that the heater thermostat was broken.  Plaintiffs informed Defendant of the broken thermostat.

24.     For the duration of Plaintiffs' tenancy, Defendant failed to repair the broken thermostat; thus, there was no functioning heater at the Property.

- 4 -

25.     On or about September 16, 2018, someone threw trash into the front yard of the Property and around Plaintiffs' vehicle.  Plaintiffs contacted the Long Beach Police Department and filed a police report.

26.     Plaintiffs informed Defendant of what had transpired.  On or about September 16, 2018, Defendant visited the property and informed the Plaintiffs that he would provide them with the log-in information for the video cameras so that they could utilize them.  For the duration of their tenancy, despite Plaintiffs' multiple requests and multiple incidents at the Property, Defendant never provided Plaintiffs the information to access the security cameras.

27.     During Defendant's visit, Plaintiffs walked through the Property with Defendant to point out all of the outstanding repairs including, but not limited to:

    a.   Nonfunctioning heater in the unit,

    b.   Broken thermostat on the heater,

    c.   Broken windows that did not open,

    d.   Front door that did not close securely,

    e.   Broken kitchen and bathroom cabinets,

    f.   Broken dial on the dryer requiring a wrench to operate it,

    g.   Plumbing issues with the tub, and

    h.   Broken front gate.

28.     Defendant informed Plaintiffs that he would schedule a time to have all the repairs made.

29.     During that visit, Defendant also walked Plaintiffs to his dental practice in the adjacent building and notified them that construction would be beginning at the dental practice in the upcoming weeks.

30.     At no time prior to signing the lease were Plaintiffs advised that Defendant would be undertaking a large-scale construction project within several feet of their home.

31.     While inside the dental practice, Plaintiffs noted that there was a sleeping bag in the building.  Defendant informed Plaintiffs that one of the construction workers who was working on the site often slept there.

- 5 -
FIRST AMENDED COMPLAINT FOR DAMAGES

32.     Because Plaintiffs had already signed the lease agreement and moved in, they felt that they had no choice but to accept the situation that Defendant presented to them.

33.     On or about October 26, 2018, Plaintiffs reached out to Defendant via text message to inquire when the repairs would be made, as no one had yet come to the Property to make the needed repairs. Plaintiffs were particularly concerned that the smoke detectors and carbon monoxide detectors had not been installed or repaired. Plaintiffs did not receive a response.

34.     On or about November 2, 2018, Defendant informed Plaintiffs that one of Defendant's agents would reach out to them to make the previously requested repairs, but rather than providing the legally required notice, or any notice at all, Defendant's agents arrived at the Property unannounced shortly thereafter on two separate occasions, once to repair the garbage disposal and the other time to install the new air conditioning unit.

35.     After spending significant amounts of time for a period of several months trying to arrange for Defendant to make the rest of the repairs at the Property, Plaintiffs realized that their efforts were futile and that Defendant was not going to respond to their requests for repairs. Plaintiffs had, many times, called both Jasmine and Defendant, had sent text messages to both Jasmine and Defendant, and had asked their real estate agent Ms. Chun to reach out to Jasmine to convey that the repairs had not been made at the Property. None of these attempts were fruitful.

36.     On or about January 8, 2019, Plaintiff Patrick Nash filed a complaint with the City of Long Beach Department of Development Services about the condition of the Property. The complaint detailed that there was still no heat at the Property, the front door security lock was broken, the tub plug did not work, the kitchen and bathroom cabinets were broken, the dryer was not functional without the use of a wrench, and that Defendant was storing construction materials and debris throughout the exterior the Property.

37.     Plaintiffs also suspected that there was a moisture problem at the Property. Every time they were inside of the Property, the air felt heavy and wet. Further, both Plaintiffs had been feeling weak and ill since moving into the Property.

FIRST AMENDED COMPLAINT FOR DAMAGES

38.    Plaintiffs had discovered that many of their belongings, including antique family heirlooms, furniture, clothing, and other property began to grow mold and were damaged by the mold and moisture at the property.  Plaintiffs discovered water intrusion on a wall behind one of their bookshelves.  As a result, the back of the bookshelf had severe mold growing on it.

39.    Plaintiffs believed that water was entering the walls from the roof and water was leaking in from the old windows.  Defendant was aware of the problem as Defendant told Plaintiffs that it was time to replace the old windows; he did not, however, change them or re-seal them for the duration of Plaintiffs' tenancy.

40.    On or about January 28, 2019, Plaintiffs hired a mold company, Huggs Quality Inspection, to conduct a mold inspection.  The mold report confirmed their suspicions and found mold in the Property, specifically in the living / dining area.  There was also visible mold growing in the second bedroom.

41.    On February 3, 2019, Plaintiffs informed Defendant that they had hired a mold inspection company and that the company had found mold in the Property.  Defendant did not make any arrangements to address the mold at the Property.

42.    On or about January 29, 2019, as a result of the complaint filed by Plaintiffs and after conducting an inspection, the City of Long Beach issued a Citation Warning Notice to Defendant for the bad conditions of the property.  The Citation listed conditions in need of repair by Defendant and stated that they were to be complete on or before February 13, 2019.  The Citation noted the following:

a.   Deteriorated bathtub faucet,

b.   Deteriorated and ill-fitting bathroom door,

c.   Inoperative room heater,

d.   Unsanitary, deteriorated kitchen cabinets,

e.   Inoperable window sashes prohibiting the windows from staying open,

f.   Deteriorated or missing window sashes,

g.   Poor painting of the windows prohibiting them from opening,

h.   Missing window screens,

- 7 -

i.    Poorly fitted exterior door, lacking weather strip, and

j.    Unapproved type of deadbolt lock on the exterior gate.

43.    On or about February 3, 2019, Plaintiffs wrote a letter to Defendant again informing him of the persistent bad conditions and informing him that due to a breach of the warranty of habitability, they would be providing him with official notice to vacate and terminating their lease as soon as possible. Defendant did not reply to or acknowledge the letter.

44.    Plaintiffs felt as if they had no choice but to terminate their lease as no repairs had been made to date other than the repair of the smoke detectors, garbage disposal and air conditioning, and the condition of the Property, as well as their health, as detailed below, continued to deteriorate.

45.    On or about February 13, 2019, Plaintiffs received a 24-Hour Notice to Enter the Property to make repairs.

46.    On or about February 14, 2019, Plaintiffs viewed footage on their doorbell camera of a man coming to the Property and ringing the doorbell. The man left without entering the property.

47.    On or about February 15, 2019, Plaintiffs received a Three (3) Day Notice to Perform or Quit for failing to allow entry to the Property.

48.    At no time did Plaintiffs deny Defendant or any of his agents entry into the Property.

49.    At no time did Plaintiffs change the locks or restrict access to the Property.

50.    At all times during Plaintiffs' tenancy, Defendant was in possession of the code to open the front door and had a key to the exterior Property.

51.    On or about February 23, 2019, Plaintiffs received a 24-Hour Notice to Enter the Property for three days: February 25, 2019, February 26, 2019, and February 27, 2019.

52.    One of Defendant's agents visited the property on February 25, 2019 to measure the windows, conduct a walk through, and inspect the property. No work was performed at the Property. No entries were made on February 26, 2019 or February 27, 2019.

53.    On or about March 7, 2019, the City of Long Beach formalized the Citation Notice that was issued because no repairs or corrections had been made at the Property. It also added a new violation

- 8 -

1  for mold at the Property.  The Citation Warning Notice was placed into effect for one year starting on
2  March 7, 2019.

3      54.    On or about March 11, 2019, Defendant's agents arrived at the Property to scrape paint
4  off the windows in order to allow them to open.  Paint scrapings were left all over the Property. The
5  sashes on the windows were not repaired and the windows were damaged by the scraping.  Plaintiffs had
6  arranged all their belongings in the middle of the room to accommodate the work that they expected
7  would be done.  They returned to find their items strewn about the interior of the Property and broken
8  personal belongings.  They also found that their mail had been tampered with.

9      55.    On March 14, 2019, the City of Long Beach issued an Administrative Citation, providing
10  Defendant until April 15, 2019 to repair or remediate the following:

11      a.  Visible mold in the Property,
12      b.  Deteriorated bathtub faucet,
13      c.  Deteriorated an ill-fitting bathroom door,
14      d.  Inoperative room heater,
15      e.  Unsanitary, deteriorated kitchen cabinets,
16      f.  Inoperable window sashes prohibiting the windows from staying open,
17      g.  Deteriorated or missing window sashes,
18      h.  Poor painting of the windows prohibiting them from opening,
19      i.  Missing window screens,
20      j.  Poorly fitted exterior door, lacking weather strip, and
21      k.  Unapproved type of deadbolt lock on the exterior gate.

22      56.    The issues listed above were not repaired or remediated during Plaintiffs' tenancy, and
23  Plaintiffs continued to live in a home that was left in disrepair.

24      57.    Defendant failed to perform his obligations under the Lease Agreement and as mandated
25  by state and local law for landlords, property owners and/or managers of residential rental property.
26  //
27
28

- 9 -
FIRST AMENDED COMPLAINT FOR DAMAGES

**Impact of the Property's Condition on Plaintiffs' Health**

58.    Upon moving into the Property, Plaintiffs noticed that the air smelled wet and musty. Within a few days, Plaintiffs began to feel ill. They were unable to identify the source of their symptoms in the first few weeks, but ultimately, a few months after living at the Property, Plaintiffs discovered that the Property itself was making them ill.

59.    Plaintiffs experienced a significant or complete reduction in their symptoms when they left the property for overnight trips.

60.    For the duration of their tenancy, both Plaintiffs experienced a persistent cough, excess mucus and nasal discharge, respiratory problems, extreme fatigue, and headaches.

61.    Plaintiffs constantly felt weak and tired for the duration of their tenancy at the Property. Both often struggled with fatigue and headaches and were not performing as well as they normally did when they exercised.

62.    When Plaintiffs began to cough up dark-colored phlegm, they grew concerned and scheduled appointments with the nurse practitioner at their primary care physician's office, Jay Kim, AGNP-BC.

63.    On or about January 23, 2019, Plaintiffs visited Kim who prescribed them antibiotics to alleviate their coughs and to assist with any infection that they may have developed as a result of their exposure to any mold or fungus. Plaintiffs felt temporary relief, but as soon as the course of antibiotics was complete, their symptoms returned.

64.    On or about March 6, 2019, Plaintiffs again visited Kim to address their ongoing symptoms.

65.    Plaintiffs' symptoms have disappeared completely after vacating the property.

66.    Plaintiffs' dog, Aiden, sneezed and coughed continuously for the duration of their tenancy at the Property. Upon vacating the Property, the dog's symptoms have subsided.

67.    Plaintiffs have suffered tremendously, both physically and emotionally, as a result of their exposure to the unchecked water intrusion and resulting moisture and mold at the Property.

//

- 10 -

**On-Going Dispute Regarding the Property's Front Yard**

68.    Before Plaintiffs moved to the Property, Jasmine verbally represented to them that the paved front yard, otherwise referred to as "one (1) parking spot" in Plaintiffs' lease and Defendant's later correspondence, could easily accommodate two cars.

69.    Plaintiffs only owned one car at the time, but intended to purchase a second to accommodate their new life in Los Angeles, and the need to drive.

70.    From the inception of Plaintiffs' tenancy at the Property, Defendant harassed Plaintiffs about their parking in the front yard of the Property, asked them to move their cars as early as 7:00am so that construction workers could use the front yard as a staging area and storage space for construction materials.  Later, Defendant attempted to evict Plaintiffs because they were parking both of their cars on the Property.

71.    On several occasions, Plaintiffs were asked to find alternate parking for both cars in order to accommodate construction workers and construction materials.  Because there was no other option, Plaintiffs were forced to park on the street when they were asked to move their cars.  Most of the street parking in the area, however, is limited to two (2) hour parking.  Plaintiffs' cars were ticketed on at least three (3) occasions due to Defendant's demands that they move the cars from the Property.

72.    Plaintiffs asked the Defendant to reimburse them for the cost of the parking tickets or find alternate parking for them.  Despite these requests, Defendant neither reimbursed Plaintiffs nor found them alternate parking.

73.    When Plaintiffs were able to park their vehicles in the Property's front yard, the vehicles were often coated with debris, cement dust, or other construction materials as a result of the construction work taking place in the dental practice and in the Property's front yard.  Plaintiffs notified Defendant of this issue on several occasions, and Defendant responded that he would advise the construction workers to be more careful; Plaintiffs' cars, however, continued to get covered in construction debris throughout their tenancy at the Property.

74.    On or about January 4, 2019, Plaintiffs received a letter from an attorney on behalf of Defendant.  The letter informed Plaintiffs that they were in "default of the lease" as a result of parking

- 11 -

FIRST AMENDED COMPLAINT FOR DAMAGES

two cars in the "one parking spot" in their front yard.  The letter claimed that Defendant and the construction workers were not able to access the back entrance of the dental practice due to the way that the cars were parked.

75.    At no time prior to signing their lease were Plaintiffs informed that there would be construction in the adjacent building.

76.    At no time did Plaintiffs give permission to the Defendant or his agents to use a portion of the Property that Plaintiffs had leased in order to access the Defendant's dental practice.

77.    At no time were Plaintiffs' cars blocking any door or entryway to the dental practice or impeding ingress and/or egress from the doors.

78.    At no time were Plaintiffs' cars obstructing the front gate from closing completely.

79.    At no time were Plaintiffs' two (2) cars outside of the parking area designated by Defendant as the one (1) parking spot.

80.    Plaintiffs reminded the Defendant multiple times of Jasmine's oral representation that two cars could easily fit within the front yard.  Defendant, however, refused to allow Plaintiffs to park two cars on the Property because it impeded Defendant's ability to conduct construction work in the front yard.  At all relevant times, this construction work unlawfully impeded on Plaintiffs' ability to enjoy the front yard and amounted to trespass.

81.    On or about January 10, 2019, Plaintiffs received a Three (3) Day Notice to Perform Covenants or Quit claiming that they were in breach of their lease by parking two cars in the driveway. Plaintiffs informed Defendant that both cars were within the parking spot and within the paved portion of the front yard.  Because they did not want to risk eviction, however, Plaintiffs began parking one of their cars on the street.

82.    On or about January 19, 2019, Defendant's agent, who was conducting construction work in the dental practice, hit and damaged one of Plaintiffs' cars with a ladder while it was parked on the Property.  The car was the only one parked on the Property at the time.  Plaintiffs suspected that the car was hit intentionally and filed a report with the Long Beach Police Department. Plaintiffs also informed

- 12 -
FIRST AMENDED COMPLAINT FOR DAMAGES

1  Defendant of the damage, asked for the video footage from the surveillance cameras, and asked that the

2  contractors not be permitted to walk through the front of the Property and damage their cars.

3      83.    Defendant reacted defensively and told Plaintiffs that they should not be parking their car

4  in the front and in a manner that interfered with the construction at the dental practice.  Defendant

5  reiterated that he wanted to use the front yard of the Property for construction workers to access the

6  dental practice and for the storage of construction materials.

7      84.    On or about January 25, 2019, Plaintiffs received another Three (3) Day Notice to

8  Perform Covenants or Quit for disturbing other occupants and neighbors by parking their cars in the

9  front yard.  The Notice claimed that the cars were impeding the construction workers' access to the

10  dental practice's rear door and were a nuisance.

11      85.    At no time did Plaintiff's cars block the rear access to the dental office.  At all relevant

12  times, the rear door, which opened inwards towards the dental office, was accessible.

13      86.    Plaintiffs had stopped parking a second car in the front yard after receiving the first Three

14  (3) Day Notice on or about January 10, 2019.

15      87.    The tenants residing in the back portion of the home had a separate parking area where

16  they parked their oversized pickup truck.  The truck often protruded beyond the gate and into the alley.

17  This meant that the gate, which was meant to secure the back portion of the premises was left open and

18  exposed the Property to trespassers.  Further, the truck often blocked a portion of the back alley and was

19  the source of many complaints from neighbors.  Defendant never cited the back tenants for having a

20  vehicle that protruded beyond the space designated.

21      88.    On several occasions throughout Plaintiffs' tenancy, Plaintiffs asked Defendant and his

22  agents working at the dental practice to make sure that the gate remained closed so that Plaintiffs' dog

23  had a secure area to play and so that the Property was secured.  This was particularly important, as the

24  front door lock, identified as broken at the inception of the tenancy, was never repaired.

25      89.    In addition to the times that Defendant's agents failed to secure the gate, there were

26  multiple occasions during Plaintiffs' tenancy when Plaintiffs encountered the Defendant's agents' dogs

27

28

1   in the Property's front yard.  On other occasions, Plaintiffs found large puddles of dog urine throughout
2   the concrete front yard.

3       90.    When Plaintiffs notified Jasmine, she replied that Plaintiffs should not be concerned as
4   the contractor's dogs were very friendly.  Plaintiffs, however, were entitled to exclusive possession and
5   control of the front yard, and were concerned that there was another dog on their Property.  Plaintiffs
6   were forced to keep their dog inside the Property to avoid any risk of a hostile interaction with the other
7   animals on the Property.

8       91.    For the duration of their tenancy at the Property, Plaintiffs were unable to have exclusive
9   possession and control of the exterior of the Property, which they were entitled to pursuant to their lease
10  terms.  Instead, Defendant, his agents, and his agents' animals regularly trespassed.

11      92.    At no relevant time did Defendant compensate Plaintiffs for the effective deprivation of
12  a parking space, which amounted to a reduction in services.

13  **Termination of Plaintiffs' Tenancy**

14      93.    Exasperated by Defendant's refusal to address substandard conditions at the Property
15  addressed and Defendant's attempts to evict them, Plaintiffs verbally notified Defendant in November
16  2018 that they would be terminating their lease as soon as possible due to the Defendant's breaches of
17  the lease agreement.  Defendant agreed to allow Plaintiffs to terminate their lease and repeatedly inquired
18  when Plaintiffs would be moving out.

19      94.    Defendant was not, however, content to allow Plaintiffs to find a new apartment and give
20  notice.  Instead, following Plaintiffs' complaints to the City of Long Beach regarding the uninhabitable
21  conditions of the Property, Defendant retaliated against Plaintiffs through the use of bogus Three (3)
22  Day Notices regarding the parking dispute and failure to allow Defendant to enter and a letter from his
23  attorney intended to intimidate Plaintiffs and have them vacate the Property.

24      95.    Ultimately, Plaintiff Patrick Nash texted Defendant to inform him that Plaintiffs would
25  be vacating the Property on March 23, 2019.  He informed Defendant that Plaintiffs would be sending
26  formal written notice.  The parties communicated further regarding other dates on which Plaintiffs may
27  be able to vacate the Property, but did not reach clear agreement to any date before March 23, 2019.

28
                                        - 14 -

96.     Prior to Plaintiffs completely removing their items, Defendant locked the premises and did not allow Plaintiffs to remove their remaining personal items.

97.     Plaintiffs were unable to gain access to the Property, and the personal property inside the unit remains in the possession and control of Defendant.  These items include some of Plaintiffs' clothing, Plaintiffs' bed and their bedding, a dining table, and other miscellaneous items.

98.     After Plaintiffs vacated the Property, Defendant had twenty-one (21) days to return Plaintiffs' security deposit, pursuant to California law.

99.     To date, Defendant has not returned Plaintiffs' full security deposit, nor has he provided Plaintiffs with an accounting of the security deposit.  More than twenty-one (21) days have passed since Plaintiffs vacated the Property.

100.    Plaintiffs' rent increased from one thousand and eight hundred dollars ($1,800.00) per month to three thousand and two hundred dollars ($3,200.00) per month as a result of their need to find immediate housing due to Defendant's threats of imminent eviction and the poor conditions at the property.  Moreover, Plaintiffs' expenses for gas have increased because the home they found to move into is further from downtown Long Beach.

101.    As described herein, Defendant engaged in malicious, fraudulent, and oppressive conduct that justifies an award of punitive damages.

102.    In committing the foregoing acts as set forth above, Defendant willfully disregarded Plaintiffs' rights to be free from, *inter alia*, unlawful retaliation, harassment, breach of the covenant of quiet enjoyment, and breach of the warranty of habitability.

103.    In committing the foregoing acts as set forth above, Defendant acted despicably and subjected Plaintiffs to cruel and unjust hardship in conscious disregard for their rights under California law.  By way of example, Defendant and his agents subjected Plaintiffs to extreme uninhabitable conditions, intentionally delayed or failed to perform necessary repairs in order to harm Plaintiffs, exposed Plaintiffs to dangerous mold that impacted their health and damaged their personal property, utilized the Property as a staging area for construction and storage for materials, and intentionally held over Plaintiffs' security deposit.  This is evidenced by the fact that Plaintiffs repeatedly voiced their

- 15 -

1  concerns to Defendant and his agents, and in response, Defendant failed to undertake the repairs and

2  added to the bad conditions of the premises by using the Property as a storage area for construction

3  materials. The Defendant's conduct demonstrates a callous indifference for the law and Plaintiffs' rights.

4      104.    In committing the foregoing acts as set forth above, Defendant and his agents intended to

5  cause emotional injury to Plaintiffs. Specifically, Defendant did not comply with applicable law, and

6  forced Plaintiffs to deal with extreme habitability problems, prohibited Plaintiffs from retrieving their

7  items left at the Property, and held over Plaintiffs' security deposit without reason and without the legally

8  required accounting, with the intent to cause them severe emotional distress or, at least, without regard

9  for the consequences on Plaintiffs' emotional well-being.

### IV.

### FIRST CAUSE OF ACTION

#### Negligent Maintenance of Premises

#### (By Plaintiffs Against All Defendants)

    105.    Plaintiffs re-allege and incorporate by reference each of the allegations of the Complaint contained in the preceding paragraphs, as if fully set forth herein.

    106.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendant, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein. *See* Ex. A.

    107.    As lessors of a building for the occupation of human beings, Defendant and/or his agents, owe a duty to Plaintiffs under Civil Code section 1941 to put the Property in a condition fit for human occupation, and to repair all subsequent dilapidations that render it untenantable.

    108.    Defendant has breached this duty by negligently failing to put the Property in a condition fit for human occupancy, and by failing to repair all subsequent dilapidations thereof.

    109.    Plaintiffs requested, on numerous occasions, that Defendant repair the dilapidations, including, but not limited to: broken heater, broken front door security lock, broken cabinet doors, broken bathroom door, water intrusion, mold, and to keep the property clear from construction materials and debris.

- 16 -

FIRST AMENDED COMPLAINT FOR DAMAGES

110.    Because of the untenantable conditions they endured daily, Plaintiffs have suffered severe emotional distress including, but not limited to, feelings of anxiety, fearfulness, frustration, depression, worry, discomfort, helplessness, disgust and shame.

111.    Defendant's negligence was a substantial factor in causing Plaintiffs' serious emotional distress, which was a foreseeable, direct, and proximate result of Defendant's failure to keep the Property fit for occupancy.  Defendant is liable to compensate Plaintiffs for these injuries.

112.    As a direct and proximate cause of the untenantable conditions they endured daily, Plaintiffs suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

113.    As a direct and proximate result of Defendant's negligent maintenance of the premises, the value of Plaintiffs' leasehold was diminished.  Plaintiffs were also forced to find alternative housing on short notice and were only able to secure a property with a higher monthly rent further from the city center.  Consequently, Plaintiffs have been damaged in an amount to be proven at trial, but which amount is within the jurisdictional limits of this Court.

114.    Defendant's breach of their duties has been willful, malicious, and oppressive, amounting to despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to entitle Plaintiffs to an award of punitive and exemplary damages. Plaintiffs are entitled to punitive and exemplary damages against Defendant, and Does 1 through 50, in an amount sufficient to punish them and deter them and others from engaging in similar conduct, as determined at trial.

## V.

## SECOND CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

### (By Plaintiffs against Defendant and Does 1 through 50)

115.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

116.     As lessors of a building intended for the occupation of human beings, Defendant and/or his agents owe a duty to Plaintiffs under Civil Code section 1941 to put the Property in a condition fit for human occupation, and to repair all subsequent dilapidations which render it untenantable.

117.     Defendant has breached these duties by, *inter alia*, failing to keep the Property in a condition fit for human occupancy, and by failing to repair all dilapidated conditions (and by creating conditions that added to the dilapidation).

118.     As landlords and/or owners and/or managers of a residential rental property, Defendant and his agents owe a duty to Plaintiffs to preserve Plaintiffs' right to quiet enjoyment of the Property.

119.     Defendant has breached these duties by, *inter alia*, negligently failing to maintain the Property, negligently failing to repair the leaks in the walls, negligently failing to repair the heater, negligently failing to abate the mold in the Property, negligently creating unsafe conditions by using the Property to store construction materials and debris, and negligently failing to understand and follow the applicable law.

120.     Because of Defendant's negligent breach of such duties, Plaintiffs have suffered serious emotional distress including, but not limited to, feelings of anxiety, fearfulness, frustration, depression, worry, discomfort, disgust and shame.

121.     Defendant's negligence was a substantial factor in causing Plaintiffs' serious emotional distress, which was a foreseeable, direct, and proximate result of Defendant's negligently failing to maintain the Property, negligently failing to abate the mold in the Property, negligently creating unsafe conditions by using the Property to store construction materials and debris, and negligently failing to understand and follow the applicable law.

122.     As a direct and proximate result of Defendant's acts, Plaintiffs have been damaged in an amount that will be shown according to proof, but which does not exceed the jurisdictional limits of this Court.

//

FIRST AMENDED COMPLAINT FOR DAMAGES

## VI.

### THIRD CAUSE OF ACTION

### Tortious Breach of Warranty of Habitability

### (By Plaintiffs against All Defendants)

123.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

124.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendant, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein. *See* Ex. A.

125.    By virtue of the landlord-tenant relationship, Defendant owed Plaintiffs the duty to comply with building, fire, health and safety codes, ordinances, regulations and other laws and to maintain the premises in a habitable condition.

126.    Defendant breached this duty and the implied warranty of habitability by failing to correct the substandard conditions complained of herein, and by creating new substandard conditions vis-à-vis his construction activities.

127.    Defendant knew, or reasonably should have known, that Plaintiffs would suffer damages as a result of this breach.

128.    Plaintiffs have been damaged by Defendant's conduct in an amount equal to rents due and paid by Plaintiffs during the time period Plaintiffs resided at the Property or in an amount to be proven at trial.

129.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered and will continue to suffer substantial damages, including illness, physical injury, mental stress, emotional distress, discomfort, annoyance, anxiety, fear for safety, loss in the value of his or her leasehold, increased cost of Plaintiffs' new lease, property damage and loss, loss of money, and lost income, in an amount to be determined at trial.

130.    Defendant's conduct in tortiously breaching the implied warranty of habitability has been fraudulent, grossly negligent, malicious, and oppressive, thereby entitling each Plaintiff to punitive damages in an amount to be determined at trial.

FIRST AMENDED COMPLAINT FOR DAMAGES

**VII.**

**FOURTH CAUSE OF ACTION**

**Breach of Implied Covenant of Quiet Enjoyment**

**(By Plaintiffs against All Defendants)**

131.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

132.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendant, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein. *See* Ex. A.

133.    Implied in the rental agreement between Defendant and Plaintiffs was a covenant that the Defendant would not interfere with Plaintiffs' quiet enjoyment of the premises during the term of their tenancy.

134.    Defendant has a duty to abide by the implied covenant of quiet enjoyment. Defendant breached this duty and the implied covenant by his conduct as described above, including, but not limited to, failing to repair unsafe, unsanitary, and uninhabitable conditions at the premises and failing to maintain the premises in habitable condition, repeatedly requesting that Plaintiffs move their cars at all hours of the day, using Plaintiffs' yard as an extended active construction zone and storage for construction materials, entering Plaintiffs' home without notice/consent, by harassing Plaintiffs in the Property, and by repeatedly serving Plaintiffs with bogus Three-Day Notices in an attempt to intimidate them.

135.    Defendant knew, or reasonably should have known, that Plaintiffs would suffer damage as a result of this breach.

136.    As a direct and proximate result of Defendant's breach of the covenant of quiet enjoyment, the value of Plaintiffs' leasehold was diminished. Consequently, Plaintiffs have been damaged in an amount equal to the rental payments due and paid during their leasehold, or in an amount to be proven at trial.

137.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered and will continue to suffer substantial damages, including illness, physical injury, mental stress, emotional

- 20 -

FIRST AMENDED COMPLAINT FOR DAMAGES

distress, discomfort, annoyance, anxiety, fear for safety, loss in the value of their leasehold, property damage, loss of money, lost income, and other injuries, in an amount to be determined at trial, but which amount is within the jurisdictional requirements of this Court.

138.    Defendant's conduct has been fraudulent, grossly negligent, malicious, and oppressive, thereby entitling Plaintiffs to punitive damages in an amount to be determined at trial.

## VIII.

### FIFTH CAUSE OF ACTION

### Retaliation – Civil Code § 1942.5

### (By Plaintiffs against All Defendants)

139.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

140.    At all relevant times, as described herein, Defendant was the owner and landlord with authority to manage and control the Property.  Plaintiffs were in landlord-tenant relationships with Defendant pursuant to a written rental agreement.  *See* Ex. A.

141.    Plaintiffs held leasehold interests in, and at all relevant times while Defendant has owned and/or managed it, were tenants at, the Property.

142.    At no time during their tenancy were Plaintiffs in default as to the payment of their rent.

143.    Defendant violated Civil Code section 1942.5(a) by retaliating against Plaintiffs within 180 days of various events including, but not limited to: Plaintiffs' complaints to City of Long Beach Department of Development Services.

144.    Defendant retaliated against Plaintiffs by failing to repair dilapidations at Property, continuing to store construction material at the Property, attempting to restrict Plaintiffs' access to the Property, and serving Plaintiffs with bogus Three-Day Notices to make them fear eviction.

145.    As a direct result of Defendant's retaliatory acts, Plaintiffs suffered and continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, loss in the value of their leaseholds, and property damage, in an amount to be determined according to proof, but which amount is within the jurisdictional

requirements of this Court. Defendant is liable to compensate Plaintiffs for these injuries under Civil Code section 1942.5(h).

146.    Defendant's acts were also malicious, oppressive, and fraudulent; as a result, under Section 1942.5(h)(2), Defendant is liable to each Plaintiff in the amount of $2,000 for each retaliatory act.

147.    Under Section 1942.5(i), Plaintiffs are entitled to attorneys' fees incurred in bringing this action.

**IX.**

**SIXTH CAUSE OF ACTION**

**Collection of Rent on Untenantable Dwelling—Civil Code section 1942.4**
**(By Plaintiffs against All Defendants)**

148.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

149.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendant, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein. *See* Ex. A.

150.    Civil Code section 1942.4 prohibits a landlord from demanding and collecting rent if: the dwelling substantially lacks any of the standard characteristics necessary for habitation in a dwelling delineated in Civil Code section 1941.1 or Health and Safety Code section 17920.3; a public officer or employee responsible for the enforcement of any housing law has notified the landlord or their agent in writing of the obligation to repair the substandard conditions; the conditions have not been abated 35 days after the date of the service of the notice from the public employee; and the conditions were not caused by an act or omission of the tenant.

151.    The Property substantially lacked, and at all times relevant to this action, substantially lacked, the following standard characteristics, without limitation, necessary for habitation in a dwelling as delineated in Civil Code section 1941.1: effective waterproofing and weather protection of roof, floor and exterior walls; heating facilities maintained in good working order; and building kept in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, rodents and vermin.

152.    The Property substantially lacked, and at all times relevant to this action, substantially lacked, the standard characteristics necessary for habitation in a dwelling as delineated in Health and Safety Code section 17920.3. Specifically, the Property had, or had for significant periods of time, *inter alia*, inadequate sanitation (*i.e.*, lack of adequate heating, dampness of habitable rooms, visible mold growth, as determined by a health officer or a code enforcement officer; general dilapidation or improper maintenance); nuisance; materials of construction, not maintained in good and safe condition; an accumulation of garbage and debris constituting a health and safety hazard; and inadequate exit facilities.

153.    Inspectors from the City of Long Beach Office of Development Services, who are public employees responsible for enforcing housing and health laws in Long Beach, inspected the Property on multiple occasions. Each time they notified Defendant in writing of the substandard conditions at the Property and of the Defendant's duty to correct the substandard conditions at the Unit.

154.    The substandard conditions existed and were not abated 35 days beyond the date of the City's Citation issued on January 29, 2019. Defendant does not have good cause for the delay in correcting the cited violations.

155.    The substandard conditions were not caused by any act or omission of Plaintiffs. Defendant, therefore, is in violation of Civil Code section 1942.4.

156.    As a direct and proximate result of Defendant's conduct and the conditions outlined above, Plaintiffs have suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, shame, anxiety, depression, helplessness, frustration, discomfort, annoyance, fear, loss in the value of the leasehold, property damage, and other economic damage in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

157.    Additionally, Plaintiffs have been damaged by Defendant's conduct in an amount equal to rents due and paid by Plaintiffs during the period of Plaintiffs' occupancy of the Property, or in an amount to be proven at trial.

158.    Plaintiffs are entitled to actual damages sustained and to special damages of not less than $100.00, and not more than $5,000.00.

159.    Code of Civil Procedure section 1942.4 provides for an award of reasonable attorneys' fees and costs incurred by the prevailing party in an action brought under this section. Plaintiffs have

employed and will continue to employ attorneys for the initiation and prosecution of this action. Plaintiffs have incurred and will continue to incur attorneys' fees and costs herein. Plaintiffs are entitled to reasonable attorneys' fees and costs.

## X.

## SEVENTH CAUSE OF ACTION

### Failure to Timely Return Security Deposit – Breach of Civil Code § 1950.5
### (By Plaintiffs against All Defendants)

160.    Plaintiffs re-allege and incorporate by reference each of the allegations of the Complaint contained in the preceding paragraphs, as if fully set forth herein.

161.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendant, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein. *See* Ex. A.

162.    Upon signing of the Lease Agreement, Plaintiffs paid two thousand dollars ($2,000.00) to the Defendant as a security deposit and three thousand and six hundred dollars ($3,600) for the first and last month's rent.

163.    On or about March 22, 2019, Defendant regained possession of the Property before Plaintiffs could complete moving out.

164.    At all times relevant to this Complaint, Plaintiffs were tenants of the Property subject to a fixed-term written lease agreement.

165.    Due to the egregious breaches of the lease, Plaintiffs intended to vacate the Property prior to the culmination of their fixed-term lease agreement. Defendant agreed with Plaintiffs' decision to vacate the Property before the term expired.

166.    Civil Code 1950.5(g) provides, in relevant part, "No later than 21 calendar days after the tenant has vacated the premises … the landlord shall furnish the tenant, by personal delivery or by first-class mail, postage prepaid, a copy of an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security, and shall return any remaining portion of the security to the tenant."

- 24 -

167.    Twenty-one days from the date that Defendant regained possession of the Property was April 12, 2019. Plaintiffs have not received their full security deposit or a proper accounting of their security deposit.

168.    At all relevant times, Defendant was aware of his legal obligation to return Plaintiffs' security deposit and failed to do so. Such failure was in bad faith.

169.    The bad faith retention of any portion of a security deposit, in violation of Section 1950.5, may subject the Defendant to statutory damages of up to twice the amount of the security, in addition to actual damages.

170.    Defendant's failure to timely return Plaintiffs' security deposit was in bad faith and in violation of Civil Code 1950.5.

171.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered economic damage in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court. Civil Code § 1950.5(l).

172.    Plaintiffs also seek statutory damages in the amount of twice the security deposit, pursuant to Section 1950.5(l).

**XI.**

**EIGHTH CAUSE OF ACTION**

**Nuisance**

**(By Plaintiffs against All Defendants)**

173.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

174.    At all relevant times, as described herein, Defendant was the owner and landlord with authority to manage and control the Property. Plaintiffs were in landlord-tenant relationships with Defendant pursuant to a written rental agreement. Plaintiffs held leasehold interests in, and at all relevant times while Defendant has owned and/or managed it, were tenants at, the Property.

175.    The conditions at the Property, as created by Defendant and as described above, constitute a nuisance within, but not limited to, the meaning of Civil Code sections 3479 *et seq.*, in that these defective conditions were injurious to the health and safety of Plaintiffs, and substantially

interfered with Plaintiffs' comfortable enjoyment of the Property.   Additionally, the Defendant's harassment of Plaintiffs and the on-going construction activities adjacent to and within the leased Property substantially interfered with Plaintiffs' comfortable enjoyment of the premises.

176.    Despite being required by law to abate the nuisance, Defendant failed to correct conditions rendering the Property a nuisance.  Defendant knew, or reasonably should have known, that Plaintiffs would be injured as a result of this failure to abate the nuisance.

177.    As a direct and proximate result of Defendant's failure to abate the nuisance, the value of Plaintiffs' leasehold was diminished.  Consequently, Plaintiffs have been damaged in an amount equal to the rental payments due and paid during Plaintiffs' leasehold, or in an amount to be proven at trial.

178.    As a direct and proximate result of Defendant's failure to abate the nuisance, Plaintiffs have suffered and/or continue to suffer illness, physical injury, mental stress, emotional distress, discomfort, annoyance, anxiety, fear, loss in the value of their leasehold, and property damage, in an amount to be determined according to proof, but which amount is within the jurisdictional requirements of this Court.

179.    Defendant's failure to abate the nuisance has been despicable, malicious, willful, knowing, cruel, unjust and oppressive, and shows extreme indifference to Plaintiffs' rights, health, and safety, thereby entitling Plaintiffs to punitive damages in an amount to be proven at trial.

## XII.

## **NINTH CAUSE OF ACTION**

### **Intentional Infliction of Emotional Distress**

### **(By Plaintiffs against All Defendants)**

180.    Plaintiffs re-allege and incorporate by reference, as though fully set forth in this paragraph, all the allegations of this Complaint.

181.    During their residence in the Property, Plaintiffs were in a landlord-tenant relationship with Defendant, paying rent and occupying the premises, pursuant to a written rental agreement, as specified herein. *See* Ex. A.

182.    The conduct of Defendant and/or his agents and employees was outrageous in the extreme.  As landlords and/or managers of the Property, Defendant and/or his agents and employees

- 26 -

were in a position of authority which they consistently abused, by, *inter alia*: failing to respond to Plaintiffs' repeated attempts to have the defective conditions at the Property repaired; allowing dangerous and unhealthy nuisance conditions to persist; creating additional dangerous and unhealthy nuisance conditions at the Property; and damaging Plaintiffs' personal property.

183.   Defendant did these things with actual knowledge that his actions were against the law. Even after Plaintiffs complained to Defendant and his agents multiple times about the defective conditions, Defendant made no effort to repair them.  Defendant compounded the problem by using the Property to store construction materials and waste.  These conditions were injurious to Plaintiffs' health and well-being. Defendant and his agents abused their positions as owners and managers of the Property by leaving the Property in uninhabitable condition, leaving Plaintiffs without a functional heater for the entirety of the Fall and Winter seasons, constantly asking Plaintiffs to move their cars without reimbursing them for alternative parking, and harassing and intimidating Plaintiffs, all while demanding and collecting rent.

184.   Defendant at all relevant times knew that Plaintiffs were particularly vulnerable as they had just moved to California from another state.  Because Plaintiffs had just moved across the country, Plaintiffs had limited options and limited support.

185.   On multiple occasions dating back to November 2018, the Defendant and his agent inquired when they would be receiving Plaintiffs' Notice to Vacate.  When Plaintiffs remained at the Property, Defendant engaged in a pattern of harassment and pretextual attempts to evict them in an attempt to have them vacate the Property as soon as possible.  Defendant knew, or reasonably should have known, that his conduct would result in Plaintiffs' severe and extreme emotional distress.

186.   Defendant and his agents knew of the applicable California law well and yet failed to maintain the Property in a habitable state as required by that law.  Defendant knew, further, that the Plaintiffs were being exposed to mold in the unit and that none of the necessary repairs at the Property had been performed, including but not limited to, stopping the water intrusion, remediating the mold resulting from that water intrusion, fixing the front door lock to secure the Property, fixing the gate lock to secure the Property, repairing the heater and thermostat, reinstalling the bathroom door, and other miscellaneous repairs.  As a direct and proximate result of Defendant's conduct, and that of his agents

and employees, Plaintiffs have suffered and continue to suffer severe emotional distress, including extreme anguish, fearfulness, horror, anxiety, worry, sleeplessness, humiliation and shame, resulting in damages in an amount to be determined at trial, but which amount is within the jurisdictional requirements of this Court.

187.    Defendant's intentional infliction of emotional distress has been despicable, malicious, willful, knowing, cruel, unjust and oppressive, thereby entitling Plaintiffs to punitive damages in an amount to be determined at trial.

## XIII.

## **PRAYER FOR RELIEF**

For All Causes of Action:

1.    For general damages, including emotional distress damages, according to proof on each cause of action for which such damages are available.

2.    For special damages, according to proof on each cause of action for which such damages are available.

3.    For compensatory damages, including emotional distress damages, according to proof on each cause of action for which such damages are available.

4.    For punitive damages, according to proof on each cause of action for which such damages are available.

5.    For declaratory and injunctive relief, as appropriate.

6.    For prejudgment interest and post-judgment interest according to law.

7.    For reasonable attorneys' fees incurred in this action pursuant to Civil Code sections 1942.4 and 1942.5.

8.    For costs of suit incurred in this action.

9.    For such other and further relief that the Court deems proper and just.

For the Fifth Cause of Action:

10.    A penalty of $2,000 per retaliatory act, pursuant to Civil Code section 1942.5.

For the Sixth Cause of Action:

- 28 -

FIRST AMENDED COMPLAINT FOR DAMAGES

11.    For special damages of not less than $100 and not more than $5,000, pursuant to Civil Code section 1942.4.

For the Seventh Cause of Action:

12.    For statutory damages of up to twice the amount of the Plaintiffs' security deposit, pursuant to Civil Code section 1950.5(l).

Dated:  November 20, 2019

EXCELSIS LAW, P.C.

By: _____
ZAINAH ALFI
C. GENEVIEVE JENKINS

Attorneys  for  Plaintiffs  PATRICK  BENJAMIN NASH, and RYAN PAUL NASH

- 29 -

FIRST AMENDED COMPLAINT FOR DAMAGES

## DEMAND FOR JURY TRIAL

Plaintiffs Patrick Benjamin Nash and Ryan Paul Nash hereby demand a trial by jury on all causes of action alleged herein in the Complaint.

Dated:  November 20, 2019

EXCELSIS LAW, P.C.

By: _____
ZAINAH ALFI
C. GENEVIEVE JENKINS

Attorneys  for  Plaintiffs  PATRICK  BENJAMIN NASH, and RYAN PAUL NASH

- 1 -
DEMAND FOR JURY TRIAL

**Exhibit A**



**ASSOCIATION OF REALTORS®**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT**
(C.A.R. Form LR, Revised 6/18)

Date _09/01/2018_ , _____ **Altaf Hudani** _____ ("Landlord") and
_**Patrick Benjamin Nash, Ryan Paul Nash**_ ("Tenant") agree as follows ("Agreement"):

1. **PROPERTY:**
   A. Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as: **228 Atlantic Avenue, Long Beach, CA 90802** ("Premises").
   B. The Premises are for the sole use as a personal residence by the following named person(s) only: **Patrick Benjamin Nash, Ryan Paul Nash**
   C. The following personal property, maintained pursuant to paragraph 11, is included: _____
      _____ or ☐ (if checked) the personal property on the attached addendum is included.
   D. The Premises may be subject to a local rent control ordinance _____

2. **TERM:** The term begins on (date) **September 1, 2018** ("Commencement Date"). If Tenant has not paid all amounts then due; (i) Tenant has no right to possession or keys to the premises and; (ii) this Agreement is voidable at the option of Landlord, 2 calendar days after giving Tenant a Notice to Pay (C.A.R. Form PPN). Notice may be delivered to Tenant (i) in person; (ii) by mail to Tenant's last known address; or (iii) by email, if provided in Tenant's application or previously used by Tenant to communicate with Landlord or agent for Owner. If Landlord elects to void the lease, Landlord shall refund to Tenant all rent and security deposit paid.
   (Check A or B):
   ☐ A. **Month-to-Month:** This Agreement continues from the commencement date as a month-to-month tenancy. Tenant may terminate the tenancy by giving written notice at least 30 days prior to the intended termination date. Tenant shall be responsible for paying rent through the termination date even if moving out early. Landlord may terminate the tenancy by giving written notice as provided by law. Such notices may be given on any date.
   ☒ B. **Lease:** This Agreement shall terminate on (date) **August 31, 2019** at **6:00** ☐ AM/ ☒ PM. Tenant shall vacate the Premises upon termination of the Agreement, unless: **(i)** Landlord and Tenant have extended this Agreement in writing or signed a new agreement; **(ii)** mandated by local rent control law; or **(iii)** Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month tenancy shall be created which either party may terminate as specified in paragraph 2A. Rent shall be at a rate agreed to by Landlord and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full force and effect.

3. **RENT:** "Rent" shall mean all monetary obligations of Tenant to Landlord under the terms of the Agreement, except security deposit.
   A. Tenant agrees to pay $**1,800.00** _____ per month for the term of the Agreement.
   B. Rent is payable in advance on the 1st (or ☒ _**3rd**_ ) day of each calendar month, and is delinquent on the next day.
   C. If Commencement Date falls on any day other than the day Rent is payable under paragraph 3B, and Tenant has paid one full month's Rent in advance of Commencement Date, Rent for the second calendar month shall be prorated and Tenant shall pay 1/30th of the monthly rent per day for each day remaining in the prorated second month.
   D. PAYMENT: **(1)** Rent shall be paid by ☒ personal check, ☒ money order, ☒ cashier's check, made payable to _**Altaf Hudani**_ _____ , ☒ wire/electronic transfer, or ☐ other _____ .
      **(2)** Rent shall be delivered to (name) _**Altaf Hudani**_
      (whose phone number is) _**(310)999-1039**_ at (address) _**15052 Springdale St. Suite E, Huntington Beach, CA, 92649**_
      _____ , (or at any other location subsequently specified by Landlord in writing to Tenant) (and ☐ if checked, rent may be paid personally, between the hours of _____ and _____ on the following days _____ ).
      **(3)** If any payment is returned for non-sufficient funds ("NSF") or because tenant stops payment, then, after that: (i) Landlord may, in writing, require Tenant to pay Rent in cash for three months and (ii) all future Rent shall be paid by ☒ money order, or ☒ cashier's check.
   E. Rent payments received by Landlord shall be applied to the earliest amount(s) due or past due.

4. **SECURITY DEPOSIT:**
   A. Tenant agrees to pay $**2,000.00** _____ as a security deposit. Security deposit will be ☒ transferred to and held by the Owner of the Premises, or ☐ held in Owner's Broker's trust account.
   B. All or any portion of the security deposit may be used, as reasonably necessary, to: **(i)** cure Tenant's default in payment of Rent (which includes Late Charges, NSF fees or other sums due); **(ii)** repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest, invitee or licensee of Tenant; **(iii)** clean Premises, if necessary, upon termination of the tenancy; and **(iv)** replace or return personal property or appurtenances. SECURITY DEPOSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT. If all or any portion of the security deposit is used during the tenancy, Tenant agrees to reinstate the total security deposit within five days after written notice is delivered to Tenant. Within 21 days after Tenant vacates the Premises, Landlord shall: **(1)** furnish Tenant an itemized statement indicating the amount of any security deposit received and the basis for its disposition and supporting documentation as required by California Civil Code § 1950.5(g); and **(2)** return any remaining portion of the security deposit to Tenant.
   C. Security deposit will not be returned until all Tenants have vacated the Premises and all keys returned. Any security deposit returned by check shall be made out to all Tenants named on this Agreement, or as subsequently modified.
   D. No interest will be paid on security deposit unless required by local law.
   E. If the security deposit is held by Owner, Tenant agrees not to hold Broker responsible for its return. If the security deposit is held in Owner's Broker's trust account, **and** Broker's authority is terminated before expiration of this Agreement, **and** security deposit is released to someone other than Tenant, **then** Broker shall notify Tenant, in writing, where and to whom security deposit has been released. Once Tenant has been provided such notice, Tenant agrees not to hold Broker responsible for the security deposit.

Tenant's Initials X(_____) X(_____)                                   Landlord's Initials X(_____) (_____)

© 2018, California Association of REALTORS®, Inc.
**LR REVISED 6/18 (PAGE 1 OF 8)**
**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 1 OF 8)**

Realty ONE Group United, 22939 Hawthorne Blvd Torrance, CA 90505                    Phone: (310)465-9231        Fax:              228 Atlantic Ave
Jasmine Hudani                    Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

Premises: 228 Atlantic Avenue, Long Beach, CA 90802

**5. MOVE-IN COSTS RECEIVED/DUE:** Move-in funds shall be paid by ☐ personal check, ☐ money order, or ☐ cashier's check, ☒ wire/ electronic transfer.

| Category | Total Due | Payment Received | Balance Due | Date Due | Payable To |
|---|---|---|---|---|---|
| Rent from  *09/01/2018* | | | | | |
| to  *09/30/2018*  (date) | $1,800.00 | | $1,800.00 | 09/01/2018 | *Altaf Hudani* |
| *Security Deposit | $2,000.00 | | $2,000.00 | 09/01/2018 | *Altaf Hudani* |
| Other *Last Months Rent* | $1,800.00 | | $1,800.00 | 09/01/2018 | *Altaf Hudani* |
| Other *Broker Fee* | $750.00 | | $750.00 | 09/01/2018 | *Altaf Hudani* |
| Total | $6,350.00 | | $6,350.00 | 09/01/2018 | |

*The maximum amount of security deposit, however designated, cannot exceed two months' Rent for an unfurnished premises, or three months' Rent for a furnished premises.

**6. LATE CHARGE; RETURNED CHECKS:**
   A. Tenant acknowledges either late payment of Rent or issuance of a returned check may cause Landlord to incur costs and expenses, the exact amounts of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Landlord. If any installment of Rent due from Tenant is not received by Landlord within **5 (or** ☐ _____ ) **calendar days** after the date due, or if a check is returned, Tenant shall pay to Landlord, respectively, an additional sum of $_____ or __**10.000**__ % of the Rent due as a Late Charge and $25.00 as a NSF fee for the first returned check and $35.00 as a NSF fee for each additional returned check, either or both of which shall be deemed additional Rent.
   B. Landlord and Tenant agree that these charges represent a fair and reasonable estimate of the costs Landlord may incur by reason of Tenant's late or NSF payment. Any Late Charge or NSF fee due shall be paid with the current installment of Rent. Landlord's acceptance of any Late Charge or NSF fee shall not constitute a waiver as to any default of Tenant. Landlord's right to collect a Late Charge or NSF fee shall neither be deemed an extension of the date Rent is due under paragraph 3 nor prevent Landlord from exercising any other rights and remedies under this Agreement and as provided by law.

**7. PARKING: (Check A or B)**
   ☒ A. Parking is permitted as follows: __*One Parking Spot in the Front of the Condo*__ _____

   The right to parking ☒ is ☐ is not included in the Rent charged pursuant to paragraph 3. If not included in the Rent, the parking rental fee shall be an additional $_____ per month. Parking space(s) are to be used only for parking properly registered and operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked on the Premises. Mechanical work, or storage of inoperable vehicles, or storage of any kind is not permitted in parking space(s) or elsewhere on the Premises except as specified in paragraph 8.
   OR☐ B. Parking is not permitted on the real property of which the Premises is a part.

**8. STORAGE: (Check A or B)**
   ☐ A. Storage is permitted as follows:
   The right to separate storage space ☐ is, ☐ is not, included in the Rent charged pursuant to paragraph 3. If not included in the Rent, storage space fee shall be an additional $_____ per month. Tenant shall store only personal property Tenant owns, and shall not store property claimed by another or in which another has any right, title or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances.
   OR☒ B. Except for Tenant's personal property, contained entirely within the Premises, storage is not permitted on the Premises.

**9. UTILITIES:** Tenant agrees to pay for all utilities and services, and the following charges: _____ except _____ , which shall be paid for by Landlord. If any utilities are not separately metered, Tenant shall pay Tenant's proportional share, as reasonably determined and directed by Landlord. If utilities are separately metered, Tenant shall place utilities in Tenant's name as of the Commencement Date. Landlord is only responsible for installing and maintaining one usable telephone jack and one telephone line to the Premises. Tenant shall pay any cost for conversion from existing utilities service provider.
   ☐ A. **Water Submeters:** Water use on the Premises is measured by a submeter and Tenant will be separately billed for water usage based on the submeter. See attached Water Submeter Addendum (C.A.R. Form WSM) for additional terms.
   ☒ B. **Gas Meter:** The Premises does not have a separate gas meter.
   ☒ C. **Electric Meter:** The Premises does not have a separate electrical meter.

**10. CONDITION OF PREMISES:** Tenant has examined Premises and, if any, all furniture, furnishings, appliances, landscaping and fixtures, including smoke alarm(s) and carbon monoxide detector(s).
   **(Check all that apply:)**
   ☒ A. Tenant acknowledges these items are clean and in operable condition, with the following exceptions: _____

   ☐ B. Tenant's acknowledgment of the condition of these items is contained in an attached statement of condition (C.A.R. Form MIMO).
   ☒ C. (i) Landlord will Deliver to Tenant a statement of condition (C.A.R. Form MIMO) ☒ within **3 days** after execution of this Agreement; ☐ prior to the Commencement Date; ☐ within **3 days** after the Commencement Date.
   (ii) Tenant shall complete and return the MIMO to Landlord within **3 (or** ☐ _____ ) **days** after Delivery. Tenant's failure to return the MIMO within that time shall conclusively be deemed Tenant's Acknowledgement of the condition as stated in the MIMO.

Tenant's Initials X(_____) X(_____)          Landlord's Initials X(_____) (_____)

**LR REVISED 6/18 (PAGE 2 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 2 OF 8)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com          228 Atlantic Ave

Premises: 228 Atlantic Avenue, Long Beach, CA 90802

☒ **D.** Tenant will provide Landlord a list of items that are damaged or not in operable condition within 3 (or ☐ _____ ) days after Commencement Date, not as a contingency of this Agreement but rather as an acknowledgement of the condition of the Premises.

☐ **E.** Other: _____

## 11. MAINTENANCE USE AND REPORTING:

**A.** Tenant shall properly use, operate and safeguard Premises, including if applicable, any landscaping, furniture, furnishings and appliances, and all mechanical, electrical, gas and plumbing fixtures, carbon monoxide detector(s) and smoke alarms, and keep them and the Premises clean, sanitary and well ventilated. Tenant shall be responsible for checking and maintaining all carbon monoxide detectors and any additional phone lines beyond the one line and jack that Landlord shall provide and maintain. Tenant shall replace any burned out or malfunctioning light bulbs. Tenant shall immediately notify Landlord, in writing, of any problem, malfunction or damage with any item including carbon monoxide detector(s) and smoke alarms on the property. Tenant shall be charged for all repairs or replacements caused by Tenant, pets, guests or licensees of Tenant, excluding ordinary wear and tear. Tenant shall be charged for all damage to Premises as a result of failure to report a problem in a timely manner. Tenant shall be charged for repair of drain blockages or stoppages, unless caused by defective plumbing parts or tree roots invading sewer lines.

**B.** ☐ Landlord ☒ Tenant shall water the garden, landscaping, trees and shrubs, except: _____.

**C.** ☐ Landlord ☒ Tenant shall maintain the garden, landscaping, trees and shrubs, except: _____.

**D.** ☐ Landlord ☐ Tenant shall maintain _____.

**E.** Landlord and Tenant agree that State or local water use restrictions shall supersede any obligation of Landlord or Tenant to water or maintain any garden, landscaping, trees or shrubs pursuant to 11B, 11C, and 11D.

**F.** Tenant's failure to maintain any item for which Tenant is responsible shall give Landlord the right to hire someone to perform such maintenance and charge Tenant to cover the cost of such maintenance.

**G.** The following items of personal property are included in the Premises without warranty and Landlord will not maintain, repair or replace them: _____.

**H.** Tenant understands that if Premises is located in a Common Interest Development, Landlord may not have authority or control over certain parts of the Premises such as roof, electrical, gas or plumbing features inside certain walls, and common areas such as shared parking structure or garage.

**I.** Tenant shall not use the premises to plant, grow, cultivate or sell marijuana.

## 12. NEIGHBORHOOD CONDITIONS:
Tenant is advised to satisfy himself or herself as to neighborhood or area conditions, including, but not limited to, schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered felons or offenders, fire protection, other governmental services, availability, adequacy and cost of any wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Tenant.

## 13. PETS:
Unless otherwise provided in California Civil Code §54.2, or other law, no animal or pet shall be kept on or about the Premises without Landlord's prior written consent, ☒ except as agreed to in the attached Pet Addendum (C.A.R. Form PET).

## 14. SMOKING:

**A.** (i) Tenant is responsible for all damage caused by smoking including, but not limited to stains, burns, odors and removal of debris; (ii) Tenant acknowledges that in order to remove odor caused by smoking, Landlord may need to replace carpet and drapes and paint the entire premises regardless of when these items were last cleaned, replaced or repainted. Such actions and other necessary steps will impact the return of any security deposit.

**B.** The Premises or common areas may be subject to a local non-smoking ordinance.

**C.** NO SMOKING of any substance is allowed on the Premises or common areas. If smoking does occur on the Premises or common areas, (i) Tenant is in material breach of this Agreement; (ii) Tenant, guests, and all others may be required to leave the Premises. ☐ Smoking of the following substances only is allowed: _____.

## 15. RULES/REGULATIONS:

**A.** Tenant agrees to comply with all Landlord rules and regulations that are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests, invitees, and licensees of Tenant shall not, disturb, annoy, endanger or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, under federal, state, or local law including, but not limited to, using, manufacturing, selling, storing or transporting illicit drugs or other contraband, or violate any law or ordinance, or commit a waste or nuisance on or about the Premises.

**B.** (If applicable, check one)

☐ **1.** Landlord shall provide Tenant with a copy of the rules and regulations within _____ days or _____.

**OR** ☐ **2.** Tenant has been provided with, and acknowledges receipt of, a copy of the rules and regulations.

Tenant's Initials X(_____) X(_____)         Landlord's Initials X( AH ) (_____)

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 3 OF 8)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com         228 Atlantic Ave

16. ☐ (If checked) **CONDOMINIUM; PLANNED UNIT DEVELOPMENT:**

A. The Premises are a unit in a condominium, planned unit development, common interest subdivision or other development governed by a homeowners' association ("HOA"). The name of the HOA is _____. Tenant agrees to comply with all HOA covenants, conditions and restrictions, bylaws, rules and regulations and decisions ("HOA Rules"). Tenant shall reimburse Landlord for any fines or charges imposed by HOA or other authorities, due to any violation by Tenant, or the guests or licensees of Tenant or Landlord shall have the right to deduct such amounts from the security deposit.

B. If applicable, Tenant is required to pay a fee to the HOA to gain access to certain areas within the development such as but not necessarily including or limited to the front gate, pool, and recreational facilities. If not specified in paragraph 5, Tenant is solely responsible for payment and satisfying any HOA requirements prior to or upon or after the Commencement Date.

C. **(Check one)**
   ☐ 1.  Landlord shall provide Tenant with a copy of the HOA Rules within _____ days
   or
   OR ☐ 2.  Tenant has been provided with, and acknowledges receipt of, a copy of the HOA Rules.

17. **ALTERATIONS; REPAIRS:** Unless otherwise specified by law or paragraph 25C, without Landlord's prior written consent, (i) Tenant shall not make any repairs, alterations or improvements in or about the Premises including: painting, wallpapering, adding or changing locks, installing antenna or satellite dish(es), placing signs, displays or exhibits, or using screws, fastening devices, large nails or adhesive materials; (ii) Landlord shall not be responsible for the costs of alterations or repairs made by Tenant; (iii) Tenant shall not deduct from Rent the costs of any repairs, alterations or improvements; and (iv) any deduction made by Tenant shall be considered unpaid Rent.

18. **KEYS; LOCKS:**

A. Tenant acknowledges receipt of (or Tenant will receive ☐ prior to the Commencement Date, or ☒ *September 1st* ):
   ☒ **2** key(s) to Premises,
   ☐ _____ key(s) to mailbox,
   ☐ _____ key(s) to common area(s),
   ☐ _____ remote control device(s) for garage door/gate opener(s),
   *1 Keys for parking gate* _____,
   _____ ,

B. Tenant acknowledges that locks to the Premises ☐ have, ☒ have not, been re-keyed.

C. If Tenant re-keys existing locks or opening devices, Tenant shall immediately deliver copies of all keys to Landlord. Tenant shall pay all costs and charges related to loss of any keys or opening devices. Tenant may not remove locks, even if installed by Tenant.

19. **ENTRY:**

A. Tenant shall make Premises available to Landlord or Landlord's representative for the purpose of entering to make necessary or agreed repairs (including, but not limited to, installing, repairing, testing, and maintaining smoke detectors and carbon monoxide devices, and bracing, anchoring or strapping water heaters, or repairing dilapidation relating to the presence of mold); providing decorations, alterations, or improvements, or supplying necessary or agreed services; or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, contractors and others (collectively "Interested Persons"). Tenant agrees that Landlord, Broker and Interested Persons may take photos of the Premises.

B. Landlord and Tenant agree that 24-hour written notice shall be reasonable and sufficient notice, except as follows: (1) 48-hour written notice is required to conduct an inspection of the Premises prior to the Tenant moving out, unless the Tenant waives the right to such notice. (2) If Landlord has in writing informed Tenant that the Premises are for sale and that Tenant will be notified orally to show the premises (C.A.R. Form NSE), then, for the next 120 days following the delivery of the NSE, notice may be given orally to show the Premises to actual or prospective purchasers. (3) No written notice is required if Landlord and Tenant orally agree to an entry for agreed services or repairs if the date and time of entry are within one week of the oral agreement. (4) No notice is required: (i) to enter in case of an emergency; (ii) if the Tenant is present and consents at the time of entry; or (iii) if the Tenant has abandoned or surrendered the Premises.

C. ☐ (If checked) Tenant authorizes the use of a keysafe/lockbox to allow entry into the Premises and agrees to sign a keysafe/lockbox addendum (C.A.R. Form KLA).

20. **PHOTOGRAPHS AND INTERNET ADVERTISING:**

A. In order to effectively market the Premises for sale or rental it is often necessary to provide photographs, virtual tours and other media to Interested Persons. Tenant agrees that Broker may photograph or otherwise electronically capture images of the exterior and interior of the Premises ("Images") for static and/or virtual tours of the Premises by Interested Persons for use on Broker's website, the MLS, and other marketing materials and sites. Tenant acknowledges that once Images are placed on the Internet neither Broker nor Landlord has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet.

B. Tenant acknowledges that prospective Interested Persons coming onto the Premises may take photographs, videos or other images of the Premises. Tenant understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Landlord have control over who views such Images nor what use viewers may make of the Images.

21. **SIGNS:** Tenant authorizes Landlord to place FOR SALE/LEASE signs on the Premises.

22. **ASSIGNMENT; SUBLETTING: A.** Tenant shall not sublet all or any part of Premises, or parking or storage spaces, or assign or transfer this Agreement or any interest in it, without Landlord's prior written consent. Unless such consent is obtained, any assignment, transfer or subletting of Premises or this Agreement or tenancy, by voluntary act of Tenant, operation of law or otherwise, shall, at the option of Landlord, terminate this Agreement. Any proposed assignee, transferee or sublessee shall submit to Landlord an application and credit information for Landlord's approval and, if approved, sign a separate written agreement with Landlord and Tenant. Landlord's consent to any one assignment, transfer or sublease, shall not be construed as consent to any subsequent assignment, transfer or sublease and does not release Tenant of Tenant's obligations under this Agreement. **B.** This prohibition also applies ( ☐ does not apply) to short term, vacation, and transient rentals such as, but not limited to, those arranged through AirBnB, VRBO, HomeAway or other short term rental services. **C.** Any violation of this prohibition is a non-curable, material breach of this Agreement. *A.H.*

Tenant's Initials X(_____) X(_____)          Landlord's Initials X(_____) (_____)

LR REVISED 6/18 **(PAGE 4 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 4 OF 8)**

**23. JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this Agreement, jointly with every other Tenant, and individually, whether or not in possession.

**24. POSSESSION:**

**A. (1)** Tenant is not in possession of the Premises. If Landlord is unable to deliver possession of Premises on Commencement Date, such Date shall be extended to the date on which possession is made available to Tenant. If Landlord is unable to deliver possession within **5 (or** ☐ _____ **) calendar days** after agreed Commencement Date, Tenant may terminate this Agreement by giving written notice to Landlord, and shall be refunded all Rent and security deposit paid.

**or (2)** Possession is deemed terminated when Tenant has returned all keys to the Premises to Landlord.

**B.** ☐ Tenant is already in possession of the Premises.

**25. TENANT'S OBLIGATIONS UPON VACATING PREMISES:**

**A.** Upon termination of this Agreement, Tenant shall: **(i)** give Landlord all copies of all keys and any opening devices to Premises, including any common areas; **(ii)** vacate and surrender Premises to Landlord, empty of all persons; and personal property belonging to Tenant **(iii)** vacate any/all parking and/or storage space; **(iv)** clean and deliver Premises, as specified in paragraph C below, to Landlord in the same condition as referenced in paragraph 10; **(v)** remove all debris; **(vi)** give written notice to Landlord of Tenant's forwarding address; and **(vii)** _____ .

**B.** All alterations/improvements made by or caused to be made by Tenant, with or without Landlord's consent, become the property of Landlord upon termination. Landlord may charge Tenant for restoration of the Premises to the condition it was in prior to any alterations/improvements.

**C. Right to Pre-Move-Out Inspection and Repairs: (i)** After giving or receiving notice of termination of a tenancy (C.A.R. Form NTT), or before the expiration of this Agreement, Tenant has the right to request that an inspection of the Premises take place prior to termination of the lease or rental (C.A.R. Form NRI). If Tenant requests such an inspection, Tenant shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Agreement. **(ii)** Any repairs or alterations made to the Premises as a result of this inspection (collectively, "Repairs") shall be made at Tenant's expense. Repairs may be performed by Tenant or through others, who have adequate insurance and licenses and are approved by Landlord. The work shall comply with applicable law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. **(iii)** Tenant shall: **(a)** obtain receipts for Repairs performed by others; **(b)** prepare a written statement indicating the Repairs performed by Tenant and the date of such Repairs; and **(c)** provide copies of receipts and statements to Landlord prior to termination. Paragraph 25C does not apply when the tenancy is terminated pursuant to California Code of Civil Procedure § 1161(2), (3), or (4).

**26. BREACH OF CONTRACT; EARLY TERMINATION:** In addition to any obligations established by paragraph 25, in the event of termination by Tenant prior to completion of the original term of the Agreement, Tenant shall also be responsible for lost Rent, rental commissions, advertising expenses and painting costs necessary to ready Premises for re-rental. Landlord may withhold any such amounts from Tenant's security deposit.

**27. TEMPORARY RELOCATION:** Subject to local law, Tenant agrees, upon demand of Landlord, to temporarily vacate Premises for a reasonable period, to allow for fumigation (or other methods) to control wood destroying pests or organisms, or other repairs to Premises. Tenant agrees to comply with all instructions and requirements necessary to prepare Premises to accommodate pest control, fumigation or other work, including bagging or storage of food and medicine, and removal of perishables and valuables. Tenant shall only be entitled to a credit of Rent equal to the per diem Rent for the period of time Tenant is required to vacate Premises.

**28. DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render Premises totally or partially uninhabitable, either Landlord or Tenant may terminate this Agreement by giving the other written notice. Rent shall be abated as of the date Premises become totally or partially uninhabitable. The abated amount shall be the current monthly Rent prorated on a 30-day period. If the Agreement is not terminated, Landlord shall promptly repair the damage, and Rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of Premises. If damage occurs as a result of an act of Tenant or Tenant's guests, only Landlord shall have the right of termination, and no reduction in Rent shall be made.

**29. INSURANCE: A.** Tenant's, guest's, invitees or licensee's personal property and vehicles are not insured by Landlord, manager or, if applicable, HOA, against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. **Tenant is advised to carry Tenant's own insurance (renter's insurance) to protect Tenant from any such loss or damage. B.** Tenant shall comply with any requirement imposed on Tenant by Landlord's insurer to avoid: **(i)** an increase in Landlord's insurance premium (or Tenant shall pay for the increase in premium); or **(ii)** loss of insurance. **C.** ☒ Tenant shall obtain liability insurance, in an amount not less than $**100,000.00**_____ , naming Landlord and, if applicable, Property Manager as additional insured for injury or damage to, or upon, the Premises during the term of this agreement or any extension. Tenant shall provide Landlord a copy of the insurance policy before commencement of this Agreement, and a rider prior to any renewal.

**30. WATERBEDS/PORTABLE WASHERS:** Tenant shall not use or have waterbeds on the Premises unless: **(i)** Tenant obtains a valid waterbed insurance policy; **(ii)** Tenant increases the security deposit in an amount equal to one-half of one month's Rent; and **(iii)** the bed conforms to the floor load capacity of Premises. Tenant shall not use on the Premises ☐ Portable Dishwasher ☐ Portable Washing Machine.

**31. WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same or any subsequent breach.

Tenant's Initials X(_____) X(_____)     Landlord's Initials X(_____) (_____)

LR REVISED 6/18 (PAGE 5 OF 8)

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 5 OF 8)**



**32. NOTICE:** Notices may be served at the following address, or at any other location subsequently designated:

Landlord: *15052 Springdale Street, Suite E,*
*Huntington Beach, CA, 92649*

Tenant: *Patrick Benjamin Nash, Ryan Paul Nash*
*228 Atlantic Avenue, Long Beach, CA, 90802*

**33. TENANT ESTOPPEL CERTIFICATE:** Tenant shall execute and return a tenant estoppel certificate delivered to Tenant by Landlord or Landlord's agent within **3 days** after its receipt (C.A.R. Form TEC). Failure to comply with this requirement shall be deemed Tenant's acknowledgment that the tenant estoppel certificate is true and correct, and may be relied upon by a lender or purchaser.

**34. REPRESENTATION**

**A. TENANT REPRESENTATION; OBLIGATIONS REGARDING OCCUPANTS; CREDIT:** Tenant warrants that all statements in Tenant's rental application are accurate. Landlord requires all occupants 18 years of age or older and all emancipated minors to complete a lease rental application. Tenant acknowledges this requirement and agrees to notify Landlord when any occupant of the Premises reaches the age of 18 or becomes an emancipated minor. Tenant authorizes Landlord and Broker(s) to obtain Tenant's credit report periodically during the tenancy in connection with the modification or enforcement of this Agreement. Landlord may cancel this Agreement: **(i)** before occupancy begins; upon disapproval of the credit report(s), or upon discovering that information in Tenant's application is false; **(ii)** After commencement date, upon disapproval of an updated credit report or upon discovering that information in Tenant's application is no longer true. A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency if Tenant fails to fulfill the terms of payment and other obligations under this Agreement.

**B. LANDLORD REPRESENTATIONS:** Landlord warrants that, unless otherwise specified in writing, Landlord is unaware of **(i)** any recorded Notices of Default affecting the Premise; **(ii)** any delinquent amounts due under any loan secured by the Premises; and **(iii)** any bankruptcy proceeding affecting the Premises.

**35. MEDIATION:**

**A.** Consistent with paragraphs B and C below, Landlord and Tenant agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action.

**B.** The following matters are excluded from mediation: **(i)** an unlawful detainer action; **(ii)** the filing or enforcement of a mechanic's lien; and **(iii)** any matter within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation provision.

**C.** Landlord and Tenant agree to mediate disputes or claims involving Listing Agent, Leasing Agent or property manager ("Broker"), provided Broker shall have agreed to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to such Broker. Any election by Broker to participate in mediation shall not result in Broker being deemed a party to this Agreement.

**36. ATTORNEY FEES:** In any action or proceeding arising out of this Agreement, the prevailing party between Landlord and Tenant shall be entitled to reasonable attorney fees and costs, collectively not to exceed $1,000 (or $_____ ), except as provided in paragraph 35A.

**37. C.A.R. FORM:** C.A.R. Form means the specific form referenced or another comparable form agreed to by the parties.

**38. STATUTORY DISCLOSURES:**

**A.** ☒ **LEAD-BASED PAINT (If checked):** Premises was constructed prior to 1978. In accordance with federal law, Landlord gives and Tenant acknowledges receipt of the disclosures on the attached form (C.A.R. Form FLD) and a federally approved lead pamphlet.

**B. PERIODIC PEST CONTROL (CHECK IF EITHER APPLIES):**

**1.** ☐ Landlord has entered into a contract for periodic pest control treatment of the Premises and shall give Tenant a copy of the notice originally given to Landlord by the pest control company.

**2.** ☐ Premises is a house. Tenant is responsible for periodic pest control treatment.

**C.** ☐ **METHAMPHETAMINE CONTAMINATION:** Prior to signing this Agreement, Landlord has given Tenant a notice that a health official has issued an order prohibiting occupancy of the property because of methamphetamine contamination. A copy of the notice and order are attached.

**D. BED BUGS:** Landlord has no knowledge of any infestation in the Premises by bed bugs. See attached Bed Bug Disclosure (C.A.R. Form BBD) for further information. Tenant shall report suspected bed bug infestation to Landlord or, if applicable, property manager and cooperate with any inspection for and treatment of bed bugs. Landlord will notify tenants of any units infested by bed bugs.

**E. MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Landlord nor Brokers, if any, are required to check this website. If Tenant wants further information, Tenant should obtain information directly from this website.)

**F.** ☐ **RESIDENTIAL ENVIRONMENTAL HAZARDS BOOKLET:** Tenant acknowledges receipt of the residential environmental hazards booklet.

**G.** ☐ **MILITARY ORDNANCE DISCLOSURE:** (If applicable and known to Landlord) Premises are located within one mile of an area once used for military training, and may contain potentially explosive munitions.

**H. FLOOD HAZARD DISCLOSURE:** Flooding has the potential to cause significant damage to personal property owned by Tenant. See attached Tenant Flood Hazard Disclosure (C.A.R. Form TFHD) for additional information. *AH*

Tenant's Initials X(_____) X(_____)          Landlord's Initials X(_____) (_____)

LR REVISED 6/18 **(PAGE 6 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 6 OF 8)**

Premises: *228 Atlantic Avenue, Long Beach, CA  90802*                                      Date: *09/01/2018*

**39. TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing. This Agreement is subject to California landlord-tenant law and shall incorporate all changes required by amendment or successors to such law. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

**40. AGENCY:**
   **A. CONFIRMATION:** The following agency relationship(s) are hereby confirmed for this transaction:
   Listing Agent: (Print firm name) _____ *Realty One Group United*
   is the agent of (check one): [X] the Landlord exclusively; or [ ] both the Landlord and Tenant.
   Leasing Agent: (Print firm name) _____ *Keller Williams Pacific Estates*
   (if not same as Listing Agent) is the agent of (check one): [X] the Tenant exclusively; or [ ] the Landlord exclusively; or [ ] both the Tenant and Landlord.
   **B. DISCLOSURE:** [ ] (If checked): The term of this Agreement exceeds one year. A disclosure regarding real estate agency relationships (C.A.R. Form AD) has been provided to Landlord and Tenant, who each acknowledge its receipt.

**41.** [ ] **TENANT COMPENSATION TO BROKER:** Upon execution of this Agreement, Tenant agrees to pay compensation to Broker as specified in a separate written agreement between Tenant and Broker.

**42. NOTICE OF RIGHT TO RECEIVE FOREIGN LANGUAGE TRANSLATION OF LEASE/RENTAL AGREEMENTS:** California Civil Code requires a landlord or property manager to provide a tenant with a foreign language translation copy of a lease or rental agreement if the agreement was negotiated primarily in Spanish, Chinese, Korean, Tagalog or Vietnamese. If applicable, every term of the lease/rental needs to be translated except for, among others, names, dollar amounts and dates written as numerals, and words with no generally accepted non-English translation.

**43. OWNER COMPENSATION TO BROKER:** Upon execution of this Agreement, Owner agrees to pay compensation to Broker as specified in a separate written agreement between Owner and Broker (C.A.R. Form LL or LCA).

**44. RECEIPT:** If specified in paragraph 5, Landlord or Broker, acknowledges receipt of move-in funds.

**45. OTHER TERMS AND CONDITIONS;** If checked, the following ATTACHED documents are incorporated in this Agreement:
   [ ] Keysafe/Lockbox Addendum (C.A.R. Form KLA); [X] Lead-Based Paint and Lead-Based Paint Hazards Disclosure (C.A.R. Form FLD);
   [X] Lease/Rental Mold and Ventilation Addendum (C.A.R. Form LRM); [ ] Landlord in Default Addendum (C.A.R. Form LID)
   [X] Bed Bug Disclosure (C.A.R. Form BBD); [X] Tenant Flood Hazard Disclosure (C.A.R. Form TFHD) _____
   Other: _____

**46. REPRESENTATIVE CAPACITY:** If one or more Parties is signing this Agreement in a representative capacity and not for him/herself as an individual then that Party shall so indicate in paragraph 49 or 50 and attach a Representative Capacity Signature Disclosure (C.A.R. Form RCSD). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Party acting in a representative capacity (i) represents that the entity for which that party is acting already exists and (ii) shall Deliver to the other Party and Escrow Holder, within 3 Days After Acceptance, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code §18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

Landlord and Tenant acknowledge and agree Brokers: **(a)** do not guarantee the condition of the Premises; **(b)** cannot verify representations made by others; **(c)** cannot provide legal or tax advice; **(d)** will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Landlord in this Agreement, Brokers: **(e)** do not decide what rental rate a Tenant should pay or Landlord should accept; and **(f)** do not decide upon the length or other terms of this Agreement. Landlord and Tenant agree that they will seek legal, tax, insurance and other desired assistance from appropriate professionals.

**47.** [ ] **INTERPRETER/TRANSLATOR:** The terms of this Agreement have been interpreted for Tenant into the following language: _____ . Landlord and Tenant acknowledge receipt of the attached interpreter/translator agreement (C.A.R. Form ITA).

**48.** The Premises is being managed by Owner, (or, if checked):
   [ ] Listing firm in box below     [ ] Leasing firm in box below     [ ] Property Management firm immediately below

Real Estate Broker (Property Manager) _____ DRE Lic # _____

By (Agent) _____ DRE Lic # _____

Address _____ Telephone # _____

Tenant's Initials X(_____) X(_____)                      Landlord's Initials X(_____) (_____)

**LR REVISED 6/18 (PAGE 7 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 7 OF 8)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          228 Atlantic Ave

Premises: *228 Atlantic Avenue, Long Beach, CA  90802*                                                      Date: *09/01/2018*

**49. Tenant agrees to rent the Premises on the above terms and conditions.**
☐ One or more Tenants is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (For Tenant Representative) (C.A.R. Form RCSD-T) for additional terms.

Tenant X _____    Date _____
Print Name *Patrick Benjamin Nash* _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____
Tenant X _____    Date _____
Print Name *Ryan Paul Nash* _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA)

☐ **GUARANTEE:** In consideration of the execution of this Agreement by and between Landlord and Tenant and for valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Guarantor") does hereby: **(i)** guarantee unconditionally to Landlord and Landlord's agents, successors and assigns, the prompt payment of Rent or other sums that become due pursuant to this Agreement, including any and all court costs and attorney fees included in enforcing the Agreement; **(ii)** consent to any changes, modifications or alterations of any term in this Agreement agreed to by Landlord and Tenant; and **(iii)** waive any right to require Landlord and/or Landlord's agents to proceed against Tenant for any default occurring under this Agreement before seeking to enforce this Guarantee.

Guarantor (Print Name) _____
Guarantor _____    Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

**50. Landlord (owner or ☐ agent for owner) agrees to rent the Premises on the above terms and conditions.**
☐ One or more Landlords is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (For Landlord Representative) (C.A.R. Form RCSD-LL) for additional terms.

Landlord X *Altaf Hudani* _____ Date _____ Landlord _____ Date _____
                    **Altaf Hudani**                          *8/28/2018  3:20:39 PM PDT*
Address *15052 Springdale St, Huntington Beach, CA  92649* _____
Telephone *(310)999-1039* _____ Fax _____ E-mail *altafhudani@hotmail.com* _____

---

**REAL ESTATE BROKERS:**
**A.** Real estate brokers who are not also Landlord under this Agreement are not parties to the Agreement between Landlord and Tenant.
**B.** Agency relationships are confirmed in paragraph 40.
**C.** **COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker (Leasing Firm) and Cooperating Broker agrees to accept: **(i)** the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Property is offered for sale or lease or a reciprocal MLS; or **(ii)** ☐ (if checked) the amount specified in a separate written agreement between Listing Broker and Cooperating Broker.

Real Estate Broker (Leasing Firm) *Keller Williams Pacific Estates* _____ DRE Lic. # *01430290*
By (Agent) _____ *Esther J Chun* DRE Lic. # *01974491*    Date _____
Address *2883 E Spring St* _____ City *Long Beach* _____ State *CA*   Zip *90806-2467*
Telephone _____ Fax _____ E-mail *EstherJChun@kw.com* _____

Real Estate Broker (Listing Firm) *Realty One Group United* _____ DRE Lic. # *01828350*
By (Agent) _____ *Jasmine M Hudani* DRE Lic. # *02058953*    Date *7/28/2018  3:20:3*
Address *22939 Hawthorne Blvd* _____ City *Torrance* _____ State *CA*   Zip *90505-3680*
Telephone *(310)465-9231* _____ Fax _____ E-mail *jasminehudani729@gmail.com* _____

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



**LR REVISED 6/18 (PAGE 8 OF 8)**